No. 24-40248

# In the United States Court of Appeals for the Fifth Circuit

M. D., BY NEXT FRIEND SARAH R. STUKENBERG; D. I., BY NEXT FRIEND NANCY G. POFAHL; Z. H., BY NEXT FRIEND CARLA B. MORRISON; S. A., BY NEXT FRIEND JAVIER SOLIS; A. M., BY NEXT FRIEND JENNIFER TALLEY; J. S., BY NEXT FRIEND ANNA J. RICKER; K. E., AS NEXT FRIEND JOHN W. CLIFF, JR.; M. R., AS NEXT FRIEND BOBBIE M. YOUNG; J. R., AS NEXT FRIEND BOBBIE M. YOUNG; H. V., BY NEXT FRIEND ANNA J. RICKER; P. O., AS NEXT FRIEND ANNA J. RICKER; L. H., AS NEXT FRIEND ESTELA C. VASQUEZ; C. H.; S. R., AS NEXT FRIEND BOBBIE M. YOUNG; S. S., AS NEXT FRIEND ESTELA C. VASQUEZ; A. R., AS NEXT FRIEND TOM MCKENZIE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs-Appellees

*v.*

GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF TEXAS; CECILE ERWIN YOUNG, IN HER OFFICIAL CAPACITY AS EXECUTIVE COMMISSIONER OF THE HEALTH AND HUMAN SERVICES COMMISSION OF THE STATE OF TEXAS; STEPHANIE MUTH, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,

Defendants-Appellants

On Appeal from the United States District Court, Southern District of Texas, Corpus Christi Division, No. 2:11-cv-00084
Hon. Janis Graham Jack, Judge Presiding

## PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION TO DEFENDANTS' EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND STAY PENDING APPEAL

Stephen Dixon
CHILDREN'S RIGHTS
88 Pine Street
New York, New York 10005
(212) 683-2210
sdixon@childrensrights.org

R. Paul Yetter
Christian J. Ward
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
pyetter@yettercoleman.com
cward@yettercoleman.com

**Attorneys for Plaintiffs-Appellees**

## Certificate of Interested Persons

No. 24-40248

M. D., by next friend Sarah R. Stukenberg; D. I., by next friend Nancy G. Pofahl; Z. H., by next friend Carla B. Morrison; S. A., by next friend Javier Solis; A. M., by next friend Jennifer Talley; J. S., by next friend Anna J. Ricker; K. E., as next friend John W. Cliff, Jr.; M. R., as next friend Bobbie M. Young; J. R., as next friend Bobbie M. Young; H. V., by next friend Anna J. Ricker; P. O., as next friend Anna J. Ricker; L. H., as next friend Estela C. Vasquez; C. H.; S. R., as next friend Bobbie M. Young; S. S., as next friend Estela C. Vasquez; A. R., as next friend Tom McKenzie, individually and on behalf of all others similarly situated,

Plaintiffs-Appellees

*v.*

Greg Abbott, in his official capacity as Governor of the State of Texas; Cecile Erwin Young, in her official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas; Stephanie Muth, in her official capacity as Commissioner of Texas Department of Family and Protective Services,

Defendants-Appellants

The undersigned counsel of record certifies the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate their possible recusal or disqualification:

Counsel who will represent Plaintiffs-Appellees in the Fifth Circuit are:

R. Paul Yetter
pyetter@yettercoleman.com
Christian J. Ward
cward@yettercoleman.com
Yetter Coleman LLP
811 Main Street, Suite 4100

Houston, Texas 77002
(713) 632-8000

Samantha Bartosz
sbartosz@childrensrights.org
Stephen Dixon
sdixon@childrensrights.org
CHILDREN'S RIGHTS
88 Pine Street
New York, New York 10005
(212) 683-2210

Marcia Robinson Lowry
mlowry@abetterchildhood.org
Laura Welikson
lwelikson@abetterchildhood.org
David Baloche
dbaloche@abetterchildhood.org
A BETTER CHILDHOOD, INC.
355 Lexington Avenue, Floor 16
New York, New York 10017
(646) 795-4456

Counsel who represented Plaintiffs-Appellees in the district-court

proceedings are:

R. Paul Yetter
pyetter@yettercoleman.com
Christian J. Ward
cward@yettercoleman.com
Karla Rosali Maradiaga
kmaradiaga@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

Barry F. McNeil
State Bar No. 13829500
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
(214) 651-5000
barry.mcneil@haynesboone.com

Samantha Bartosz
Stephen Dixon
CHILDREN'S RIGHTS
88 Pine Street
New York, New York 10005
(212) 683-2210
sbartosz@childrensrights.org

Marcia Robinson Lowry
Laura Welikson
David Baloche
A BETTER CHILDHOOD, INC.
355 Lexington Avenue, Floor 16
New York, New York 10017
(646) 795-4456

Defendants-Appellants are represented in the Fifth Circuit by:

Ken Paxton
  Attorney General
Brent Webster
  First Assistant Attorney General
James Lloyd
  Deputy Attorney General for Civil
  Litigation
Kimberly Gdula
  General Litigation Division
Karl E. Neudorfer
  Assistant Attorney General
  Administrative Law Division

Clayton R. Watkins
  Assistant Attorney General
  Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2120
kimberly.gdula@oag.texas.gov
karl.neudorfer@oag.texas.gov
clayton.watkins@oag.texas.gov

Allyson N. Ho
Bradley G. Hubbard
John Adams
Savannah Silver
Jason Muehlhoff
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
aho@gibsondunn.com
bhubbard@gibsondunn.com

Prerak Shah
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600
pshah@gibsondunn.com

Counsel who represented Defendants-Appellants in the district-court

proceedings are:

Ken Paxton
  Attorney General
Brent Webster
  First Assistant Attorney General
James Lloyd

Deputy Attorney General for Civil
Litigation
Kimberly Gdula
 General Litigation Division
Karl E. Neudorfer
 Assistant Attorney General
 Administrative Law Division
Clayton R. Watkins
 Assistant Attorney General
 Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2120
(512) 370-0667 – Fax
kimberly.gdula@oag.texas.gov
karl.neudorfer@oag.texas.gov
clayton.watkins@oag.texas.gov

Allyson N. Ho
Bradley G. Hubbard
John Adams
Savannah Silver
Jason Muehlhoff
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
aho@gibsondunn.com
bhubbard@gibsondunn.com

Prerak Shah
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600
pshah@gibsondunn.com

/s/R. Paul Yetter
R. Paul Yetter
*Attorney of record for Plaintiffs-Appellees*

## Introduction

The State asks for permission to keep children in danger indefinitely. These children are the most vulnerable of the vulnerable. The district court targeted its contempt order to coerce the State to comply with constitutional duties, upheld by this Court, to protect developmentally disabled foster children in the class from abuse and neglect. The Texas foster care system has been broken for decades. Notwithstanding welcome progress under the district court's injunction, the State has not complied with the straightforward remedial orders currently at issue, despite having almost five years to do so.

The Court should not, as the State seems to request, tell these children to "hurry up and wait" to be kept safe from repeated abuse and neglect. The State's appeal is meritless. The stay motion should be denied.

Importantly, contrary to the State's refrain, it has ***not*** been held "in criminal contempt." Mot. 1. The order at issue imposes textbook ***civil*** contempt sanctions—daily fines intended to coerce future compliance—for abject failures to investigate harm to these children.

Nor must the sanctions continue. Under the order, the State could avoid *any* fines if it validly certifies on day one that it is now complying with the relevant remedial orders for investigations of abuse and neglect affecting developmentally

disabled children.  It can stop further fines the moment it so certifies.  Nobody is being punished for the State's past noncompliance, except child victims whose suffering was caused or prolonged by it.

Plaintiff Children are a class comprising thousands of foster children in the State's Permanent Managing Conservatorship (PMC), who sought and received permanent injunctive relief against the Governor of Texas and the Commissioners of the Health and Human Services Commission (HHSC) and Department of Family Protective Services (DFPS) in their official capacities.  *E.g.*, *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 243 (5th Cir. 2018) (*Stukenberg I*).

The order at issue holds the HHSC Commissioner in civil contempt for failing to comply with two components of the permanent injunction—remedial orders requiring accurate and timely investigation of reports of child abuse and neglect. Although one would barely know it from the State's motion, the order specifically targets shocking dereliction by a unit within HHSC called Provider Investigations (sometimes abbreviated "PI"), which is responsible for investigating abuse and neglect of disabled children in certain state-licensed facilities.  Severely backlogged, Provider Investigations routinely takes a year or longer to complete investigations, many of which are so defective it is impossible to determine their accuracy.

Meanwhile, disabled child victims languish in unsafe placements, and facility staff who may have perpetrated abuse also remain a threat to other children.

Sadly, the contempt record abounds with evidence of the tragic consequences of Provider Investigations dysfunction. One example is the case of Child C, a developmentally disabled, nonverbal girl, who suffered several events of abuse, including credibly alleged sexual abuse, being tasered, and physical abuse resulting in a broken jaw. Provider Investigations conducted 12 investigations of sorts, most of which took at least 16-19 months to complete. Order 302-39 (detailing Child C's history).

The State has had plenty of time to comply with the orders it violated in the case of Child C and numerous others like her. In 2015, the district court found the State liable for violating Plaintiff Children's constitutional right to be free from an unreasonable risk of harm. *Stukenberg I*, 907 F.3d at 246. This Court affirmed the liability finding in 2018, *id.* at 287-88, and issued its judgment and mandate affirming the relevant remedial orders in July 2019. *M. D. by next friend Stukenberg v. Abbott*, 929 F.3d 272, 281 (5th Cir. 2019) (*Stukenberg II*). A central aspect of the orders mandated accurate and timely investigations.

Thus, the State was held liable for constitutional violations more than eight years ago, and these remedial orders have been in effect for nearly five years. In

September 2023, the court-appointed Monitors updated the district court about their review of HHSC investigations opened or closed in January-April 2023. Ex. 1, Dkt. 1412.  The findings were both alarming and avoidable, as shown by improvements in investigations by sister-agency DFPS.  HHSC's noncompliance was litigated in the three-day evidentiary hearing the district court held in early December 2023, more than four months before the contempt order.

In short, the State simply has no excuse for not complying by April 15, 2024. If it cannot certify compliance immediately, and its motion seems to insist that it *can*, the State has only itself to blame.  And if it *cannot*, that is all the more reason not to lift the pressure of coercive daily fines.

The State's stay motion exemplifies its persistent lack of urgency.  The State will suffer no irreparable harm from paying refundable fines.  Meanwhile, its most vulnerable children are at serious risk of irreparable harm each passing day.  The Court should reject the State's plea to remove any incentive to fix its system at once.

## Background

In *Stukenberg I*, this Court affirmed the district court's finding that Texas's dysfunctional foster care system violated PMC children's substantive due-process rights. *Id.* at 287-88.  In *Stukenberg II*, the Court affirmed most of the post-remand remedial orders, several of which—including the two at issue here—went

unchallenged on appeal. *See* 929 F.3d at 281. This Court directed the district court "to begin implementing . . . the modified injunction." *Id.* Its mandate issued in July 2019. In an appeal of a previous contempt order, this Court reiterated that its mandate governs implementation of the injunction. *See M. D. by Stukenberg v. Abbott*, 977 F.3d 479, 483 (5th Cir. 2020) (*Stukenberg III*).

*Stukenberg I* emphasized "critical problems with DFPS's policies and practices regarding monitoring and oversight," including that "deficient investigatory practices have yielded a high error rate in abuse investigations." 907 F.3d at 265. As the district court had found, the State's "dysfunction," "incompetence in responding to incidents," and "inadequate" investigations had "led to an 'epidemic of physical and sexual abuse.'" *Id.* at 291-92 (Higginbotham, J., concurring).

*Stukenberg I* expressly approved the two remedial orders at issue here as "valid" and "reasonably targeted toward remedying the identified issues." *Id.* at 276-77.[1] *Stukenberg II* directed the district court to implement those and other

---

[1] The relevant orders are items 1 and 8 in *Stukenberg I*'s list of valid investigation-related orders. They are now denoted Remedial Orders 3 and 10, as numbered in the district court's post-remand November 20, 2018 order. Dkt. 606 at 2-3.

remedial orders, and it affirmed monitoring as an administrative measure to facilitate implementation.  929 F.3d at 280-81.

The relevant remedial orders provide:

> 3. DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.
>
> ***
>
> 10. Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

Dkt. 606 at 2-3.[2]

---

[2] In a 2017 reorganization, various functions, including Provider Investigations, transferred from DFPS to HHSC. *See, e.g.*, Order 284; *DFPS 2017 Annual Report, Agency Reorganization*, *available at* https://www.dfps.texas.gov/About_DFPS/Annual_Report/2017/agency_reorganization.asp.  Although *Stukenberg I* and some remedial orders, including those at

In short, these orders require timely and effective investigations, and, most importantly, investigations "conducted taking into account at all times the child's safety needs." Although, within DFPS, there has been notable progress in this area since the injunction took effect, HHSC Provider Investigations has chronically failed "to timely investigate, commence and complete investigations of abuse and neglect of PMC children." Order 284.

Provider Investigations has responsibility to investigate allegations of abuse and neglect of adults and children, including PMC children, in the "Home and Community-Based Services (HCS) waiver program," "a Medicaid program . . . for the provision of services and support to individuals with intellectual disabilities or related conditions" that "allows them to live in community-based settings and avoid institutionalization." *Id.* at 285-86. As the Monitors uncovered and brought to the district court's attention, "PI investigations do not use the same parameters" as those conducted within DFPS. *Id.* at 286.

At least by February 2021, the State began producing data to the Monitors regarding Provider Investigations intakes of abuse and neglect reports. The Monitors began reviewing the unit's performance, as noted in their January 2022

---

issue, refer to "DFPS," the State (properly) has never disputed that such references include HHSC when performing relevant functions previously assigned to DFPS.

Third Report. Dkt. 1165 at 36 & n.78, 72 & n.152. Last year, they conducted a thorough review of "PI investigations pertaining to PMC children that were opened and/or closed between January 1, 2023 and April 30, 2023" and reported their findings in a September 2023 update. Ex. 1, Dkt. 1412 at 1-10 & n.10. The update described numerous investigations "emblematic of PI's repeated failure to 'ensure the investigations of all reports are commenced and completed on time consistent with [the district court's injunctive] Order and conducted taking into account at all times the child's safety needs.'" *Id.* at 2-3; *see also id.* at 10-66.

Given these revelations of severe noncompliance by Provider Investigations— with severe consequences for child victims, like Child C and others—Plaintiff Children amended their already-pending show-cause motion to add noncompliance by this unit as a contempt topic. *See* Dkt. 1427 at 9-16. During the three-day hearing in early December 2023, ample evidence confirmed Provider Investigations' noncompliance with Remedial Orders 3 and 10. *See generally* Order 280-422 (detailing evidence supporting contempt finding and the State's failure to establish defenses). Voluminous exhibits included the Monitors' filings and documents produced in discovery, all admitted without objection. *See id.* The evidence also included the testimony of Stephen Pahl, the HHSC executive in charge of Provider Investigations. *See id.* at 399-420.

Pahl confirmed that Provider Investigations was massively backlogged, and he could not refute the Monitors' findings of huge delays and deficiencies in its investigations. *E.g.*, Dkt. 1487 at 106-27. Despite knowing of severe staffing issues for eight years, the unit had done nothing to solve them. *Id.* at 117-19. Pahl admitted shocking ignorance of the unit he supposedly runs, including unfamiliarity with a new policy instructing investigators to omit any explanation of findings of "unconfirmed" or "inconclusive" from their reports to shield deficient investigations from scrutiny. *E.g.*, *id.* at 129 (Pahl: "I'm not familiar with all of our policies and procedures."); *see also id.* at 115-34, 138-39, 144-45, 115-61; Order 399-420.

Provider Investigations was far from the only deficiency. The evidence also showed continued dysfunction throughout other aspects of the system. These include the crisis involving what the State terms "Children Without Placement" or "CWOP"—i.e., children whom the State fails to house in safe, appropriate, licensed settings and instead shuffles among seedy motels, squalid leased houses, and the like, where they face violence, drug use, physical and sexual abuse, rape, and sex trafficking. This crisis has "hijacked the agency," overburdening caseworkers in conflict with stipulated caseload guidelines. *E.g.*, Dkt. 1488 at 210-11, 213, 216-20. Other serious problems include failure to enforce residential-care contract

requirements for managing powerful psychotropic medications prescribed to many PMC children. *E.g.*, Dkt. 1487 at 339-49.

While problems related to CWOP, medication management, and other topics raised in Plaintiff Children's contempt motion remain concerns, they are not at issue in this appeal. The district court's April 15 order makes no contempt findings on issues other than HHSC's noncompliance with Remedial Orders 3 and 10. To the extent the State purports to "appeal" from anything in the district court's order relating to other topics, any such appeal is unripe. *See* Ex. 2, *M.D. v. Abbott*, No. 16-40023, 3-4 (5th Cir. Mar. 21, 2016) (order denying stay in State's attempted appeal from the 2015 liability verdict and holding only one portion was immediately appealable when other issues remained subject to "future rulings by the district court"). And there is no basis to stay further district court proceedings regarding those still-pending issues. *Id.* at 4 ("Because the prohibition on unsafe placements is the only portion of the order currently appealable, it is the only portion of the district court's order that we could stay.").

Nor can the State justify staying the only contempt order ripe for appeal, the one holding HHSC in civil contempt for all-but-admitted violations of Remedial Orders 3 and 10 by Provider Investigations. If Provider Investigations is now complying with those orders, the State can stop the civil fines *immediately* simply by

certifying compliance. If it still is not complying, these especially vulnerable children are still in danger, and keeping up the pressure of coercive sanctions is all the more justified and indeed crucial.

## ARGUMENT AND AUTHORITIES

## I.    THE STATE FACES A HEAVY BURDEN TO JUSTIFY A STAY.

As the "party requesting a stay," the State "bears the burden of showing that the circumstances justify" exercising this Court's discretion to grant one. *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). The State cannot meet that burden here, where it asks the Court to condone further delay while children remain unsafe.

"The authority to grant stays has historically been justified by the perceived need 'to prevent irreparable injury to the parties or to the public' pending review." *Id.* at 432. "A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* at 427 (cleaned up). As discussed further below, the State faces no injury, much less irreparable injury. Meanwhile children in the class face irreparable harm if a stay is granted, permitting the State to continue violating orders designed to protect them without consequences.

The four factors to consider when deciding whether to grant a stay are

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 434.

Of those, the first two factors—likelihood of success and applicant's irreparable injury—"are the most critical." *Id.* In this case, the other two factors are also critical. With every passing day, absent compliance by the State, substantial injury to children in the class is likely. And the public interest clearly lies in keeping our children safe.

## II. THE STATE IS NOT LIKELY TO SUCCEED ON THE MERITS.

To satisfy the first factor, "It is not enough that the chance of success on the merits be 'better than negligible.'" *Id.* "More than a mere 'possibility' of relief is required." *Id.* (cleaned up).

The State can show no serious possibility of success under either of its two merits arguments. At the contempt hearing, it did not show substantial compliance with Remedial Orders 3 and 10. In fact, it put on no witness even to try to show compliance. And the contempt order imposed coercive, civil sanctions, not criminal punishment.

If—as it contends—the State can show substantial compliance *now*, it should simply do so. Validly certifying compliance *today* would immediately stop the coercive fines and would moot not only the stay motion but this entire appeal.

### A.     The State Did Not Show Substantial Compliance.

The district court found HHSC in contempt of two of the more than 60 specific remedial orders contained in that court's affirmed permanent injunction. Specifically, the court found that Provider Investigations was noncompliant with Remedial Orders 3 and 10 in the conduct and timeliness of its investigations into abuse and neglect of developmentally disabled PMC children.

"This Court reviews the district court's order holding Defendants in contempt for an abuse of discretion." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 46 (5th Cir. 1992). It "measure[s] the competency of the district court's underlying findings under the clearly erroneous rule." *Id.* at 46-47.

As noted above, extensive documentary evidence and testimony satisfied Plaintiff Children's burden of establishing that HHSC failed to comply with conduct required by Remedial Orders 3 and 10. *See, e.g.*, *Texas v. Dep't of Labor*, 929 F.3d 205, 213 n.11 (5th Cir. 2019) (discussing civil-contempt movant's burden). During the hearing (for which the district court allocated a week), the State had every opportunity to call witnesses to support its claimed substantial-compliance defense. *See, e.g.*, *United States v. Barnett*, 346 F.2d 99, 100 (5th Cir. 1965). But it chose to rest after putting on only a single witness, a State physician, who did not even address Provider Investigations.

The district court detailed its findings and the evidence supporting them in its 424-page order. About 144 of those pages are devoted to the contempt findings and sanctions as to Provider Investigations. Order 279-424. They extensively quote evidence showing failure to comply with Remedial Orders 3 and 10 by Provider Investigations, including live testimony and filings by the Monitors. *Id.*

In short, ample evidence supports the district court's findings that

> The substantial rate at which the State's investigations are inappropriately resolved or deficiently conducted indicates that the State is failing to "ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs," as required by Remedial Order 3

and that "most of the PI investigations reviewed by the Monitors were not compliant with Remedial Order 10 and its requirement that investigations must be completed within thirty days unless they have an approved and documented extension for good cause." *Id.* at 413, 415.

Review of district court factual findings is "necessarily deferential" and for "clear error"; such findings should "be reversed only if this Court is left with a definite and firm conviction that a mistake has been committed." *Brown v. Plata*, 563 U.S. 493, 512-13, 517 (2011) (cleaned up); *accord, e.g.*, *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015). The State will not be able to show clear error given the ample,

unrebutted evidence supporting the district court's findings of its failure to comply. *Cf.* Ex. 2 at 4 (denying State's earlier stay request when trial evidence supported "the grave problems arising from the lack of 24-hour supervision in foster group homes").

The State indicates it plans to argue that it substantially complied because it scored better with investigations *other than* those in the purview of HHSC's Provider Investigations. It focuses on compliance rates in investigations conducted within DFPS. Mot. 15-16. But that argument misdirects the issue. Plaintiffs' motion and the district court's contempt order were targeted to the abysmal record of HHSC's Provider Investigations.

As the district court explained,

> First, these children being abused in HCS group homes are not just a data set, they are some of the most vulnerable children in the State's care—children who suffered for months or years while the State bungled investigation after investigation. Second, the fifteen children discussed in the Monitors' reports represent a substantial portion of the eighty-eight PMC children in HCS group homes.

Order 416 (footnotes omitted).

Further, the State's audacious claim that "[m]ost of these investigations were conducted . . . years ago (in 2021 and 2022)," Mot. 15, is false. While some of them involved alleged abuse and neglect *occurring* as early as 2021, the great majority of

these investigations languished and did not close until 2023. *See* Ex. 1, Dkt. 1412 at 11-66. That is, of course, a big part of the problem.

The State cites no support for its concept that some degree of compliance with remedial orders by one agency as to some children prevents the district court from addressing specific pockets of egregious noncompliance by the other agency as to other children. "Once issued, an injunction may be enforced," and a court is "not reduced to issuing injunctions against state officers and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). The district court has "inherent power to enforce compliance" with all affirmed remedial orders "through civil contempt," *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966), and this Court has directed it to enforce those orders. *See Stukenberg III*, 977 F.3d at 483; *Stukenberg II*, 929 F.3d at 281.

That is just what the district court has done, in its targeted contempt order directed only to HHSC, the agency containing Provider Investigations. The State need only bring Provider Investigations into compliance to purge the contempt. The State did not try to show compliance by Provider Investigations at the hearing. If it can validly certify compliance today, it can stop the fines today and moot this appeal.

## B.    The District Court Imposed Civil Contempt, Not Criminal.

Nor will the State prevail with its argument that the district court's order imposed criminal contempt without required due-process protections. As

established by the very case law on which the State relies, the sanctions imposed here are "civil contempt sanctions," that is, "penalties designed *to compel future compliance* with a court order." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) (emphasis added).

The State misreads *Bagwell*. And *Bagwell*'s facts were inapposite to those here. So, the State would not prevail on its argument that the contempt order here is criminal even were the Court to apply the State's distorted version of *Bagwell*'s analysis.

*Bagwell* does not say that sanctions are criminal just because they are non-compensatory. *See* Mot. 19. Rather, it says clearly that non-compensatory fines are civil if intended to coerce compliance. "A contempt fine. . . is considered civil and remedial if it **either** coerces the defendant into compliance with the court's order, **or** compensates the complainant for losses sustained." *Bagwell*, 512 U.S. at 829 (cleaned up and emphasis added). "Where a fine is not compensatory, it is civil . . . if the contemnor is afforded an opportunity to purge," that is, "to reduce or avoid the fine through compliance." *Id.*

There can be no serious dispute that sanctions imposed here meet the classic descriptions of coercive *civil* contempt fines. The daily fines will be suspended immediately once the State can certify and supply data that HHSC Provider

Investigations is complying with Remedial Orders 3 and 10.  Order 422; *see Bagwell*, 512 U.S. at 829 ("Like civil imprisonment, such fines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged.").

The State's argument that the fines punish for past conduct because it must certify compliance for investigations closed since December 4, 2023 (when the contempt hearing began), Mot. at 21, borders on the absurd.  If the State has been substantially complying, as it asserts, it should have no problem certifying immediately.  And if it remains noncompliant—over four months since the hearing—it is being penalized for present noncompliance to coerce future compliance.  Regardless, a fine need not be completely avoidable to be civil; it is still civil if future compliance can "reduce" it. *Bagwell*, 512 U.S. at 829.  Moreover, the State already produces data regarding closed investigations to the Monitors on a routine basis.

In short, the State's comparisons to the criminal sanctions in *Bagwell* are misplaced.  Unlike here, the *Bagwell* sanctions were not imposed to compel future performance with discrete requirements of specific injunctive orders.  Rather, over $52 million in fines were assessed against a union as punishment for various and sundry past conduct by its members found to have violated a sprawling injunction.

*Id.* at 823-24, 836-38.  "The fines [were] not coercive day fines, or even suspended fines, but [were] more closely analogous to fixed, determinate, retrospective criminal fines which petitioners had no opportunity to purge once imposed."  *Id.* at 837.  The fines here are, clearly, "coercive day fines."

Nor does *Bagwell* say that criminal process is required merely because the State's contempt occurred outside of court.  *See* Mot. 19-20.  The process required depends on the nature of the penalties imposed, not where the State's misconduct occurred.  When noting that "civil contempt sanctions" that are "coercive and avoidable through obedience" "may be imposed in an ordinary civil proceeding," *Bagwell* made clear it was addressing "the procedures required for adjudication of indirect contempts, *i.e.,* those occurring out of court."  512 U.S. at 827 & n.2.  Where, as here, a court imposes only coercive, civil fines, "Neither a jury trial nor proof beyond a reasonable doubt is required."  *Id.* at 827.

Finally, the specific injunctive orders at issue here are hardly complex.  *See* Mot. at 20.  Although the district court's permanent injunction as a whole is comprehensive, Remedial Orders 3 and 10 state a few clear and discrete requirements for investigations.  And the contempt order targets only those investigations conducted by Provider Investigations, which even the State concedes are a limited subset of investigations conducted systemwide.  *See* Mot. at 15; *cf.*

*Bagwell*, 512 U.S. at 823-24, 836-38 (contempt order punished "more than 400 separate violations" of injunction prohibiting wide swath of conduct).

The State has had ample notice of how Provider Investigations must and could comply with Remedial Orders 3 and 10. The orders were articulated over six years ago and took effect nearly five years ago. A year ago, the Monitors were compiling data on recent investigations. Seven months ago, they issued their update detailing egregious problems with the unit's investigations. Over four months before the contempt order issued, the evidence presented at the hearing further confirmed the noncompliance. None of this chronology is in dispute.

HHSC had all that time to begin doing what it should have been doing all along— following Remedial Orders 3 and 10 to safeguard developmentally disabled children. It is the State's own fault if it cannot purge the contempt immediately by certifying compliance today.

## III. THE STATE CANNOT SHOW IRREPARABLE INJURY.

Nor can the State show any irreparable injury. In the unlikely event its appeal is successful, any fines paid can be refunded. That is the definition of *reparable*: "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981); *accord Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297, 304 (5th Cir. 2017).

And the State is not injured at all by "providing a legal certification and producing documents in support of that certification." Mot. 23. A litigant seeking relief is not injured by needing to file a piece of paper in court. And, contrary to the State's claim, *see id.*, the permanent injunction expressly requires it to provide the Monitors any data they need to verify compliance. *See* Dkt. 606 at 16-18.

The State's overblown rhetoric about "'institutional injury to Texas from the inversion of . . . federalism principles,'" Mot. 23 (quoting *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016)), is inapt. *Texas v. EPA* concerned "the threat of [electrical] grid instability and potential brownouts" and imposing a potentially void "federal implementation plan" on Texas's Public Utility Commission. 829 F.3d at 433-34. Here, the only thing at stake is money that can be refunded with mathematical precision if the contempt order is reversed.

Indeed, the State could not satisfy this factor even if it could not recoup the fines, as the Court explained during the attempted appeal from the liability verdict. "Financial harm, though, is outweighed by the harm to the class members and public interest if we stay the case." Ex. 2 at 5.

## IV. PLAINTIFF CHILDREN WILL SUFFER IRREPARABLY IF A STAY IS GRANTED, AND THE PUBLIC INTEREST LIES IN PREVENTING THAT HARM.

In contrast to the State, children in the plaintiff class will be at risk of life and limb each day a stay is in place. *See id.* Too many children have already been

irreparably harmed by the Texas foster care system, which has been the main point of this litigation. The district court's order details extensively how especially vulnerable, developmentally disabled children are being harmed by the specific noncompliance this order targets. Order 279-424.

The State has the power to stop that harm—and the alleged harm to itself, i.e., the fines—immediately by bringing Provider Investigations into compliance. It has had years to comply, and continued delay—without penalty—continues to endanger children.

Further, that the public interest lies in keeping children safe is established by both common sense and constitutional law. This Court has clearly held that Plaintiff Children have a constitutional "right to 'personal security and reasonably safe living conditions.'" *Stukenberg I*, 907 F.3d at 250. And the Court has mandated that the State comply with Remedial Orders 3 and 10 as part of protecting that right. *See Stukenberg II*, 929 F.3d at 281. Upholding the Constitution promotes the public interest. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1132, (10th Cir. 2012), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).

The State's contention that its own interest "merge[s] with that of the public," Mot. 24, rings hollow in this case. Its deliberate indifference to the constitutional rights and safety of thousands of its youngest citizens was adjudicated

long ago. *Stukenberg I*, 907 F.3d at 267-68 ("The district court correctly found that the State was deliberately indifferent to a substantial risk of serious harm to the LFC subclass as a result of its insufficient monitoring and oversight, and that these deficiencies are a direct cause of the constitutional harm."). Monitoring and oversight "deficiencies pose a significant safety risk for foster children." *Id.* at 267. If the State cannot immediately certify that Provider Investigations is now complying with Remedial Orders 3 and 10, it cannot be in the public interest to remove the coercive pressure to start complying. *Cf. id.* at 267-68 (noting that, despite knowledge of safety risks, the State had "not taken reasonable steps to cure the problems" if, indeed, "any steps at all").

Even before affirming liability, in denying a stay that would have allowed "the State to continue to make apparently dangerous placements," this Court explained, "where the value of the constitutional rights to be protected far outweigh administrative costs that might be incurred in formulating a remedy, the lower court proceedings should continue." Ex. 2 at 5 (cleaned up). As in that earlier appeal, a stay now would do "harm to the class members and public interest." *Id.*

## Conclusion

For these reasons, the Court should deny the motion and grant Plaintiff Children any other relief to which they are entitled.

Dated:  April 22, 2024

Respectfully submitted,

*/s/ R. Paul Yetter*

| | |
|---|---|
| Stephen Dixon | R. Paul Yetter |
| sdixon@childrensrights.org | pyetter@yettercoleman.com |
| CHILDREN'S RIGHTS | Christian J. Ward |
| 88 Pine Street | cward@yettercoleman.com |
| New York, New York 10005 | YETTER COLEMAN LLP |
| (212) 683-2210 | 811 Main Street, Suite 4100 |
| | Houston, Texas 77002 |
| | (713) 632-8000 |

***Attorneys for Plaintiffs-Appellees***

## CERTIFICATE OF SERVICE

I certify that the document was filed with the Court via the court's electronic filing system, on the 22nd day of April, 2024, and an electronic copy of this document was served on all counsel of record, as listed below, via the court's electronic filing system on the same date:

Ken Paxton
  Attorney General
Brent Webster
  First Assistant Attorney General
James Lloyd
  Deputy Attorney General for Civil
  Litigation
Kimberly Gdula
  General Litigation Division
Karl E. Neudorfer
  Assistant Attorney General
  Administrative Law Division
Clayton R. Watkins
  Assistant Attorney General
  Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
kimberly.gdula@oag.texas.gov
karl.neudorfer@oag.texas.gov
clayton.watkins@oag.texas.gov

*Attorneys for Appellants*

Allyson N. Ho
Bradley G. Hubbard
John Adams
Savannah Silver
Jason Muehlhoff
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
aho@gibsondunn.com
bhubbard@gibsondunn.com
jsadams@gibsondunn.com
ssilver@gibsondunn.com
jmuehlhoff@gibsondunn.com

Prerak Shah
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, Texas 77002
pshah@gibsondunn.com

*Attorneys for Appellants*

*/s/ R. Paul Yetter*
R. Paul Yetter

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2) because this document contains 5,188 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2016 in 14-Point Equity A font.

Date:    April 22, 2024            */s/ R. Paul Yetter*
                                   R. Paul Yetter

**INDEX**

| Tab | Dkt. | Document |
|-----|------|----------|
| 1. | 1412 | Update to K. Ryan Report to the Court (09/19/2023) |
| 2. | | Court Order Denying Motion to Stay Pending, *M.D. v. Abbott*, No. 16-40023 (5th Cir. Mar. 21, 2016) |

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity | § | |
| as Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

## Monitors' Update to the Court Regarding Remedial Order 3

***Remedial Order 3:*** *DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

Pursuant to Remedial Order 3, this Update to the Court discusses the Monitors' assessment and review of the State's investigation of reports of abuse, neglect and exploitation of children in Permanent Managing Conservatorship (PMC) conducted by the Health and Human Services Commission (HHSC) Provider Investigations (PI).[1] Adult Protective Services (APS), which includes PI—the public employees who investigate alleged abuse, neglect and exploitation of adults and children with disabilities residing in certain settings—is a division of the Department of Family and Protection Services (DFPS). After the Texas legislature consolidated DFPS and HHSC and then separated them again into independent agencies, the legislature determined that APS as a whole would remain with DFPS but that the PI division of APS would be part of HHSC.

---

[1] The language in Remedial Order 3 specifically refers to the General Class, rather than limiting its application to children in licensed settings. In an advisory filed with the Court on September 21, 2021, Governor Greg Abbott advised that with respect to the scope of the Court's injunctions, "[A] General Class member should receive the same protections under the Court's remedial orders regardless of the licensed or unlicensed nature of the facility where the member is housed, unless the remedial order at issue specifies that it applies only to the [Licensed Foster Care] subclass or licensed or unlicensed facilities." Governor Greg Abbott's Advisory Concerning the Court's September 14, 2021 Inquiries 3, ECF No. 1137. In the Monitors' Seventh Report, the Monitors will also include an assessment of Remedial Orders 7, 8 and 10 with respect to closed PI investigations.

1

The Monitors' review of State records revealed egregious deficiencies in these PI investigations, as recounted in greater detail below. In many of the PI investigations reviewed by the Monitors, records contained evidence of an utter disregard by Texas for children's safety, falling seriously below the standard required by Remedial Orders 3, 7, 8 and 10. Texas repeatedly addressed allegations of Sexual and Physical Abuse of some of the State's most vulnerable children with shocking carelessness, leaving PI investigations open with no activity for months on end—in numerous instances for more than one year—while children with significant developmental disabilities were left in harm's way. Children and their advocates repeatedly cried out to the State for help, alleging disturbing child maltreatment, including sexual abuse; physical assaults of children; abandonment of a child in a locked, unsupervised facility; a child being tasered by a staff member; and a child being instructed by a staff member to share a bed with an apparent adult resident of a group home. Time and again, PI failed to respond in a manner consistent with this Court's orders (and their own policies) and left children exposed to danger that in certain instances caused them terrible suffering and harm.

In one of the most appalling failures by the State, a PMC child was the subject of multiple reports of abuse and neglect leading to 12 PI investigations, all pending simultaneously, over a one-year period at the same placement, C3 Academy, LLC. The State repeatedly failed to conduct the investigations in a manner consistent with child safety. In one of the investigations, PI failed to identify the confirmed Sexual Abuse history of a staff member at C3 that occurred during the course of its investigation of a PMC child's outcry of Sexual Abuse by an unnamed staff member at the facility: PI allowed its Priority One investigation of the child's outcry to lay dormant for more than a year; during that time, a different arm of the State, DFPS's Child Protection Investigations (CPI) unit, substantiated allegations that a C3 Academy staff member at the group home sexually abused his stepdaughter, for which he was also charged criminally. Investigative records show even when the PI investigator identified this staff member as the alleged perpetrator in the record a year after the intake and eventually learned of pending criminal charges, she did not consider—and appeared unaware of —the CPI substantiation of Sexual Abuse by the staff member during the investigation, even months after CPI closed the case and documented the disposition in IMPACT.

In another shocking instance—the twelfth investigation of alleged abuse and neglect of the same child at that same placement—a staff member allegedly broke the child's jaw in two places. The child and a witness identified the staff member who attacked the child. Evidence, as detailed below, showed that only the next morning when another staff member brought the child to a hospital and left her there alone was the injury treated.[2] Nonetheless, PI took nine months to complete the investigation with long periods of inactivity and it ultimately determined the allegations were Inconclusive, despite a preponderance of evidence that the staff member abused the child. These and numerous other State child abuse and neglect investigations described below are emblematic of PI's repeated failure to "ensure the investigations of all reports are commenced and completed

---

[2] An administrator of C3 Academy, who PI interviewed six months after the intake, said another resident informed her that the staff member hit the child in the face with his fist multiple times the day before the child was taken to the hospital. Child C reportedly went to bed after the attack with untreated and substantial injuries. The following day, a different staff member and the administrator observed blood and bruising on the child's face, at which time the child was taken and left at the hospital and to a hospital and law enforcement was contacted.

on time consistent with this Order and conducted taking into account at all times the child's safety needs."[3]

A. Background

HHSC's PI investigative authority includes HHSC state operated facilities, including state-supported living centers, state hospitals and Home and Community Based Services (HCS) residences; the HCS residences include three and four person residences (HCS Group Homes) and host home settings. PI investigates abuse, neglect and exploitation at HCS Group Homes regardless of whether the individual is receiving services under the home and community-based services waiver program (under Sec. 1915 of the Social Security Act) (HCS waiver services).[4]

If the allegations take place in an HCS host home setting, HHSC has authority to investigate abuse, neglect or exploitation of an individual receiving HCS waiver services from a person who contracts with a health and human services agency or managed care organization to provide home and community-based services. DFPS CPI investigates allegations involving children in those residences in instances when PI's jurisdiction does not apply because the alleged victim is not receiving HCS waiver services.[5,6]

---

[3] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. (S.D. Tex. Nov. 20, 2018), ECF No. 606 (as modified by *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626). (stating that "DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.").

[4] 26 TEX. ADMIN. CODE §§711.1(2)(A)(ii) &(iii). The Code states that APS has jurisdiction in the instances described herein; the jurisdiction is exercised by HHSC's PI. Eligibility for HCS waiver services requires that an individual has an Intellectual disability under state law or a diagnosis of a "related condition" with an IQ of 75 or below as further defined in the Code of Federal Regulations, Title 42, §435.1010.

[5] Recently, HHSC and DFPS appeared to clarify Handbook intake and investigation policy and procedures regarding jurisdiction over allegations involving children in different types of HCS group homes and/or receiving HCS waiver services in other settings, including those group homes identified by HHSC as "HCS Group Homes (1-4)." For example, in September 2023, DFPS updated language in its SWI Handbook where it discusses jurisdiction; it now states that PI: "has jurisdiction to investigate abuse, neglect, or exploitation of a child who resides in one of the following settings: [1] A Home and Community-based Services (HCS) group home. [2] A setting with services to meet the child's special needs paid for by a Medicaid waiver." The Handbook updates further state "Child Protective Investigations (CPI) has jurisdiction to investigate abuse or neglect of a child receiving services when all of the following apply: [1] The child does not reside in an HCS group home. [2] The child resides in a setting with services to meet his or her special needs, but those services are not paid for by a Medicaid waiver. [3] The home is not licensed by RCCR." DFPS, Statewide Intake Policy & Procedures Handbook §4760, available at https://www.dfps.texas.gov/handbooks/SWI_Procedures/Files/SWP_pg_4000.asp#SWP_4760 (Updated in September 2023). There is no additional information listed for the intake specialist about what is considered "an HCS group home." The Monitors have also observed examples of jurisdictional confusion between SWI, CPI and PI during the intake and investigation process.

[6] The Monitors previously reviewed and reported on investigations of allegations of abuse, neglect and exploitation of PMC children whose living arrangements the State identified as "HCS Group Homes" that were conducted by CPI in the Fifth Report to the Court pursuant to Remedial Order 3. *See* Deborah Fowler & Kevin Ryan, Fifth Report, Appendix 2 Maltreatment in Care Case Summaries 48-49 & 51, ECF No.1318-2.

The definitions of abuse, neglect and exploitation for investigations conducted by PI are contained in Title 26 of the Texas Administrative Code.[7] The definitions apply to all individuals who are alleged victims, whether children or adults.

Possible findings for investigations conducted by PI include the following:

> Confirmed — There is a preponderance of credible evidence to support that abuse, neglect or exploitation occurred.

> Inconclusive — There is not a preponderance of credible evidence to indicate that abuse, neglect or exploitation did or did not occur due to lack of witnesses or other available evidence.[8]

> Unconfirmed — There is a preponderance of credible evidence to support that abuse, neglect or exploitation did not occur.

> Unfounded — Evidence gathered indicates that the allegation is spurious or patently without factual basis.[9]

Additionally, PI closes investigations using a disposition of "Other" when it determines that it does not have jurisdiction over any of the allegations. This dispositional choice is not defined in the Provider Investigations Handbook nor in the Administrative Code but is listed as a disposition for investigations in the IMPACT database and in data reports submitted to the Monitors by HHSC.

B. Overview

HHSC opened 77 new PI investigations involving at least one PMC child between January 1, 2023 and April 30, 2023.[10] The number of investigations opened per month ranged from 14 to 35. PI closed 101 investigations of maltreatment of PMC children between January 1, 2023 and April 30, 2023. The number of investigations closed per month ranged from 19 to 35.

Of the 101 investigations closed during this period, State data indicates the alleged abuse or neglect occurred in the following "facility types:" Private HCS Homes accounted for 51% (52);[11] HCS

---

[7] 26 TEX. ADMIN. CODE §§711.11-23.

[8] If PI assigns a disposition of Inconclusive to an allegation but the disposition for any other allegation is either Confirmed or Unconfirmed, HHSC reports the overall disposition of the investigation to the Monitors as Confirmed or Unconfirmed, respectively. Per HHSC, in its data reports to the Monitors an overall disposition of Inconclusive is assigned only if other allegations in the same investigation were not assigned as Confirmed or Unconfirmed. E-mail from Katy Gallagher, Associate Director – Complex Litigation Team, HHSC, to Megan Annitto, Monitoring Team, et al. (July 6, 2023).

[9] 26 TEX. ADMIN. CODE §§711.421.

[10] The Monitors analyzed data about maltreatment in care for PI investigations pertaining to PMC children that were opened and/or closed between January 1, 2023 and April 30, 2023. HHSC, *PI Open and Closed Investigations – January 2023* (March 1, 2023); *PI Open and Closed Investigations – February* 2023 (April 5, 2023*); PI Open and Closed Investigations – March 2023* (April 26, 2023*); PI Open and Closed Investigations – April 2023* (May 22, 2023) (on file with the Monitors).

[11] This information is derived from "Facility Type" as reported by HHSC in its data reports noted above. The Facility Type and the child's Living Arrangement in IMPACT do not appear to track one another when the Monitors conducted their reviews of the investigations. For example, investigations identified with Facility Type "Private HCS Home" may involve a child identified with a living arrangement in an "HCS Group Home 1-4." Additionally, investigation locations identified with the facility type of "HCS Private homes" in the State's data reports are routinely referred to

4

Group Homes (1-4) accounted for 18% (18); state supported living centers accounted for 14% (14); state hospitals accounted for 8% (8); Home and Community Support Services Agencies (HCSSA) accounted for 5% (5); and the remaining four closed investigations were identified as occurring in an Adult Foster Care Licensed Intermediate Care Facility (ICF/IID), a Community Provider, a Residential Treatment Center and a Texas Youth Commission (TYC) Halfway House.

**Figure 1: Facility Type in Closed HHSC PI Investigations Involving PMC Children, January 1, 2023 to April 30, 2023**



Source: HHSC PI Investigations Closed January 1, 2023 to April 30, 2023
n=101 investigations closed

Community Provider (APS Only), 1%
Residential Treatment Center, 1%
AFC Licensed ICF/IID, 1%
TYC Halfway House, 1%
HCSSA (APS Only), 5%
State Hospital, 8%
State Supported Living Center, 14%
Private HCS Home, 51%
HCS Group 1-4, 18%

Of the 101 investigations closed during this period, HHSC determined that 2% (2) of the investigations resulted in an overall disposition of Confirmed, thereby substantiating at least one allegation as abuse, neglect, or exploitation. In the remaining investigations, HHSC reported that the overall dispositions in 8% (8) of investigations were Inconclusive,[12] 55% (56) of investigations were Unconfirmed, and 35% (35) of investigations were assigned a disposition of Other.

---

by PI in the investigative records as group homes or HSC group homes; therefore, the record typically does not distinguish what type of group home is the subject of the investigation.

[12] As noted above, HHSC informed the Monitors that for PI investigations with allegations resulting in both Unconfirmed and Inconclusive dispositions, the overall disposition appears as Unconfirmed in the HHSC data reports submitted to the Monitors. Therefore, there are additional allegations that PI resolved as Inconclusive in other investigations reviewed by the Monitors. This approach is unlike DFPS, which assigns an overall disposition of Unable to Determine (similar to PI's disposition of Inconclusive) in those situations.

Figure 2: Dispositions in Closed HHSC PI Investigations Involving PMC Children, January 1, 2023 to April 30, 2023



Source: HHSC PI Investigations Closed January 1, 2023 to April 30, 2023
n=101 investigations closed

To validate the State's performance associated with Remedial Order 3 and the appropriateness of investigations of abuse, neglect or exploitation of a PMC child conducted by PI, the monitoring team conducted reviews of 50 PI investigations, 45 of which closed between January 1, 2023 and April 30, 2023 and 5 of which closed prior to 2023 but involved the same PMC children and allegations related to the investigations that closed during 2023.[13] Of the 50 investigations the Monitors reviewed, PI assigned an overall disposition of Unconfirmed to 43 (86%); Inconclusive to 6 (12%); and Confirmed to 1 (2%).

The Monitors concluded that a total of 28 (56%) of 50 investigations with an overall disposition of Unconfirmed, Inconclusive or Confirmed were inappropriately resolved or deficient. Specifically, the Monitors found that PI reached its disposition appropriately in 22 investigations (44%); inappropriately resolved 3 investigations (6%); conducted 24 investigations (48%) with such substantial deficiencies that the Monitors were prevented from reaching a conclusion; and in the one Confirmed investigation (2%), PI resolved the investigation with the appropriate disposition but failed to conduct the investigation consistent with the child's safety needs due to the extensive, unexplained delay that kept the child in an unsafe situation. To appropriately reach a final disposition in the deficient investigations, additional information would have been required to determine whether children were subject to maltreatment. The alleged child victims in these 28

---

[13] To evaluate dispositional results for the investigations included in the sample, the Monitors designed an instrument for the case record review. To support consistency in scoring, both inter-rater reliability and secondary reviews were tested and used. For this portion of its assessment, the monitoring team reviewed a sample of PI investigations with an overall disposition of Inconclusive or Unconfirmed as reported by HHSC in its monthly data reports provided to the Monitors for the period under review. In future reporting, the Monitors will include their evaluation of investigations that PI closed with a disposition of Other during the period of review. Additionally, the Monitors reviewed five investigations that closed prior to 2023 as they were related and relevant to the PMC children and allegations in the investigations that closed during the initial period of review.

PI investigations, discussed below, had caseworkers employed by DFPS, except for Child C (OCOK) and Child F (2Ingage).

Often the deficiencies identified by the Monitors began at the start of the investigations during the expected assessment of the alleged victim's current safety and recounting of the allegations; these problems included a failure to promptly interview children face-to-face and, in some instances, a failure to conduct interviews with children at all, despite the Court's orders.[14] PI frequently failed to conduct the investigations in a manner that appropriately accommodated and considered the limited capacities, verbal or otherwise, among this population of PMC children. Due to the children's documented developmental challenges and accompanying eligibility for HCS services, it is unclear why PI investigators were so consistently ill-equipped to accommodate or consider them during investigations into allegations about the children.

The Monitors discovered lengthy and severe unexplained delays in investigations' completion that impacted child safety, including in Priority One investigations. Among the investigations the Monitors reviewed, very few were completed in 30 days and many had egregious delays, remaining open without activity for extended periods even in situations where the child was an alleged victim in newer additional serious allegations at the same placement.[15] Although untimely investigations had documented extensions approved, the delays in investigative activity were frequently without documented justification and/or exceeded reasonable periods of time to complete the investigation, as discussed in greater detail below. For example, in one instance

---

[14] Timely face-to-face contact is required by Remedial Orders 7 and 8. Remedial Order 7 states that:

> Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.

Remedial Order 8 states that:

> Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.

The Administrative Code also requires face-to-face contact, though it does not include a timeframe for face-to-face contact in PI investigations. It states that "[t]he investigator makes a face-to-face contact with the alleged victim except when the intake alleges any allegation type where there is no physical or emotional injury to the alleged victim and no risk of physical or emotional injury or death to the alleged victim." TEX. ADMIN. CODE §711.415 (a). By definition, nearly all allegations of abuse, neglect and exploitation that meet the criteria for investigation by PI include facts alleging physical or emotional injury or risk of physical or emotional injury. *See* TEX. ADMIN. CODE §§711.11-21 (including for example, the definition of Neglect: "[a] negligent act or omission which caused or may have caused physical or emotional injury or death to an individual receiving services or which placed an individual receiving services at risk of physical or emotional injury or death.").

[15] 26 TEX. ADMIN. CODE §§711.417- 419 (requiring investigations to be completed in 30 days and in some instances, more rapidly, unless there is an extension for good cause); Furthermore, Remedial Order 10 states that:

> Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

below, the Monitors discovered a child was an alleged victim in three investigations that remained open for more than 20 months while several new allegations of child abuse and neglect arose, resulting in three new additional investigations.[16]

PI's response is often fragmented and uncoordinated where multiple intake reports and investigations involve the same child or children at the same placement. The lack of management, diligence and coordination across many PI investigations fails to prioritize child safety and creates or exacerbates serious risk of harm for PMC children. For example, for one PMC child, the Monitors identified that there had been 12 investigations that remained open, including four Priority One investigations, into allegations of abuse and neglect of the child over a 12-month period while the child was placed at an HCS Group Home with one agency, C3 Academy. The child's records documented repeated outcries of Physical Abuse, including Physical Abuse by a staff member with a taser that PI eventually Confirmed, as well as Sexual Abuse and Neglect. Yet, the PI investigators did not appear to consider the connection between the child's outcries with her repeated instances of running away and serious attempts to self-harm at the group home. The PI investigators ignored her outcries by allowing the investigations to remain totally dormant for inexplicable periods of time—in multiple instances for over one year; when investigators finally returned to the allegations many months or over a year later, they appeared to adopt as fact the statements by staff members who claimed no wrongdoing or that the child routinely made false outcries.

In one Priority One investigation into allegations of Sexual Abuse of the child, the investigator documented that an administrator of the group home stated, "[the child] would make the same allegations all of the time, against staff and other individuals." But the Monitors' review showed that the child's investigative history at the placement did not include any prior investigations of Sexual Abuse at that time; therefore, either that statement was untrue or staff members failed to report the prior allegations of Sexual Abuse by the child. The investigator did not question the administrator about this lack of alignment of facts or failure to report. Moreover, the investigation into the child's allegation of Sexual Abuse sat dormant for one year.

Unlike DFPS investigations into child maltreatment, PI investigations do not involve a review of the referral history of the placement location,  the supervising agency or owner, or of specific group home locations, despite its relevance to the fact-finding endeavor.[17] For example and as a

---

[16] Additionally, when states submit the Application for a §1915(c) Home and Community-Based Services Waiver to the federal government, they are required to submit Appendix G, Participant Safeguards, which "describes the safeguards that the state has established to assure the health and welfare of waiver participants in specified areas." In its current draft dated September 2023, HHSC states that:

> The Department of Family and Protective Services Statewide Intake receives allegations of abuse, neglect, and exploitation of individuals enrolled in the HCS waiver program. The Department of Family and Protective Services and HHSC Provider Investigations are statutorily responsible for review, investigation, and response to those reports. HHSC Provider Investigations must complete all investigations within 30 days from the day the allegation is reported to Department of Family and Protective Services Statewide Intake.

*See* HHSC, *Draft Application for a §1915(c) Home and Community-Based Services Waiver*, available at https://www.hhs.texas.gov/sites/default/files/documents/hcs-waiver-renewal-draft-sept-2023.pdf.

[17] For example, DFPS instructs its Residential Child Care Investigations (RCCI) investigators to review the prior referral history at an operation or at other operations supervised by the same administrator, director, owner, or other person in charge. In a training document for its investigators regarding preponderance of the evidence, DFPS instructs the following in a section entitled "History as Evidence:"

point of comparison, according to DFPS, relevant history, including that of the alleged perpetrator, the operation, and the operation's regulatory history, "is given just as much weight as any other piece of evidence in the case and could tip the scales towards a specific finding when the evidence leads to two equally plausible conclusions."[18] PI investigators are instructed to review the case history of alleged perpetrators and victims; however, the referral history of abuse, neglect and exploitation allegations at a specific placement location, such as an HCS Group Home or the agency overseeing it, is not available in IMPACT. HHSC confirmed that it does not consider that history during PI investigations.[19]

Additionally, although PI investigators are instructed to review the case history of the alleged perpetrator and the alleged victim, the Monitors found critical and relevant failures with this analysis. In one instance noted above and discussed further below, a Priority One PI investigation into Sexual Abuse of a PMC child by an unnamed staff member at C3 Academy sat dormant for one year without investigative activity; during the course of that year, DFPS's CPI unit substantiated allegations that one of the child's caregivers, a staff member at the group home, sexually abused his stepdaughter, for which he was also charged criminally. The PI investigator did not appear to consider or know about the CPI substantiation at any point during the PI investigation. The Monitors discovered that the alleged perpetrator's history involved the CPI substantiation (using the same source that is available to PI investigators in IMPACT). But the investigator never discussed or considered the information about the CPI substantiation for Sexual Abuse against this staff member when conducting the investigation into the allegations by the child. The investigator eventually learned that the staff member had a criminal charge pending for

---

It is important to consider history during an investigation, as past behavior can be an indicator for future behavior. When we refer to history in a case, we mean all prior intakes and investigations involving the alleged perpetrator, *operation*, and alleged victim; the operation's regulatory compliance history; and the background check history for the alleged perpetrator. Case history is important because it is another piece of credible evidence that can corroborate or refute the allegations in the current investigation. Even if prior DFPS history was ruled out, found unable to determine, or was downgraded to a standards investigation, this can be important information to consider for the current allegations. History is given just as much weight as any other piece of evidence in the case and could tip the scales towards a specific finding when the evidence leads to two equally plausible conclusions.

DFPS, *Preponderance of the Evidence*, 1, 5 (undated training manual) (emphasis added) (on file with the Monitors).

Moreover, DFPS investigators are instructed to consider operational referral history to determine culpability of administrators. "If abuse, neglect, or exploitation that is the same as, or similar to, the current allegations has been alleged under the supervision of the same person in charge, the investigator evaluates whether the person in charge failed to make a reasonable effort to prevent the allegations from reoccurring." DFPS, *Child Care Investigations Handbook*, §5110, *available at* https://www.dfps.texas.gov/handbooks/CCI/Files/CCI_pg_5000.asp#CCI_5110.

[18] DFPS, *Preponderance of the Evidence*, 1, 5 (undated training manual) (on file with the Monitors).

[19] The monitoring team inquired with HHSC about locating the child abuse, neglect and exploitation referral history for locations over which PI has jurisdiction, such as an HCS Group Home. HHSC informed the Monitors that PI investigators do not consider such information during investigations. HHSC stated that "the investigator looks at prior case history that involves either the alleged perpetrator or the alleged victim. PI does not have prior case history data by provider agency." HHSC further explained that when it performs sampling of PI investigations at an operation during the recertification process, the process might lead to additional inquiry into systemic concerns and might result in additional inquiry into the "operational history." E-mail from Katy Gallagher to Megan Annitto, et al. (December 14, 2022).

sexual assault during interviews with a different staff member at C3 Academy; that interview was three months after CPI substantiated the staff member for Sexual Abuse.

The monitoring team also observed PI's repeated failures to conduct investigations consistent with the relevant definitions of Neglect, creating additional child safety risk. Specifically, PI investigators failed to consider or discuss whether administrators were neglectful for a failure to "provide a safe environment for [the alleged victims], including the failure to maintain adequate numbers of appropriately trained staff, if such failure results in physical or emotional injury or death [to the alleged victims] or which placed [the alleged victims] at risk of physical or emotional injury or death."[20] The failure to investigate that issue included situations that were crying out for such analysis by the State of Texas. For example, with one group home, law enforcement officers repeatedly expressed alarm at the deficits in care for residents that they encountered. In one instance, a staff member locked a PMC child in a room with another resident and left the facility at some time prior to 3:30 a.m. When the child and the other resident broke out of the locked room and sought help from a neighbor, law enforcement was unable to locate a staff member to come and care for the individuals. The record ultimately demonstrated that for at least two hours, staff members left the child and the other resident without supervision, access to an exit or bathroom, and without means to summon help in the middle of the night. PI failed to substantiate the allegations of Neglect; moreover, as in many instances, the PI investigator did not consider whether this event evidenced a failure by the administrators "to provide a safe environment for [the alleged victims], including the failure to maintain adequate numbers of appropriately trained staff, if such failure results in physical or emotional injury or death to [the alleged victim] or which placed [the alleged victims] at risk of physical or emotional injury or death."[21] Failure to analyze these key elements of Neglect also occurred in instances where staff members expressly acknowledged to PI investigators the lack of adequate staff resources and/or training provided to them as caregivers.

In another example, a staff member at Educare Community Living Corporation (Educare), an HCS Group Home, reported that although she was aware of an alleged victim's repeated self-harming, administrators did not provide the staff member with training related to the child's care. In the investigation findings, the investigator documented: "It is a concern that there was no record to show that [the staff member] was trained on [the alleged victim's] Special Needs or Person-Directed Plan." Yet the investigator failed to consider the relevance of these facts to the Neglect allegation, despite their applicability to the definition of Neglect in the Texas Administrative Code.[22] In another instance, a staff member at Educare called SWI herself to report Neglect because she was not able to properly care for the six individuals that the administration left in her care.

C. Investigative Summaries

Below are the facts and conclusions in the 28 investigations which the Monitors determined PI inappropriately resolved or conducted with substantial investigative deficiencies.

---

[20] See 26 TEX. ADMIN. CODE § 711.719(a)-(b)(3).
[21] See 26 TEX. ADMIN. CODE §711.719(a)-(b)(3).
[22] See 26 TEX. ADMIN. CODE §711.719(a)-(b)(3).

## Child A, age 15, IQ of 56[23]

The monitoring team reviewed six PI abuse or neglect investigations with a disposition of Unconfirmed or Inconclusive that involved a child (Child A,[24] age 15) while she lived at Educare, an HCS Group Home.[25] According to Child A's Plan of Service, she has the following diagnoses: Fetal Alcohol Spectrum Disorder; Persistent Depressive Disorder, Intermittent Major Depressive Episodes; Disruptive Mood Dysregulation Disorder; and Intellectual Disability, Mild. Child A's Full-Scale IQ is reported as 56. Child A was placed at Educare from May 11, 2020 to April 30, 2021.[26] During this one year, Educare moved her among at least four of its different group home locations.[27] Five of the six abuse and neglect investigations the monitoring team reviewed involved allegations that appear to have occurred at the final Educare location, although it is not possible to confirm this in the documentation provided to the Monitors nor is it apparent in the documentation included in the child's placement and investigative records.[28]

As the following table illustrates, PI opened these six investigations of alleged abuse and neglect of Child A within a short time-period of eight weeks from March 7, 2021 to May 4, 2021. However, most of the investigations sat dormant for long periods of time with no activity, and the

[23] In its recent guidelines, HHSC characterized the intellectual functioning of children with lower full-scale IQ test scores in the following ways: 1): IQ between 70 and 80: Children may need assistance with complex tasks, navigating social nuances, judgment and decision-making. Children may require special education services while remaining mainstreamed; 2): IQ between 55 and 70: Children's memory, judgment and decision-making are impaired. Children with IQ scores in this range have a concrete problem-solving approach and may struggle to use academic skills in daily life; and 3): IQ between 40 and 55: Children experience a marked difference in communicative behavior from their peers and their social judgement and decision-making abilities are limited. Children in this group reach elementary academic skill development. HHSC, *Determination of Intellectual Disability Best Practice Guidelines 2022*, 59 & 74 (2022), available at https://www.hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/providers/long-term-care/lidda/did-best-practice-guidelines.pdf. The IQ is noted due to its significance to the discussion about the investigative deficiencies surrounding child interviews and assessment of child safety and risk, though it is not the only relevant factor. As noted above, it is also not the only factor for HCS waiver qualification decisions.

[24] As of September 1, 2023, Child A is placed in another HCS Group Home (1-4). She has been there for one year. She is an alleged victim in one open Neglect investigation that opened on January 5, 2023.

[25] As with other children included in this report, the child's Living Arrangement typically appeared in IMPACT as "HCS Group Home 1-4" through most or all of the time period she was placed with Educare; in this and other instances, HHCS's data reports listing the investigation identified "Facility Type" as "Private HCS Home" and the investigations routinely referred to the location as a "group home." The Monitors used HCS Group Home to describe it due to the child's listed Living Arrangement in IMPACT.

[26] Based upon the child's case contacts in IMPACT and information contained in investigations, Child A's last day with Educare was on April 30, 2021, despite her placement log recording May 10, 2021. From April 30, 2021 until May 10, 2021, it appears Child A was hospitalized for ongoing mental and behavioral health issues.

[27] Child A's record in IMPACT indicates that over the one-year period Child A was placed at various group homes run by Educare and that Educare moved Child A among at least four separate Educare group homes during this period, all of which were located in the same city in Texas and appeared to have some shared staff members. Child A's placement record does not include documentation of these moves within Educare group homes; the monitoring team identified these moves by reading Child A's case contact notes. The child's case contact notes do not provide an explanation for Child A's multiple moves nor the exact dates the child was placed at each Educare location. Lastly, as the following PI investigations involving Child A illustrate, it is unclear whether the placement instability Child A experienced while placed at Educare contributed, in some part, to her emotional and behavioral instability during this time period.

[28] The first investigation (IMPACT ID: 48570835) described below may have involved allegations that occurred at the Educare location that preceded Child A's final placement location but as noted above, the specific group home location is not apparent in the investigative record.

investigations were completed between June 15, 2021 and January 20, 2023, with the longest investigation spanning 21 months prior to completion.[29]

Table 1: HHSC PI Abuse or Neglect Investigations of Child A

| Case ID | Intake Date | Completed Date | Closed Date | Months Open Prior to Completion | Allegation Type | Alleged Perpetrator |
|---------|-------------|----------------|-------------|----------------------------------|-----------------|---------------------|
| 48570835 | 3/7/2021 | 12/21/2022 | 1/23/2023 | 20 months | Neglect | Staff 1 |
| | | | | | Neglect | Staff 2 |
| | | | | | Neglect | Unknown |
| | | | | | Emotional Abuse | Staff 3 |
| | | | | | Physical Abuse | Unknown |
| 48622287 | 4/14/2021 | 1/20/2023 | 2/23/2023 | 21 months | Neglect | Unknown |
| 48624895 | 4/16/2021 | 1/12/2023 | 2/23/2023 | 21 months | Neglect | Unknown |
| 48632744 | 4/22/2021 | 6/15/2021 | 5/11/2022 | 1+ months | Neglect | Staff 4 |
| 48646196 | 5/1/2021 | 7/9/2021 | 10/8/2021 | 2 months | Neglect | Staff 5 |
| 48656069 | 5/4/2021 | 9/2/2021 | 11/3/2021 | 4 months | Neglect | Staff 6 |
| | | | | | Neglect | Staff 4 |
| | | | | | Neglect | Unknown 1 |
| | | | | | Physical Abuse | Staff 6 |
| | | | | | Physical Abuse | Unknown 2 |
| | | | | | Emotional Abuse | Staff 6 |
| | | | | | Emotional Abuse | Unknown 1 |

In five of the six investigations, the investigators requested and received an extension; however, the investigators did not include any documented explanation for the substantial investigative delays nor the reason that formed the basis of the request to complete the investigations so late—three of which took well over a year to complete despite serious allegations about incidents of Physical Abuse, self-harm, and supervision lapses.[30] As detailed below in the summaries of each investigation, the monitoring team's review found that PI's substantial failure to timely and appropriately investigate all six investigations involving Child A contributed to ongoing safety risks for Child A while she was placed at Educare. PI failed to conduct the investigations in a manner that took into account the child's safety at all times and, instead, the record of investigations involving Child A exhibits serious disregard for child safety.

## 1. IMPACT Case ID: 48570835

Summary of Key Allegations:

---

[29] Investigations conducted by PI are required to be completed in 30 days (some within a shorter time-period, depending on location) unless there is an extension granted for good cause. 26 TEX. ADMIN. CODE §§711.417- 419.

[30] Presumably, some of the initial delay was due to the COVID-19 pandemic; however, the lack of any investigative activity and extreme delay ran well beyond that time-period and are without explanation for most of these investigations.

On March 7, 2021, a DFPS caseworker reported the following allegations regarding Child A at Educare. First, the child alleged that three days prior to the report, a staff member (Staff 1) provided her with money and allowed her to walk alone to a nearby store where she purchased a bottle of Tylenol containing 24 pills. When the child returned to the placement, she allegedly went to her bedroom and ingested all 24 pills. The reporter stated that at the time the intake report was made, the child was at a hospital for ingesting the pills. When the caseworker went to visit the child at the hospital, the child also reported to her caseworker that on an unknown date, a different staff member instructed her to sleep in the same bed as another individual living in the home (Individual 1, age unknown) and she complied. (Educare is a home to both minors and adults who qualify for services; the age of Individual 1 is unknown to the Monitors and appears to be an adult).[31] The following night, after the child and Individual 1 allegedly slept in the same bed per a staff member's instruction, Staff 1 told the child and Individual 1 that one person had to sleep in a bed and the other on the couch. Next, the child disclosed to her caseworker that on an unknown date, she engaged in self-injurious behavior by cutting herself with a plastic pen at the placement; the caseworker observed scratches on the child's wrist. In response to the child's self-injurious behavior, a third staff member (Staff 3) allegedly yelled at the child to stop cutting herself. When the child responded by telling Staff 3 she was going to hit him, Staff 3 reportedly threatened to hit the child. The child also disclosed to her caseworker that staff members at the placement said mean things to her and hurt her feelings. Lastly, the child told the reporter that staff members did not provide her with her morning medications. The reporter stated that the child had experienced two hospital stays in a short duration of time while placed at the group home. There is no documentation in the record indicating that any individual from Educare reported any of the above allegations to SWI, including the child's purchase and ingestion of 24 Tylenol pills.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority One investigation, PI initiated an investigation of Emotional Abuse, Neglect and Physical Abuse of Child A by three named staff members and two unknown staff members. Due to substantial investigative deficiencies, most notably that it took one year and eight months to complete the investigation, a disposition of the allegations cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed or Other to all of them.

During the investigation, the investigator concluded that PI did not have jurisdiction over the Neglect allegation regarding a staff member instructing Child A and another resident to sleep in the same bed. The investigator cited Title 26 of the Texas Administrative Code, §711.7 and concluded that the allegation "does not fall within the purview about HHSC PI. This information is being referred back to the provider and, if applicable, forwarded to the appropriate regulatory program, law enforcement, or Office of Inspector General, for appropriate action."[32] There is no

---

[31] Some HCS Group Homes house both adults and children. When the residents or "clients" are children in DFPS custody, the Monitors have access to their ages in IMPACT. When the residents are adults and children who are not in DFPS custody, the Monitors do not consistently have access to their ages in IMPACT. The investigator in the above investigation failed to determine or document whether Individual 1 was a child or adult, a critical lapse in assessing the allegation and risk to Child A. Based on information Child A provided about Individual 1, including her first name, which appears in another investigation at Educare and is connected to an adult, the investigative record suggests that Individual 1 is an adult; however, the monitoring team cannot definitively confirm this information.

[32] The investigator did not cite from among the specific provisions within the Administrative Code Section 711.7 when documenting the decision.

additional documentation available in the records accessible to the Monitors about any actions that followed with regard to a staff member's instruction to the 15-year-old child to share a bed with another resident who appears to be an adult living in the home. The record also does not contain additional information confirming whether the child and Individual 1 had their own beds at that time.

Monitors' Review:

The investigator did not determine whether staff members provided Child A with adequate supervision when she was able to leave the home to purchase Tylenol and then left the home again and subsequently consumed 24 Tylenol pills, which resulted in her hospitalization.

The investigator did not interview any staff members until 21 months after the investigation commenced. During these delayed and flawed interviews, the investigator did not reference the relevant incident report. The incident report was included in the investigative record and contained an unnamed staff member's documentation of Child A's departure from the home and ingestion of pills, during which time the staff member documented that he was the only staff member on site:

> Not even 45mins later [the child] walks back to house showing staff that she went to the store [sic] that the site manager gave her permission to go and that's when she showed staff what she had bought from the store. She showed a 20oz soda and a small bottle that contain[ed] 24 pills of migraine medication. Staff told her she can't have it[,] she said she don't give a fuck[,] she keeping them and that's when she left to walk to the other group home again after the site manager told her not to leave. She then walked back in the house[,] walk to the backyard and said she wants to die and that she already took all the medications. Staff notify both case managers, site manager and then call 911 so she can go to the hospital… During the whole incident staff was alone and the only staff on shift.

During the interviews with staff members, the investigator did not attempt to identify the staff member who authored the above incident report nor the person responsible for the child's supervision at the time of the elopement and self-harming behavior. Instead, the investigator's interviews with staff members and her documentation thereof appeared to lack detailed questioning about the alleged incident, including a failure to identify which staff member(s) was on duty. Due to extensive delays and inadequate questioning, the investigator did not gather the following information to inform an assessment of the allegation of Neglect:

- How many children or other residents was the single, on-duty staff member responsible for supervising at the time of the incident? What was the group home's contractual staff-to-client ratio and was the group home in compliance with this ratio at the time of this incident?

- What efforts, if any, did a staff member make to prevent the child from leaving the placement, particularly given that the child possessed a bottle of pills and had a documented history of self-harming behavior and suicidal ideation? Additionally, given the child's history of frequent elopement, what safety precautions had the group home implemented to prevent, as best as possible, the child from eloping?

14

- Given that the child left the placement with pills, did the staff member notify the other HCS Group Home that the child was walking toward the home and had pills with her?

In the absence of gathering the above information, the investigator appeared to base the investigative finding of Unconfirmed for this Neglect allegation on the evidence that the child was not subject to heightened supervision at the time of the incident. Statements and conclusions in the investigative record seemed to suggest that any acts and omissions by staff members did not rise to the level of Neglect when, as here, the child eloped and self-harmed so long as a staff member adhered to her "routine" supervision level.[33]

The investigative record included documentation demonstrating that while placed at Educare, the child exhibited emotional dysregulation, suicidal ideation leading to inpatient hospitalization and, as discussed in this investigation, a serious incident of self-harm. Given these re-occurring, high-risk behaviors, the investigative record raised critical questions regarding the appropriateness of the child's supervision while with Educare; one of the most pressing among them was (and remains) whether Educare failed to "establish or carry out an appropriate individual program plan or treatment plan" for Child A that resulted in or placed her at risk of physical or emotional injury or death.[34] But the investigation into Neglect did not further explore or discuss that central issue as part of the investigation. In addition, when the investigator interviewed the Educare case manager six months after the investigation commenced and when the child was no longer placed with Educare, the case manager reported that the child did not have a Behavior Support Plan while at the placement nor did staff members have "special training" or instruction about caring for Child A, despite her ongoing high-risk behaviors. The investigator did not discuss or further explore whether this failure was tantamount to or at least evidence of Neglect due to a failure by Educare "to provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff" that resulted in or created risk of physical or emotional injury or death for this child.[35]

With regard to the remaining allegations of Physical Abuse, Emotional Abuse, and Neglect related to the administration of medication and instructing the child to sleep in a bed with another resident, the Monitors also find the investigation was deficient. While the child denied most of the disclosures that she previously made to her caseworker related to these allegations (except for the allegation that a staff member instructed her to share a bed with another resident, which she maintained), the investigation's delay of one year and nine months made it impossible to reconcile the child's outcries to her caseworker (the reporter) with her statements to the investigator. For example, regarding the allegation her medication was not administered appropriately, the investigator's lack of activity precluded the opportunity to probe the records at the group home

---

[33] During the six investigations discussed in this report involving Child A, PI investigators gathered the following information regarding Child A's supervision requirements. HCS Group Home administrators and staff members reported that Child A's supervision level was "routine" and that this supervision level did not require a staff member to maintain one-to-one nor line of sight supervision. While supervising Child A, a staff member was permitted, according to facility documentation, to care for and supervise other residents and this care for other residents may occur in a separate room or part of the HCS Group Home from where Child A was located. Child A's "Level of Need" (LON) was five. According to the investigative record, an individual with an LON of five had skills ranging from fairly independent to requiring some personal care reminders and guidance and staff intervention may vary from reminders to 24-hour guidance and supports.

[34] *See* 26 TEX. ADMIN. CODE §711.719(b)(1).

[35] *See* 26 TEX. ADMIN. CODE §711.719(b)(3).

and timely review the information with staff members. Lastly, instructing a child to sleep in a bed with another resident, who appears to be an adult, is an allegation of Neglect and should have been investigated for placing the child at risk of physical or emotional injury.[36]

Notable Gaps in Investigation Timeframe:

The investigation took one year and eight months to be completed. The intake was received on March 7, 2021. There was no investigative activity from April 2021 to mid-September 2021 nor from late September 2021 to October 2022. An extension was approved on September 14, 2022, more than one year after the investigator requested it. The record did not include any explanation for the extension nor for the extended periods without investigative activity. The investigation was completed on December 21, 2022, approved on December 21, 2022, and closed on January 23, 2023.[37]

## 2. IMPACT Case ID: 48622287

Summary of Key Allegations:

On April 14, 2021, approximately one month after the above investigation began, PI initiated another investigation of Neglect regarding Child A at Educare. According to the intake report, a child's parent reported that her son (Child B, age 11, not in DFPS care) arrived at school with cuts on his wrists and he alleged they were caused by Child A. Child B told his parent that Child A had cuts all over her wrists, as well. The parent also reported other allegations that pertained only to her son.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority One investigation, PI initiated a Neglect investigation related to Child A and Child B by an unknown staff member. Due to substantial investigative deficiencies, among them the fact that the investigation took one year and nine months to be completed, a disposition for the Neglect allegation related to Child A cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

The majority of this deficient investigation focused on allegations related to Child B, however, the following investigative deficiencies were identified as related to Child A:

- The investigator never conducted a face-to-face interview with Child A about the allegations and instead, the investigator attempted a telephone interview with Child A on December 20, 2022 – over a year and half after SWI received the intake.[38] When

---

[36] 26 TEX. ADMIN. CODE §711.719 (a).

[37] According to HHSC, investigations may remain open for 60 days after their completion "to allow for an appeal or to work an appeal. PI typically waits 60 days after supervisor approval before closing out the case in IMPACT to allow for an appeal, if any. There could be a longer gap if the case was appealed and additional work was needed." E-mail from Katy Gallagher to Megan Annitto (December 12, 2022).

[38] Related to a separate investigation (IMPACT ID: 48624895) discussed below in summary number three, the investigator briefly observed and spoke to Child A on April 16, 2021, two days after the above investigation

interviewed by telephone 20 months after the alleged incident and when she was no longer placed at the group home, Child A reported to the investigator that she could not recall the alleged incident involving Child B. The investigator documented that Child A then reported that she did not want to speak with the investigator and hung up. The investigator did not attempt to contact Child A again.

- The investigator's failure to timely observe and interview Child A prevented her ability to assess whether Child A had "cuts all over her wrists," as alleged by Child B and assess her safety at the placement. Further, given the serious nature of the allegations of self-harm that PI received just over one month earlier involving Child A (IMPACT ID: 48570835; discussed above), and continued allegations of Child A engaging in self-harming behavior at the HCS Group Home, and in light of the Court's explicit remedial order for timely face-to-face contact with PMC children who are the subject of abuse or neglect investigations, it was incumbent upon the investigator to timely interview Child A and assess and observe her safety at the placement.

- The investigator conducted a timely face-to-face interview with Child B. Regarding the alleged incident, Child B reported that Child A used a broken piece of glass to cut his wrist. Child B stated that he and Child A were in the group home's backyard at the time of the incident; staff members were allegedly inside the facility while the children were allegedly cutting one or both of their wrists outside.

- During the investigation, the investigator did not timely or adequately question staff members to evaluate whether they provided Child A and Child B with appropriate supervision at the time of the alleged incident. Likely due to the investigator's untimely interviews with staff members over a year and a half after SWI received the intake report, staff members were unable to recall the alleged incident with any detail.[39,40] Like the above investigation, staff members reported that the children were not subject to a heightened level of supervision at the time of the alleged incident and therefore, the investigator reported no concern for Neglect. During the investigation, the investigator did not attempt to establish the date and duration of time Child A and Child B were reportedly alone outside in the backyard using glass to cut Child B's wrist and possibly Child A's wrist; nor how Child A, a child known to self-harm, had access to a broken piece of glass.

Notable Gaps in Investigation Timeframe:

The investigation took one year and nine months to be completed. The intake was received on April 14, 2021. An extension was approved on May 14, 2021, with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from April 2021 to December 2021. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January

---

commenced while she was placed in an ambulance; because the conversation was brief and occurred in an ambulance, the investigator was not able to speak to Child A about the allegations in either investigation.

[39] The group home administration did not provide the investigator with an incident report nor any other documentation related to the allegation.

[40] The investigator conducted timely interviews with the HCS Group Home case manager, administrator, and nurse. These individuals were not directly involved in the alleged incidents of Neglect in this investigation.

20, 2023, approved on January 20, 2023, and closed on February 23, 2023.

### 3. IMPACT Case ID: 48624895

Summary of Key Allegations:

On April 16, 2021, two days after SWI received the above intake report, a law enforcement officer reported an allegation of Neglect of Child A. According to the reporter, on April 14, 2021, a staff member at the group home contacted law enforcement to report Child A as a runaway. The child reported to law enforcement that she cut herself but that she did not want to kill herself, she "only wanted to feel the cuts." The child reportedly had superficial wounds to her right wrist.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to Child A by an unknown Educare staff member. This became PI's third concurrent pending investigation involving Child A as an alleged victim. Without explanation, the investigation took one year and nine months to be completed—including a period of over a year when it sat entirely dormant before it was finally completed in January 2023. Due to substantial investigative deficiencies, a disposition of the Neglect allegation related to Child A cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed; moreover, the investigation evidenced a serious disregard for child safety.

Monitors' Review:

On April 16, 2021, the investigator attempted to conduct a face-to-face interview with Child A regarding the allegations that law enforcement reported to have occurred two days prior on April 14, 2021. Upon arriving at the HCS Group Home, the investigator observed that two police units and an ambulance were present and Child A was in the ambulance due to another, separate incident of self-harm.[41] With permission from a paramedic, the investigator briefly spoke with Child A in the ambulance and documented the following in the investigative record: "[Child A] looked at investigator and smiled and said that she was doing okay that she was not trying to hurt herself but that she had been self injurious again. [Child A] stated that she should be back at the home tomorrow." The investigator did not document whether he observed any injuries on the child's body. Three days later, the investigator made a second attempt to conduct a face-to-face interview with Child A at the placement; there is no documentation about the reason the interview did not occur and at that time, Child A was placed at a behavior unit of a local hospital.

Over the following five months after the investigator attempted to interview Child A at her placement, the investigator conducted minimal investigative activity and then the investigation sat dormant for over a year from October 2021 to December 2022. During the lapse in investigative activity, additional allegations were reported involving Child A and no one sought to interview the child about these allegations nor conduct additional investigative activity for this investigation. Finally, on December 8, 2022, 20 months after the intake, an investigator contacted the child for an interview through a telephone call using the FaceTime video application. When the investigator

---

[41] The allegations related to the incident that resulted in the paramedic response are discussed below in investigation IMPACT ID 48632744.

asked Child A on FaceTime about "what happened" over a year ago when Child A was placed at the HCS Group Home, Child A reportedly had difficulty remembering the incident. She responded that she did not remember the reason she ran away nor why she cut herself; she could not recall which staff member was working nor where she was located when law enforcement found her. In the absence of a timely face-to-face interview, the investigator failed to assess and address, as appropriate, the child's safety at the placement, observe the child's alleged injuries and gather information from the child about the allegation of Neglect.

During interviews conducted by the investigator 20 months after SWI received the intake report, collateral staff members and the reporter also stated that they were unable to recall the alleged incident with any detail to inform the investigator's assessment of the allegations. The investigator was unable to identify an alleged perpetrator who was responsible for Child A's supervision at the time of the incident. While staff members were unable to recall the alleged incident, staff members reported that at the time of the incident, Child A was not subject to an increased level of supervision. The investigator documented and appeared to adopt the view of Child A's case manager at Educare that Child A was not likely subject to "abuse or neglect because there was not an increased level of supervision that required staff to see [Child A] at all times."

Next, during the investigation, staff members from Educare provided the investigator with records related to Child A. The records included the following case note entered by an Educare nurse on April 14, 2021, one of the days law enforcement responded to a call from the placement related to Child A:

> [Unnamed Direct Care Staff] called to report [Child A] self inflicted 8-10 superficial scratches to rt arm. [Unnamed Direct Care Staff] states consumer was having a behavior and left the home approximately at 9pm. Staff from another group home called [Unnamed Direct Care Staff] to inform her [Child A] was at the group home at 9:45pm. [Child A] was returned to her group home. She continued with behaviors she obtained a tap from a soda can [and] made superficial cuts to her rt arm. Case Manager [name removed] was called to assist with [Child A]. [Case Manager] was able to assist in deescalating [Child A's] behavior. [Unnamed Direct Care Staff] cleaned scratches with soap and water. [Child A] refused to allow vital signs to be taken. [Child A] was assisted to bed. [Direct Care Staff] called triage to report scratches… [Direct Care Staff] to monitor for bleeding, redness, drainage from scratches or pain. [Direct Care Staff] to call triage if behavior continues or if consumer elopes…

Due to investigative deficiencies, the investigative record did not establish whether the above incident was related to the allegations included in the intake report or a separate incident. The investigator did not attempt to interview the nurse who entered and signed the contact note. When the investigator interviewed another case manager named in the contact 20 months after the investigation began, the case manager reported that he did "not recall who [Child A] is." Additionally, the investigator did not reference the above contact during interviews with other staff members to identify the following: which staff member was responsible for Child A at this time; whether this individual acted appropriately to prevent, as best as possible, Child A's elopement and self-injurious behavior; nor whether the facts included were related to the incident under investigation reported by law enforcement.

With such a substantial delay, the investigator would not have been able to determine—nor did she appear to contemplate at any point earlier in the investigation—a critical question about Neglect, namely whether Educare failed to "establish or carry out an appropriate individual program plan or treatment plan" for Child A that resulted in or placed her at risk of physical or emotional injury or death.[42] Nor did the investigator discuss or determine whether the allegations demonstrated a failure to "provide a safe environment for [the child], including the failure [by Educare] to maintain adequate numbers of appropriately trained staff" that resulted in or created risk of physical or emotional injury or death for Child A.[43]

Notable Gaps in Investigation Timeframe:

The investigation took one year and nine months to be completed. The intake was received on April 16, 2021. An extension was approved on May 14, 2021, with a documented reason of "Extraordinary Circumstances." There was no investigative activity for one year and eight months, from April 2021 to December 2022. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 12, 2023, approved on January 12, 2023, and closed on February 23, 2023.

## 4. IMPACT Case ID: 48632744

Summary of Key Allegations:

On April 22, 2021, six days after the above investigation began (IMPACT ID: 48624895), a law enforcement officer reported allegations related to an incident that occurred on April 16, 2021 when Child A was observed by the above investigator in an ambulance. According to the officer, law enforcement was dispatched to the Educare home regarding a "suicidal person." Reportedly, a staff member at the placement contacted law enforcement because Child A was cutting herself with a knife and the staff member was unable to recover it from the child. After engaging with Child A, a law enforcement officer allegedly retrieved the knife from the child. A law enforcement officer observed that Child A had carved the word "fake" into her left leg. Shortly thereafter, a law enforcement officer reportedly accompanied EMS paramedics and Child A to a hospital.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to Child A by a named staff member, Staff 4, its fourth concurrent pending investigation related to serious allegations of Neglect regarding Child A. Due to substantial investigative deficiencies, a disposition of the Neglect allegation related to Child A cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

The investigative record showed that Child A was involved in the following two incidents on April 16, 2021, the day under investigation; in response, the solo, on-duty staff member (Staff 4) contacted law enforcement twice when she was unable to respond to the incidents. During her

---

[42] See 26 TEX. ADMIN. CODE §711.719(b)(1).
[43] See 26 TEX. ADMIN. CODE §711.719(b)(3).

face-to-face interview with the investigator on April 28, 2021, six days after the date of the intake report received on April 22, 2021,[44] Child A stated that during the first incident (on April 16), she retrieved a knife from a drawer, presumably at the placement, and that no one saw her take the knife. When Staff 4 identified that the child had a knife (the same day), she attempted to retrieve the knife from the child but was unable to do so. Staff 4 stated in her interview (the interview was nearly one month after the intake) that she contacted law enforcement that same day, who secured the knife from the child and then left the placement. Both Child A and Staff 4 reported to the investigator that within the next hour, the child acquired a pickle jar from the kitchen and went outside. Once outside in the placement's backyard and when Staff 4 was not watching, Child A alleged that she broke the jar and cut her leg with the broken glass and wrote the word "fake" into her skin. According to Child A, after cutting herself with the glass, she went back inside the placement and informed Staff 4 about the cut, who then contacted law enforcement again. Child A and Staff 4 provided similar accounts of the incidents. However, the investigator failed to clarify pertinent information regarding the allegations with Staff 4 and a facility case manager she interviewed, nor did the investigator attempt to interview additional administrators. In addition, despite the other related allegations pending in the above investigations, there is no evidence that the investigator attempted to identify and assess these allegations jointly.

- Given Child A's frequent engagement in self-harming behavior at the placement, which at this point was well-known and well-documented, the investigator did not assess whether the administrators of the HCS Group Home implemented any preventive safety measures to reduce the likelihood that the child could gain access to both a knife and a glass jar in a single day and then use one of those items to self-harm.

- The investigator did not assess how often Staff 4 was required to conduct checks on Child A and whether Staff 4 adhered to this requirement on the date of the incident. The investigator did not assess how long the child went unsupervised in the backyard when she cut herself with the jar.

- The investigator did not assess why the child was permitted to be alone in the backyard after having acquired a knife within the past hour requiring intervention from law enforcement to recover it.

On the date of the incidents, Staff 4 reported to the investigator that she was the only staff member on duty and that she was also responsible for the care of another resident who was attempting to elope from the placement. Staff 4 reported that she had asked the administrators of the placement "constantly" for an additional staff member to assist in the care of the residents; however, the placement administrators had not yet hired another staff member. Staff 4 also reported that while she was aware of Child A's history of self-harming behavior, administrators did not provide her with any training related to Child A's care. In the investigative findings, the investigator documented the following concern: "It is a concern that there was no record to show that [Staff 4] was trained on [Child A's] Special Needs or Person-Directed Plan." The investigator did not appear to consider this critical concern in her assessment of the Neglect allegation.

---

[44] The investigator attempted to meet Child A at her placement promptly; however, at that time, the child was at a hospital and the investigator did not attempt to interview the child at the hospital.

Finally, as in the above investigations relating to Child A, the investigator found that at the time of the incidents, Child A was not subject to any heightened supervision. At the time of the allegations, the child was placed with Educare for nearly a year and in this specific Educare group home location for approximately two months; however, the case manager reported to the investigator that Educare personnel had not yet completed a Behavior Support Plan for the child.[45] The case manager reported that the placement personnel were presently in the "observation and data collection stages" of creating Child A's Behavior Support Plan and once the plan was completed, the staff member(s) responsible would conduct a meeting and potentially set certain restrictions, such as "locked sharps" and an increased level of supervision. Following this incident, the case manager reported that staff members locked up sharp items in the home in an emergency type status. Child A's supervision otherwise remained routine.

By the time the investigator was closing this investigation, there were six open investigations of abuse and neglect involving this child at Educare and all of them originated in the span of two months. Despite that fact, as in the other investigations of abuse and neglect of Child A, again, the investigator failed to consider whether Educare failed to "establish or carry out an appropriate individual program plan or treatment plan" for Child A that resulted in or placed her at risk of physical or emotional injury or death.[46] In addition, even after the staff member in this investigation reported that she was not able to properly supervise the individuals in her care and did not have the training to do so, the investigator failed to discuss or further explore whether Educare administrators were neglectful due to their "failure to provide a safe environment for [Child A], including failure to maintain adequate numbers of appropriately trained staff" that resulted in or created risk of physical or emotional injury or death for this child.[47] Finally, perhaps because, as HHSC confirmed, PI investigators do not have access to review the referral history of the site when conducting an investigation unless it involves the same alleged perpetrator or alleged victim, the investigator did not consider highly relevant information about whether there were similar patterns of allegations involving the facility.[48]

Notable Gaps in Investigation Timeframe:

The investigation took seven weeks to be completed. The intake was received on April 22, 2021. An extension was approved on May 21, 2021, with a documented reason of "A statement from the Area Site Supervisor is required to make a determination in this case." The investigation was completed on June 15, 2021, and approved on June 15, 2021. The investigation closed on May 11, 2022.

## 5. IMPACT Case ID: 48646196

---

[45] It is unclear from the investigative records whether Educare had created and implemented a prior Behavior Support Plan for Child A when she was placed in other Educare group home locations and, if so, why this plan either could not be or was not shared between group home locations.

[46] 26 TEX. ADMIN. CODE §711.719(a)-(b)(1). *See also*, 26 TEX. ADMIN. CODE §711.423(c) (stating that "the perpetrator is 'systems issue' when the investigator determines that the lack of established policy or procedure contributed to the abuse, neglect, or exploitation.").

[47] *See* 26 TEX. ADMIN. CODE §711.719(a)-(b)(3).

[48] *See e.g.*, DFPS, *Preponderance of the Evidence*, 1, 5 (undated training manual) (on file with the Monitors).

<u>Summary of Key Allegations:</u>

On May 1, 2021, approximately one week after the above investigation began (IMPACT ID: 48632744), a law enforcement officer reported another allegation of Neglect of Child A at the placement—the fifth report in less than eight weeks. The officer reported that on April 30, 2021, law enforcement was dispatched to the placement. When law enforcement arrived at the home, a staff member (Staff 5) informed law enforcement that Child A was in the living room where law enforcement observed that Child A was "emotionally upset and argumentative" and had numerous cuts on both of her forearms and thighs. The law enforcement officer stated that most of Child A's injuries seemed older, although some appeared new; reportedly, none of Child A's injuries had broken through her skin. The law enforcement officer observed that Child A was hiding a small orange knife on her person. The child placed the knife on the floor at law enforcement's request. According to the reporter, Child A refused medical or mental health treatment. Law enforcement instructed the on-duty staff member to hide all knives and scissors from the child. The officer attempted to contact Child A's Educare case manager but was unable to reach him.

<u>Assigned Priority and Disposition:</u>

Following receipt of this fifth intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to Child A by a named staff member (Staff 5) which became its fifth concurrent pending investigation of related allegations involving Child A. Due to substantial investigative deficiencies, a disposition of the Neglect allegation related to Child A cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

<u>Monitors' Review:</u>

During the investigation, the investigator failed to gather pertinent information necessary for the investigator to make an informed disposition for the allegation of Neglect:

- The investigative record showed that Child A likely obtained the knife from school and hid the knife in her room. In light of the child's recent self-harming behavior, the investigator did not determine or inquire whether Educare administrators provided training for staff members or communicated to them policies or directives to minimize the risk that a harmful object, such as a knife, could be hidden in the child's room.

- Next, the investigator found that Staff 5, who was responsible for the child's supervision on the day of the incident, did not typically work at this Educare HCS Group Home; Staff 5 was employed at another location and had not previously worked with Child A. Similar to the finding in the above investigation (IMPACT ID: 48632744), the investigative record showed that the placement failed to adequately train Staff 5 on Child A's Person-Directed Plan and special needs prior to her shift caring for Child A. During her interview, which took place over one month after the intake, Staff 5 reported that she struggled to manage Child A's behavior and, like the staff member in the above investigation, Staff 5 contacted law enforcement twice during her shift due to her inability to respond to Child A's escalated behavior and ensure her safety. The investigator did not appear to consider Educare's failure to adequately train its staff members charged with caring for children, especially those who engage in frequent high-risk behaviors, and the safety risk this created for the children.

23

Also similar to the above investigations involving Child A, when interviewed by the investigator, Child A's case manager reported that Child A was on "routine" supervision, which permitted a staff member to complete other tasks while supervising the child and assist other residents who were not in the same room as Child A. The case manager further reported that the facility was still in the process of creating Child A's Behavior Support Plan; the investigator did not question the case manager regarding when Child A's Behavior Support Plan was required to be completed and what actions the HCS placement had taken to ensure Child A's safety or adjust Child A's supervision  since Child A had been in the care of Educare for a year and had often exhibited unsafe behavior.

By the time the investigator was closing this investigation, there were six open investigations of abuse and neglect involving this child at Educare and all of them originated in the span of two months. Despite that fact, as in the other investigations of abuse and neglect of Child A, again, the investigator failed to consider whether personnel at Educare failed to "establish or carry out an appropriate individual program plan or treatment plan" for Child A that resulted in or placed her at risk of physical or emotional injury or death.[49] In addition, Staff 5 reported that she was not able to properly supervise Child A and did not have the training to do so, but again this investigator failed to assess whether Educare administrators had evidenced a failure to "provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff" resulting in or creating risk of physical or emotional injury or death for this child.[50] Moreover, there was no evidence in the record that the investigator considered the allegations from the prior week, nor the staff member's (Staff 4) acknowledgment that she also could not properly care for Child A. Finally, the investigator did not consider highly relevant information about whether there were similar patterns of allegations involving the facility;[51] as noted previously, a review of those prior referrals and patterns is not part of PI's practice unless it involves the same alleged perpetrator or victim.

<u>Notable Gaps in Investigation Timeframe:</u>

The investigation took over two months to be completed and there was no approved extension.[52] The intake was received on May 1, 2021. The investigation was completed on July 9, 2021, approved on July 10, 2021, and closed on October 8, 2021.

### 6.  IMPACT Case ID:  48656069

<u>Summary of Key Allegations:</u>

Just a few days later, SWI received the following two intake reports, the sixth and seventh reports of abuse and neglect in less than two months related to Child A at Educare and merged them together into a single investigation. In the first intake report dated May 4, 2021, a DFPS caseworker reported the following allegations about Child A:

---

[49] *See* 26 TEX. ADMIN. CODE §711.719(b)(1).
[50] *See* 26 TEX. ADMIN. CODE §711.719(b)(3).
[51] *See e.g.*, DFPS, *Preponderance of the Evidence*, 1, 5 (undated training manual) (on file with the Monitors).
[52] IMPACT shows that the investigator requested an extension on June 1, 2021; however, it appears that a supervisor did not approve this extension.

- Child A alleged that unnamed staff members forcibly grabbed her upper arms and caused bruising. She also alleged that staff members held her down and elbowed and kicked her in the ribs. The child complained that her ribs hurt and might be broken from staff members' actions. Child A stated that she then attempted suicide after the most recent time staff members reportedly attacked her on that day. The child was at the hospital when the caseworker spoke to her and observed bruises on Child A's upper arms. The child also mentioned a broken finger and a sore ankle.

- Child A stated that unnamed staff members were verbally abusive towards her prior to her suicide attempt.

- Child A stated that unnamed staff members were aware that another resident planned to assault and attack her, but staff members did not attempt to protect her. This contributed to Child A's suicide attempt.

Four days later on May 8, 2021, SWI received another report from a law enforcement officer, who reported additional allegations of Neglect related to the incident in the above investigation (IMPACT ID: 48646196) that occurred on April 30, 2021. The reporter stated that law enforcement was dispatched to the placement because Child A allegedly attacked another resident and a staff member. When law enforcement arrived, Child A was looking for any sharp object she could find to cut herself. The law enforcement officer asked Child A whether she had any sharp items in her possession and she eventually admitted that she had cardboard; the cardboard was tucked into Child A's jacket. The reporter also stated that Child A attempted to access a pill counter and stated that she had taken two pills and was trying to overdose. Child A allegedly refused to provide law enforcement with any information on the type(s) of pills she consumed. According to the reporter, Child A requested transportation to a hospital to be evaluated for her suicidal and self-harm ideations. While Child A was being placed into the medical gurney for transport to the hospital, Child A slapped an emergency technician on the head.

Assigned Priority and Disposition:

Following receipt of the two intake reports, which SWI referred for a Priority Two investigation, PI initiated an investigation of the following allegations: Emotional Abuse, Neglect, and Physical Abuse to Child A by two named staff members (Staff 4 and Staff 6) and two unknown staff members. The monitoring team disagrees with PI's disposition of Unconfirmed for the allegation of Physical Abuse; the allegation should have been assigned a disposition of Inconclusive. Regarding the allegation of Neglect, due to substantial investigative deficiencies, a disposition cannot be determined, despite the investigator's assignment of Unconfirmed.

Monitors' Review:

Regarding the allegation of Physical Abuse to Child A, the monitoring team disagrees with PI's finding of Unconfirmed and found that the investigative record supports a finding of Inconclusive for the following reasons:

- The investigator attempted to conduct a timely interview with Child A at the hospital; however, when the investigator told Child A that she would like to speak with her, Child A covered her face with her blankets and shook her head no. The investigator asked Child A whether they could take photographs of her injuries and Child A responded no. The

25

investigator made a second attempt to interview Child A ten days later while the child was still hospitalized. The child again refused to speak with the investigator. The investigator did not make any additional attempts to speak to or observe the child during the investigation. In the absence of an interview with Child A, the investigator was unable to gather key information regarding the allegation of Physical Abuse, including observing any injuries on the child's body.

- When Child A was admitted to the hospital on April 30, 2021, medical personnel took X-rays of Child A's ankle, pelvis, abdomen and chest and reported that no injuries were identified for these areas. However, the X-rays found that Child A's right wrist was "healing" from a distal radius fracture and that her dorsal tissues had "mild swelling."

- The investigative record showed that the investigator did not attempt to reach out to the doctor/nurse to discuss the child's fractured wrist until four months into the investigation. The investigator was unable to establish the cause of the injury to Child A. The original investigative findings report shows that the investigator initially assigned a finding of Inconclusive to the allegation of Physical Abuse, as documented below. The Monitors agree with the reasoning expressed in the investigator's initial conclusion:

> It could not be determined if there was an act or failure to act. According to home staff, [staff members' names removed], no staff on the home had harmed [Child A], but that [Child A] self harms. [Staff members] stated that [Child A's] fractured wrist was obtained when she was at Ocean's Behavioral Hospital before she ever came to [the current Educare location]. [One staff member] stated that she thinks [Child A] hurt her wrist punching the wall while at the [current] group home, but no [incident report] was provided for this incident, and [the staff member] was not certain that [Child A's] wrist was not already hurt. Hospital Notes support that [Child A's] wrist was already in healing stages and there was no new fracture, only some swelling. [Name Removed] Hospital Psychiatric evaluation reveals [Child A] displays aggressive behaviors, self mutilation, suicidal thoughts and threats and intermittent explosive disorder. Patient has history of suicide attempts, depression and bipolar disorder. [Child A's case manager, also an employee of Educare] stated that there was no suspicion about [Educare] staff harming [Child A], but that [Child A] had a history of attacking staff and making false allegations to get them in trouble. [Child A's] special needs support that she does display self injurious behaviors. According to [responding police officer], when he was called out to the home, [Child A] was trying to cut herself with cardboard and that she had old cuts where she had previously tried to cut herself, showing that she does self harm, and the police had been called to the home several times when [Child A] was the aggressor. While, there are no witnesses to any staff hurting [Child A], she had injuries that were of unknown origin so it cannot be determined if any of those were done by staff or if she was self harming.

- As noted previously, the child was placed within various group homes owned by Educare for one year at the point in time that her medical records showed a fractured wrist.

- The investigative record did not include any information related to the investigator's decision to change the final disposition of the allegation of Physical Abuse from Inconclusive to Unconfirmed.[53] Because the investigator was unable to obtain information that confirmed when and how the child sustained the injury, the allegation of Physical Abuse should have been assigned a disposition of Inconclusive.

With regard to the allegation of Neglect, the Monitors also find the investigation was deficient. The investigative record raises the same critical concerns highlighted in the above investigations (most notably, IMPACT IDs: 48632744 and 48646196): namely, that Educare failed to train and support the single, on-duty staff member (Staff 4) to adequately care for Child A. Due to these failings, Staff 4 was unable to effectively intervene to protect Child A and other residents when Child A's behavior escalated on the date of the alleged incident. The responding law enforcement officer to the incident reported that Staff 4 "could not control" Child A and that the group home appeared "understaffed." Similar to other investigations, the investigator again failed to discuss or further explore whether Educare administrators had failed to "provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff" resulting in or creating risk of physical or emotional injury or death for this child.[54]

Finally, when Child A entered the hospital on April 30, 2021, Educare discharged the child from its care. According to a physician who treated Child A at the hospital, staff members brought the child to the hospital with her all of her belongings.

Notable Gaps in Investigation Timeframe:

The investigation took four months to be completed. The intake was received on May 4, 2021. An extension was approved on June 14, 2021, with documented reasons of "Extraordinary Circumstances" and "More time is needed to identify and interview collaterals, company has not provided requested information." The investigation was completed on September 2, 2021, approved on September 2, 2021, and closed on November 3, 2021.

**Child C, age 14-15, IQ Unknown**

The monitoring team reviewed 12 investigations into abuse or neglect of Child C (age 14-15) while she was placed at C3 Academy, LLC, an HCS Group Home. Eleven of the investigations resulted in an overall disposition of Unconfirmed or Inconclusive; in one investigation of Physical Abuse, PI entered a disposition of Confirmed for the allegation that a staff member physically abused Child C when she tasered the child.

Child C was placed at C3 Academy for one year from April 4, 2021 to May 4, 2022. According to Child C's Plan of Service, Child C is diagnosed with: Unspecified Disruptive Behavior Disorder; Language Disorder; ADHD-Combined Presentation; and Intellectual Disability-Mild (provisional). Child C's Full-Scale IQ is unknown because she was unable to participate in IQ testing.

As the following table shows, PI opened ten of the 12 investigations related to allegations of abuse and neglect of Child C between May 24, 2021 and November 7, 2021. The last two investigations

---

[53] The monitoring team did not locate any supporting documentation for this investigation in PI's external storage database, NeuDocs.

[54] See 26 TEX. ADMIN. CODE §711.719(b)(3).

opened in April 2022, with the final investigation opening on April 28, 2022 after a staff member dropped Child C off at a hospital with a broken jaw. The 12 investigations involved six unique alleged perpetrators, two of whom were involved in more than one investigation. PI did not complete all of the investigations until March 20, 2023, with the longest investigation spanning 19 months prior to completion. Due to substantial delays in PI's completion of these investigations, Child C was no longer placed at C3 Academy when these investigations closed.[55]

Table 2: PI Abuse or Neglect Investigations of Child C

| Case ID | Intake Date | Completed Date | Closed Date | Months open prior to Completion | Allegation Type | Alleged Perpetrator |
|---------|-------------|----------------|-------------|--------------------------------|-----------------|---------------------|
| 48677387 | 5/24/2021 | 10/15/2022 | 10/17/2022 | 16+ months | Physical Abuse | Staff 1 |
| 48746511 | 7/19/2021 | 1/26/2023 | 1/30/2023 | 18 months | Neglect | Staff 2 |
| 48769719 | 8/7/2021 | 1/26/2023 | 1/30/2023 | 17 months | Neglect | Unknown |
| 48777670 | 8/13/2021 | 1/26/2023 | 1/30/2023 | 17 months | Neglect | Staff 2 |
| 48785934 | 8/20/2021 | 3/20/2023 | 3/21/2023 | 19 months | Neglect | Staff 3 |
| 48797313 | 8/29/2021 | 1/27/2023 | 1/30/2023 | 17 months | Neglect | Staff 2 |
| | | | | | Physical Abuse | Staff 2 |
| 48794924 | 8/26/2021 | 2/7/2023 | 3/24/2023 | 17 months | Physical Abuse | Staff 3 |
| 48801178 | 9/1/2021 | 2/7/2023 | 4/13/2023 | 17 months | Neglect | Staff 4 |
| | | | | | Physical Abuse | Staff 4 |
| | | | | | Physical Abuse | Staff 3 |
| 48846045 | 10/2/2021 | 1/27/2023 | 1/30/2023 | 16 months | Neglect | Staff 3 |
| | | | | | Physical Abuse | Staff 3 |
| 48896408 | 11/7/2021 | 12/21/2022 | 12/23/2022 | 13 months | Sexual Abuse | Staff 2[56] |
| 49096014 | 4/6/2022 | 1/27/2023 | 1/30/2023 | 9+ months | Physical Abuse | Staff 5 |
| 49131249 | 4/28/2022 | 2/7/2023 | 4/13/2023 | 9 months | Physical Abuse | Staff 6 |

In eleven of the 12 investigations, the investigator requested and received an extension; however, there is no documentation in the record to explain the delays or reasons for the extensions. The monitoring team identified that these significant investigative delays and egregiously deficient investigations left Child C at great risk of harm while she continued to be placed at C3 Academy. The State's lack of action on behalf of Child C and the decision to have her remain in the care of this entity is confounding in the face of these allegations.

The investigative records included the following dangerous investigative practices in the face of serious allegations of abuse and neglect of Child C: an overarching failure to prioritize and take into account the child's safety needs at all times; failure to timely and adequately interview Child C, if at all, particularly considering her documented speech and comprehension limitations; and

---

[55] Child C is currently placed at a State Supported Living Center. As of September 1, 2023, Child C is an alleged victim in three open investigations into allegations of Sexual Abuse and Physical Abuse. She is also an alleged victim in three additional investigations in her current placement that opened between June 11, 2023 and July 16, 2023 and closed with dispositions of Unconfirmed.

[56] According to IMPACT, the investigator did not formally assign a named alleged perpetrator to this investigation. However, within the investigative record, the investigator named Staff 2 as the alleged perpetrator.

unexplained investigative delays of over a year that significantly impeded the quality and quantity of information investigators gathered to assess whether the child had suffered abuse and neglect. In many instances, the failure to pursue the allegations for months at a time displayed an abject indifference to child safety. Further, as described more fully below, in addition to the deficiencies identified by the monitoring team within each of the individual investigations, HHSC and its investigators also failed to appropriately coordinate their work among investigations involving Child C and her repeated outcries and reports of abuse and neglect. This and other critical lapses in investigative practice left Child C at serious risk and, ultimately, allowed for further harm to occur to the child.

The State's unexplained and extensive delays and inactivity turned a deaf ear to Child C's repeated outcries of abuse or neglect across investigations. As a result, the State did not identify patterns and concerns related to Child C's care while placed at C3 Academy, which began with an incident of confirmed Physical Abuse when the child was tasered by a staff member and culminated one year later when Child C suffered a broken jaw from Physical Abuse that PI should have Confirmed. Due to these failures, PI investigators did not appropriately investigate nor mitigate risk of harm to Child C following allegations of abuse or neglect at C3 Academy. Moreover, HHSC conducted the investigations with an utter and shocking disregard for child safety.

*Confirmed Physical Abuse of Child C*

**7. IMPACT Case ID:** 48677387

<u>Summary of Key Allegations and Monitors' Review:</u>

On May 24, 2021, six weeks after Child C was placed at C3 Academy, PI initiated its first investigation (IMPACT ID: 48677387) of Physical Abuse of Child C by a named staff member.

<u>Assigned Priority and Disposition:</u>

Significantly delayed, PI completed the Priority One investigation nearly 17 months later on October 15, 2022 with a disposition of Confirmed and found a preponderance of evidence that a staff member tasered Child C on her arm while she was in bed:

> Testimony from [Child C] supports that [Child C[57]] identified [Staff 1] by name and that [Staff 1] held a taser to [Child C's] inner left forearm multiple times. Photographs of [Child C's] inner left forearm support there were burn, signature or taser marks. Testimony from Officer [name removed] supports that after review of the photographs of [Child C] by Officer [name removed] that he could confirm the marks were signature marks or burn marks from a taser and it looked like when someone would touch a taser to skin and the person would pull away and then the taser would be touched again to the skin harder. Although a taser could not be recovered, Incident/Investigation Report supports that at one point [Staff 1] did have a taser even though she had not seen it since December of 2020.

---

[57] The investigator wrote Staff 1 in this location of the text, not Child C. This appears to be a typo.

As of September 1, 2023, the staff member is not registered on the Employee Misconduct Registry where such instances are confirmed for future employers.

Monitors' Review:

As noted below in the investigation timeline, there is no documentation in the record to explain the extensive delay nor the lack of investigative activity for more than thirteen months. The investigation incorporated evidence from law enforcement's criminal investigation but there is no indication in any of the records that the investigative delay was caused by such coordination with law enforcement. The significant delay in the resolution of these serious allegations as eleven new investigations emerged naming this child as an alleged victim, evidences a profound failure to conduct the investigation consistent with the child's safety needs as required by Remedial Order 3.

During Child C's interview, the investigator used an American Sign Language (ASL) interpreter due to Child C's documented limited speech. With the assistance of the interpreter, Child C used some signs, gestures, and language to communicate to the investigator that Staff 1 held something against her forearm twice and that it hurt; the investigator ultimately determined that the object the staff member used on Child C's arm was a taser. As discussed in the following investigations involving Child C, investigators routinely failed to accommodate Child C's limited speech through methods such as an ASL interpreter; this failure in subsequent investigations may have reduced the child's ability to communicate and report allegations of abuse or neglect during her subsequent interviews with investigators.[58]

Notable Gaps in Investigation Timeframe:

The investigation took one year and four months to be completed. The intake was received on May 24, 2021. An extension was approved on June 25, 2021, with a documented reason of "Other: Need to interview collaterals and alleged perpetrator." The investigation was delayed without activity between June 2021 and August 2022. The record did not include any explanation for the lack of investigative activity for more than thirteen months and substantial delay in completing the investigation. The investigation was completed on October 15, 2022, approved the same day on October 15, 2022, and closed on October 17, 2022.

Following the Physical Abuse of Child C by a staff member using a taser, Child C remained at the C3 Academy for ten additional months and was identified as an alleged victim in 11 other investigations. Of those additional investigations, six included further allegations of Physical Abuse of Child C. PI failed to appropriately investigate these allegations and, as a result, did not safeguard Child C's safety. In two of the investigations, the monitoring team disagreed with PI's finding of Inconclusive, instead finding that the investigative records included a preponderance of evidence of Physical Abuse or Neglect. In the first investigation, the record showed that a staff member neglected Child C when he locked the child and another adult resident in a bedroom at night and left the premises, and in the second investigation, the record showed that a different staff

---

[58] Child C's records indicate that she has varying communication capacities, including some ability to speak in short sentences and answer questions. To accommodate Child C's communication, the child's record documents that she has "some sign language" and that a communication board was requested for her "as she is not able to fully communicate." It is not evident from the records that Child C was provided a communication board nor that any PI investigators considered the use of such a tool to encourage Child C's ability to report information to investigators to safeguard her safety.

member physically abused Child C by breaking her jaw. In all other instances, the investigations were substantially deficient.

*Unconfirmed and Inconclusive Allegations of Abuse or Neglect of Child C*

**8. IMPACT Case ID:** 48746511

Summary of Key Allegations:

On July 19, 2021, two months after a staff member used a taser on Child C's left forearm in a manner consistent with it being "pulled away and…touched again to the skin harder," a law enforcement officer reported an allegation of Neglect of Child C at C3 Academy. The reporter stated that Child C ran away from the placement. After law enforcement located and returned the child to her placement on the same day, the child allegedly attempted to strangle herself by placing a sheet around her neck. According to the officer, the child stated that she was trying to kill herself and that she wanted to be admitted to a hospital.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to Child C by a named staff member, Staff 2. Due to substantial investigative deficiencies, most notably the 18 months to complete the investigation, a disposition regarding the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

The investigator did not attempt to gather sufficient evidence to determine whether Staff 2 adequately supervised Child C at the time of the incident. The investigator conducted a face-to-face interview with Child C eight days after PI received the intake with the assistance of an ASL interpreter. During her interview, Child C reported that she ran away from the group home and wrapped a sheet around her neck in response to verbal and physical altercations with other residents in the home. Following this interview, the investigator did not conduct any additional investigative activity for 18 months, during which time the investigation alleging another staff member tasered the Child also remained open.[59] Once the investigation resumed a year and a half later, and nine months after Child C had been moved from the HCS Group Home, the investigator identified the staff member responsible for Child C's supervision at the time of the incident but did not attempt to interview this key individual. The investigator also did not attempt to identify and interview any other staff members or other residents who may have been present on the day that the child attempted to kill herself.

The investigator interviewed the responding law enforcement officer to the incident; the officer reported that the staff member contacted law enforcement promptly after Child C eloped and responded appropriately when Child C attempted to place the sheet around her neck. Although the law enforcement officer and Child C did not appear to report any concerns for Neglect to the investigator, the investigator did not assess whether the staff member appropriately supervised

---

[59] PI closed the investigation involving a staff member tasering Child A nearly 17 months after it was initiated in October 2022 and three months before the instant investigation (IMPACT ID: 48746511) closed in January 2023.

Child C prior to her elopement. Moreover, the investigator failed to determine whether staff members took appropriate actions to minimize, address, or contain any verbal or physical altercations between Child C and the other residents or whether supervisory failures contributed to the conflicts in other ways. Because the investigator did not interview key individuals involved in the alleged incident, including the alleged perpetrator, the investigator failed to gather sufficient evidence to determine whether the alleged perpetrator neglected Child C prior to her elopement.

Notable Gaps in Investigation Timeframe:

The investigation took one year and six months to be completed. The intake was received on July 19, 2021. An extension was approved on November 2, 2021, with a documented reason of "Need to talk to collaterals, Ap, request documentation and police report." The investigation was delayed without activity between July 2021 and January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 26, 2023, approved the same day on January 26, 2023, and closed on January 30, 2023.

## 9. IMPACT Case ID: 48769719

Summary of Key Allegations:

On August 7, 2021, nearly three weeks after SWI received the above intake report, a law enforcement officer reported that he responded to another incident of Child C eloping from the placement. According to the reporter, law enforcement observed Child C running down a busy street and a staff member was running after her. The reporter expressed concern that Child C was a "flight risk" and that the staff members at the placement may not have provided adequate care for her. The reporter noted that other residents had allegedly wandered off "unnoticed" from the placement. Lastly, the reporter stated that he observed marks on Child C's arm, but he did not know whether the marks were injuries.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to Child C by an unknown staff member, which became its third open investigation involving Child C. Due to substantial investigative deficiencies, most notably the 17 months to complete the investigation, a disposition regarding the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

The investigator did not gather sufficient evidence to render a disposition regarding the allegation of Neglect of Child C. First, the investigator attempted to interview Child C three days after the date of the intake report while the child was hospitalized;[60] the child was asleep when the investigator arrived at the hospital to conduct the interview. The investigator documented that she observed Child C asleep in the emergency room with a blanket over her and that she did not observe any marks or bruises on the child, presumably because the blanket covered the child's

---

[60] The Monitors could not determine why the child was hospitalized from the available records.

body. The child returned to the placement after a few days in the hospital; the record did not document the length of her hospital stay and the investigator did not attempt to interview Child C again, at the hospital nor at the group home.[61] In the absence of interviewing and adequately observing the child, the investigator failed to assess the child's safety and gather information about the allegation, particularly given the reporter's observation that the child had marks on her arms and was not receiving adequate care at C3 Academy, in addition to pending allegations she had been tasered by a staff member nine weeks earlier, had eloped previously, and had then tried to tie a sheet around her neck. Following the attempted visit with Child C, the investigator did not pursue any additional investigative activity for 17 months and, shortly thereafter, closed the investigation with a disposition of Unconfirmed. The investigator concluded the investigation without identifying and interviewing an alleged perpetrator or any other staff members who may have been present on the day of the alleged incident. Finally, the investigator did not consider highly relevant information about the allegations, including reports by a law enforcement officer that residents wandered off from the property "unnoticed." The investigator did not consider whether the group home's referral history included similar allegations that the group home failed to provide adequate care to and supervision of children;[62] as noted previously, a review of those patterns is not part of PI's practice unless it involves the same alleged perpetrator or victim.

Because the investigator did not gather any evidence related to the allegations, including a failure to communicate with the child, the assigned disposition of Unconfirmed to the allegation of Neglect is baseless and inappropriate.

Notable Gaps in Investigation Timeframe:

The investigation took one year and five months to be completed and there was no approved extension.[63] The intake was received on August 7, 2021. The investigation was delayed without activity from August 2021 to January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 26, 2023, approved on January 26, 2023, and closed on January 30, 2023.

**10. IMPACT Case ID:** 48777670

Summary of Key Allegations:

Nearly a week after law enforcement reported the above allegations (IMPACT ID: 48769719), on August 13, 2021, a different law enforcement officer reported another allegation of Neglect of Child C at C3 Academy. The law enforcement officer reportedly spoke to Child C while she was admitted to a hospital (a different hospital stay from the one referenced above, during which time the investigator failed to return to interview the child). The child was hospitalized after she allegedly jumped out of a van and attempted to tie sheets around her neck for the second time in

---

[61] While a separate investigation of Neglect during this time-period referenced a visitor suspension at C3 Academy due to COVID-19, there is no such documentation in this record explaining why the investigator never spoke to nor fully observed the child in-person or through other means.

[62] *See e.g.*, DFPS, *Preponderance of the Evidence*, 1, 5 (undated training manual) (on file with the Monitors).

[63] IMPACT shows that the investigator requested an extension on September 9, 2021; however, it appears that a supervisor did not approve this extension.

approximately four weeks. Child C disclosed to the law enforcement officer that she was punched a lot at her placement. The law enforcement officer observed a laceration near the child's right eye. The child then reported that a named resident (Individual 1, age 20) punched her and she bled a lot. The child reported that she did not receive medical care for the injury to her eye.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to Child C by a named staff member, Staff 2, which became its fourth open investigation regarding Child C. Due to substantial investigative deficiencies, most notably that it took 17 months to complete the investigation, a disposition regarding the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

Due to a substantially delayed investigation and missing interviews with key individuals, the investigator failed to determine the following information to inform the disposition.

- Whether Staff 2 adequately supervised the child to prevent or mitigate the child from jumping out of the van and whether the staff member promptly notified law enforcement following her exit from the van;

- Whether Staff 2 adequately supervised the child prior to her tying a blanket around her neck for the second time in four weeks: and,

- Whether the child's injury near her eye was due to a lack of supervision.

First, the investigator interviewed Child C by video call using the application FaceTime.[64] The investigator did not document any efforts to accommodate Child C's limited speech during the interview; in two other investigations, the record documented that PI conducted the interview with the assistance of an ASL interpreter and it is unclear how this investigator determined that she could ensure Child C's meaningful participation in the video interview without aid. During her interview, Child C reported to the investigator that she jumped out of the van because Staff 2 poured out her soda. Child C also reported that Individual 1[65] scratched her and caused her lip to bleed, as she alleged in the intake report. During the video call, the investigator reportedly took screenshots of the child; the investigative record did not document whether the screenshots were of the child's face nor did the investigator document whether she observed any injuries on the child. When interviewed shortly after Child C, the case manager at C3 Academy reported that she was unaware of any incidents between Individual 1 and Child C. Regarding Child C's elopement, the case manager reported that after the child jumped out of the van, the child ran into someone's backyard and jumped into their pool. Reportedly, Child C knew how to swim and was able to safely exit the pool by herself. After an unknown duration of time had passed, a law enforcement officer located the child and returned her to C3 Academy. Once she returned to the placement and

---

[64] According to the investigative record, the group home case manager reported that the placement suspended visitors due to the COVID-19 pandemic.
[65] According to a C3 administrator, Individual 1 had previously been incarcerated for assaulting his mother.

law enforcement was still present at the facility, the child attempted to tie a sheet around her neck in another room at the home. When the staff member checked on the child after an unknown period, he reportedly intervened and removed the sheet from the child's neck. According to the police report, after the child "wrap[ped] a bed sheet around her neck and state[d] that she wanted to kill herself," a law enforcement officer placed Child C under an "emergency detention and into double lock handcuffs." Law enforcement then transferred Child C to a hospital. At the time of this incident, the child was subject to "routine" supervision.

After completing initial interviews with Child C and the case manager, the investigator did not pursue any investigative activity for one year and five months. After this significant delay, and several months after the child was moved from the placement, the investigator attempted to locate the alleged perpetrator (Staff 2) and Individual 1 for interviews. Likely due to the significant delay, the investigator was unable to locate and interview these key individuals. The investigator then re-interviewed the case manager who reported that she did not recall the details surrounding the alleged incident. The investigator also interviewed the responding law enforcement officer at this delayed time. She reported similar information to the investigator as contained in her initial intake report that was made nearly a year and a half prior.

Due to these deficiencies, the investigator failed to gather sufficient information to render a disposition for the allegation of Neglect.

Notable Gaps in Investigation Timeframe:

The investigation took one year and five months to be completed. The intake was received on August 13, 2021. An extension was approved on October 29, 2021, with a documented reason of "Additional interviews needed with collateral and alleged perpetrator." The investigation was delayed without activity from August 2021 to January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 26, 2023, approved on January 26, 2023, and closed on January 30, 2023.


**11. IMPACT Case ID:** 48785934

Summary of Key Allegations:

During a nine-week period between August 20, 2021 and October 28, 2021, SWI received eight reports of Physical Abuse regarding an adult resident (Individual 2, age 29) at C3 Academy which PI merged together into a single investigation that eventually involved Child C as an alleged victim, as well. The reporters, including a law enforcement officer, medical facility staff, and Individual 2's service coordinator, reported that Individual 2 stated a staff member (Staff 3) "punched," "beat up," "assaulted," and "hit" her on her arms and face and that she had injuries as a result.

Assigned Priority and Disposition:

Child C was not named in any of the initial allegations; however, a PI investigator added her as an alleged victim after initiation of the Priority Two investigation. During an interview on August 24, 2021, Individual 2 relayed that she and another adult living in the home (Individual 3, age 18)

engaged in a physical altercation with Child C while Staff 3 drove them in a van on two occasions. Individual 2 also alleged that Staff 3 "punched" her in the van after she fought with Individual 3 and Child C.

Due to substantial investigative deficiencies, most notably that it took 19 months to complete the investigation, a disposition of the Neglect allegation related to Child C by Staff 3 cannot be determined. The investigator assigned the allegation a disposition of Inconclusive.

Monitors' Review:

Regarding the allegation of Neglect involving Child C, the investigative record demonstrated the following critical deficiencies. First, the investigator never interviewed Child C about the allegations related to her. Second, the investigator failed to interview the alleged perpetrator; having waited 18 months to attempt the interview, the investigator was unable to locate him. Finally, the interviews that did occur with the adult alleged victims, Individuals 2 and 3, failed to include sufficient questioning (if any) about the physical altercation related to the alleged victimization of Child C and one of them was conducted three months after PI received the intake.

As noted above, the investigator did not conduct an interview of Child C related to the allegations contained in this investigation. Instead, the investigator included in the investigative record an interview that was conducted with Child C on September 1, 2021 for a separate investigation (IMPACT ID: 48801178, discussed below) regarding unrelated allegations made by law enforcement on a later date; that report alleged that a different staff member locked Child C in a bedroom with Individual 2 in the home and left the premises. During that interview attempt in the other investigation, Child C was reportedly unwilling to speak to the investigator about the allegations of abuse and neglect in that investigation. The investigator did not attempt to interview Child C about the allegations contained in the instant investigation and, therefore, the investigator did not gather any information from Child C about the allegation under investigation in this investigation.

Individual 2 stated during her interview that she engaged in a physical altercation with Child C while Staff 3 transported them in a van on two specified dates; however, it appears that the investigator never asked Individual 2 to describe the physical altercation. As a result, the nature and severity of the alleged altercation between the two adults and Child C is unknown. When the investigator interviewed Individual 3 approximately three months after the date of this intake report, the investigator did not document that she asked Individual 3 any questions related to the alleged physical altercations in the van. Finally, when the investigator attempted to locate Staff 3 18 months after the investigation opened, the contact person at the placement reported that the alleged perpetrator was no longer employed there. Staff 3 did not respond to the investigator's delayed attempts to interview him. Due to these critical deficiencies and a severely flawed investigative approach, the investigator gathered almost no information about the allegation related to Child C and the disposition of Inconclusive for the allegation of Neglect is baseless and inappropriate.

Notable Gaps in Investigation Timeframe:

The investigation took one year and seven months to be completed. The intake was received on August 20, 2021. An extension was approved on September 21, 2021, with a documented reason of "Additional interviews and documentation needed." The investigation was delayed without

activity from December 2021 to March 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on March 20, 2023, approved on March 21, 2023, and closed on March 21, 2023.

## 12. IMPACT Case ID: 48797313

Summary of Key Allegations:

On August 29, 2021, two weeks after the initial intake reports were received by SWI for the investigation above, a social worker at a hospital reported allegations of Physical Abuse and Neglect of Child C at her placement. According to the reporter, Child C reportedly ran away from the placement and law enforcement located her within an hour of her elopement. The child allegedly informed law enforcement that she wanted to kill herself with a knife. According to the reporter, the child stated that she ran away from the placement because an unnamed staff member at the facility hit her. (At this time, there were five separate investigations opened regarding allegations of Physical Abuse and/or Neglect of Child C, with both distinct and similar allegations). After law enforcement located Child C, they transported her to a hospital where she was seen by a psychiatrist. The psychiatrist observed Child C to be "extremely dirty," not wearing underwear, with feces in her pants, and allegedly "had not eaten all day." Reportedly, the psychiatrist did not observe any injuries on the child's body that were consistent with a staff member hitting her; however, the psychiatrist observed that the child had "lots" of scarring on her body due to self-injurious behavior.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect and Physical Abuse investigation related to Child C by a named staff member, Staff 2, which became its sixth open investigation involving allegations of Physical Abuse or Neglect of Child C. In its investigative findings 17 months later, PI entered a disposition of Unconfirmed for the allegation of Neglect and a disposition of Inconclusive for the allegation of Physical Abuse. Due to substantial investigative deficiencies, a disposition for the Physical Abuse and Neglect allegations related to Child C cannot be determined.

Monitors' Review:

During her face-to-face interview with the investigator, Child C confirmed that a staff member hit her and added that the staff member hit her on the arm. When the investigator asked who hit her, the record states that the child pointed toward "the staff" who was present in the home. The investigator did not document in the investigative record which staff member(s) the child identified. Next, the investigator asked the child how she obtained the scratches on her face. The child responded that she got into a fight and pointed to another individual in the home. Again, the investigator did not document who the child identified when she pointed. The investigator documented that she attempted to ask Child C additional questions, but the child did not respond. Based upon the investigative record, it is unclear whether the child no longer responded to the investigator's questions due to her limited speech and comprehension. The investigator did not

make any efforts to accommodate Child C's limited speech and comprehension during the interview.

The investigator did not appear to consider whether Child C's allegation that a resident scratched her was related to the allegation included in the above investigation with an intake date of August 13, 2021 (IMPACT ID: 48777670); as noted above, a different investigator conducted a deficient investigation in that instance, as well. It is also unclear whether the scratches the investigator observed on the child's face in the current investigation were related to or separate from the laceration the law enforcement officer observed on the child's face in the above investigation. Based on the documentation in the record, the two investigators failed to collaborate and jointly staff the two investigations; this failure limited both investigators' ability to gather and assess information about the safety of Child C in her placement.

But even more confounding, after completing an interview with Child C, during which the investigator observed injuries on the child, the investigator did not conduct any additional investigative activity for more than 16 months. When the investigation resumed on January 23, 2023, the investigator assigned in the record an alleged perpetrator based upon the staff member who was working on the date of the intake report (August 29, 2021) and completed the investigation four days later. As noted above, the investigator observed the child point at a staff member(s) who allegedly hit her, but the record does not clarify the connection between the two and it is not clear the child was hit on the date of the intake report. Before completing and closing the investigation, the investigator did not attempt to interview the alleged perpetrator nor the other individual to whom the child pointed during her interview.

As a result of these substantial deficiencies, the investigator failed to determine whether a staff member hit Child C; and whether a staff member's inadequate supervision allowed a resident to scratch Child C. The investigation demonstrates an egregious example of the State's failure to conduct abuse and neglect investigations in a manner that takes into account at all times the child's safety needs.

Finally, regarding the allegation that Child C was "dirty, had no underwear on, and had feces in her pants" when she arrived at the hospital, PI determined that:

> Health and Human Services Commission (HHSC) Regulatory Services Provider Investigations (PI) will not investigate this matter further. The general complaints regarding [Child C] being unkept do not meet the definition of neglect. This information is being referred back to the provider and, if applicable, forwarded to the appropriate regulatory program, law enforcement, or Office of Inspector General, for appropriate action.[66]

---

[66] Neglect by a direct provider of an individual in this setting is defined as "a negligent act or omission which caused or may have caused physical or emotional injury or death to an individual receiving services or which placed an individual receiving services at risk of physical or emotional injury or death. (b) Examples of neglect may include, but are not limited to, the failure to: (1) establish or carry out an appropriate individual program plan or treatment plan for a specific individual receiving services, if such failure results in physical or emotional injury or death to an individual receiving services or which placed an individual receiving services at risk of physical or emotional injury or death; (2) provide adequate nutrition, clothing, or health care to a specific individual receiving services in a residential or inpatient program if such failure results in physical or emotional injury or death to an individual receiving services or which placed an individual receiving services at risk of physical or emotional injury or death; or (3) provide

There is no additional documentation in the record about the resolution of those allegations.

Notable Gaps in Investigation Timeframe:

The investigation took one year and five months to be completed. The intake was received on August 29, 2021. An extension was approved on October 7, 2021, with a documented reason of "Principal interviews are needed as well as documentary evidence." The investigation was delayed without activity from September 2021 to January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 27, 2023, approved on January 27, 2023, and closed on January 30, 2023.

**13. IMPACT Case ID:** 48794924

Summary of Key Allegations:

On August 26 and September 1, 2021, one law enforcement officer made two separate reports of abuse and neglect to SWI related to Individual 2, the adult resident discussed above. The reporter's allegations were similar in nature to those captured in the above investigation (IMPACT ID: 48785934; allegations of Physical Abuse by Staff 3 of Individual 2), namely that Staff 3 allegedly hit Individual 2. Additionally, the reporter alleged that Individual 2 did not receive appropriate medical care for injuries allegedly caused by Staff 3. Child C was not named in any of the initial allegations; however, she was added to the investigation as an additional victim during the investigation.

Assigned Priority and Disposition:

Following receipt of the two intake reports, PI initiated a Priority Two Physical Abuse investigation related to Child C by Staff 3, which became its seventh concurrent open investigation into Physical Abuse and/or Neglect of Child C. Due to substantial investigative deficiencies, notably that it was not completed for 17 months after the intake, a disposition of the Physical Abuse allegation related to Child C cannot be determined. The investigator assigned the allegation a disposition of Inconclusive.

Monitors' Review:

Based upon the investigative record, it is unclear why the investigator added Child C as an alleged victim to this investigation. Because the investigator did not document her reason(s) for adding Child C as a victim, the monitoring team was unable to determine the specific allegation of Physical Abuse the investigator surfaced related to Child C. In the absence of this central information, the monitoring team identified this investigation as deficient. Next, the investigator

---

a safe environment for a specific individual receiving services, including the failure to maintain adequate numbers of appropriately trained staff, if such failure results in physical or emotional injury or death to an individual receiving services or which placed an individual receiving services at risk of physical or emotional injury or death. (c) In this chapter, when the alleged perpetrator is a direct provider to an individual receiving services from any other service provider, neglect is defined as a negligent act or omission which caused physical or emotional injury or death to an individual receiving services." 26 TEX. ADMIN. CODE §711.19.

used a separate interview of Child C that occurred during a different investigation (IMPACT ID: 48801178, discussed below), similar to her approach in IMPACT ID: 48785934, to document her initial face-to-face contact with Child C for the instant investigation. As noted above, Child C was reportedly unwilling to speak to the investigator about allegations contained in the separate investigation and because the investigator did not interview Child C related to the instant allegation, the investigator did not gather any information about it. Next, when the investigator interviewed the alleged perpetrator 16 months after the investigation began, the investigator did not document whether she asked the alleged perpetrator any questions related to Child C. The investigator's interviews with other collateral staff members also did not discuss any allegations related to Child C. As such, the basis for the investigator's finding of Inconclusive for the allegation of Physical Abuse of Child C is unknown.

<u>Notable Gaps in Investigation Timeframe:</u>

The investigation took one year and five months to be completed. The intake was received on August 26, 2021. An extension was approved on October 7, 2021, with a documented reason of "Principal interviews are needed as well as documentary evidence." The investigation was delayed without activity from September 2021 to October 2022. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on February 7, 2023, approved on February 7, 2023, and closed on March 24, 2023.

## 14. IMPACT Case ID: 48801178

<u>Summary of Key Allegations:</u>

On September 1, 2021, a law enforcement officer reported that Individual 2 and Child C reported that at an unknown time during the night, a named staff member locked them in a bedroom and left the HCS Group Home. Individual 2 was allegedly able to break the bedroom door in half and exited the home with Child C. They then went to a neighbor's home and called 911. The officer reported that 911 received the call at 3:29 a.m. and law enforcement arrived at the home at approximately 4:00 a.m. At that time, according to law enforcement, no staff members were present in the home nor did they observe any posting or other information to inform law enforcement who to contact regarding Individual 2 and Child C's care. Also on September 1, 2021, a different law enforcement officer reported similar allegations about the staff member locking the residents in a bedroom before leaving them in the home. The reporter also stated that the staff member had to leave due to a family emergency and left the home at 3:00 a.m. The staff member allegedly notified another staff member that he needed to leave the premises. Approximately 30 minutes after the officer called in the second report, the officer called in a third report with allegations of Physical Abuse related to Child C and Individual 2. The officer reported that she observed that Child C had multiple bruises and cuts on the top of her eyelids and scratches on her face. Child C reported that Staff 3 punched her in the face and then reportedly stated that other residents "did it." The officer observed that Individual 2 had a cut under her left eye and Individual 2 reported Staff 3 punched her.

<u>Assigned Priority and Disposition:</u>

Following receipt of the three intake reports from law enforcement officers, SWI referred them to PI for a Priority One investigation; PI initiated a Physical Abuse and Neglect investigation related to Child C by two named staff members, Staff 3 and Staff 4. This became its eighth pending investigation into abuse and neglect of Child C in 13 weeks. The investigation into these serious allegations was not completed for 17 months and in one of the more egregious examples of delay the Monitors found, the investigation sat without activity for a full year without explanation. The investigator requested and received an extension to conduct interviews but once granted, did not pursue any additional investigative activity. During that time and as discussed in the investigation below (IMPACT ID: 48846045), PI opened another investigation related to a separate allegation that Staff 3 hit Child C. The investigator assigned the Neglect and Physical Abuse allegations a disposition of Inconclusive. The monitoring team's review of the investigation determined that the allegation of Neglect should have been substantiated with a disposition of Confirmed as related to Staff 4. Regarding the Physical Abuse allegation, due to substantial investigative deficiencies, a disposition cannot be determined.

Monitors' Review:

According to Impact, C3 was a "3 bed person Group Home." The record contains a preponderance of evidence that Staff 4 locked Child C in a bedroom with another adult living at the home and then left the premises. The record showed that Child C was unattended for over two hours during the night, which placed C at risk of physical or emotional injury or death. The Monitors identified the following evidence in support of assigning the allegation of Neglect a disposition of Confirmed.

The police report confirmed Individual 2's allegation that Staff 4 locked Child C and Individual 2 in a bedroom and exited the premises and left them unattended for over two hours. As noted in the police report below, the residents did not have access to a telephone in the home and had to exit the home during the night to access a telephone in a neighbor's home, further exposing the residents to risk of physical or emotional injury. They also did not have access to a bathroom or any means of exit should there have been an emergency. Per the police report:

> Dated: 9/1/21 at 3:29 AM; [address removed] … Upon arrival Officer [name removed] located two females near the roadway at the intersection of S Center St and Motley St. The Females seemed to be in distress and were relieved to see Officers. The females were identified as [Ind. 2 and Child C]. [Ind. 2] stated she was low functioning but stated she was higher functioning than [Child C] who was non-verbal…[Ind. 2] stated she woke up in the middle and found the bedroom door to be locked from the outside. [Ind. 2] stated she yelled out for [Staff 4] who was the caretaker responsible for the overnight shift. [Ind. 2] stated when no one responded she and [Child C] broke the door open to exit the room so [Ind. 2] could use the bathroom. [Ind. 2] stated she and [Child C] searched through the residence and were not able to locate a responsible party or [Staff 4] in the residence. [Ind. 2] stated the front door was left unsecured so she and [Child C] checked the front drive and could not locate anyone outside. [Ind. 2] stated they do not have access to a phone in the house or the ability to call 911 so she went to the neighbor's house at [address removed] to ask them to call… Officers made a sweep of the location and did not locate anyone inside the residence… Officers located the bedroom of [Ind. 2 and Child C]. The door appeared to have been broken in half from the bottom of

the door. Officers then attempted to contact numerous numbers associated with the group home's management, C3 Christian Academy. Officers were unable to reach anyone.

Additionally, after law enforcement arrived on the scene, it took approximately two hours before a C3 Academy staff member was located and arrived at the home. Based upon the above evidence, the investigative record includes a preponderance of evidence that Staff 4 was negligent when he locked Child C and Individual 2 in a bedroom and left them unattended with no access to an exit, bathroom or means to summon help for over two hours in the night, which placed Child C at risk of physical or emotional injury or death.

Moreover, in light of the allegations that a staff member locked two people living in the home in a room and departed in the middle of the night and that a staff member was deployed to the location only after law enforcement was able to make contact with a person at C3, it is confounding that the investigator failed to consider whether administrators at C3 Academy failed to "provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff" resulting in or creating risk of physical or emotional injury or death for this child.[67] Finally, the investigator did not consider highly relevant information about whether there were similar allegations suggesting a lack of appropriately trained staff at the facility;[68] as noted previously, a review of a site's referral history is not part of PI's practice unless it involves the same alleged perpetrator or victim.

Regarding the Physical Abuse allegation, the investigator did not adequately investigate whether Staff 3 hit Child C causing injury to her face. When interviewed by the investigator, Child C reported that she did not want to discuss the allegations. The investigator did not document any efforts to accommodate Child C's limited speech and comprehension during the face-to-face interview. Such efforts may have encouraged Child C's participation in the interview and, as discussed previously, two prior PI investigations, initiated on May 24, 2021 and July 19, 2021, indicated use of an ASL interpreter. The investigator also did not document whether she observed any injuries on Child C. During the investigator's interview with Individual 2, the investigator did not ask Individual 2 any questions related to whether Staff 3 hit her or Child C and did not document whether she observed any injuries on Individual 2. Next, the investigator did not interview Staff 3 (the alleged perpetrator for the Physical Abuse allegation) until 16 months after the investigation began. The investigator did not ask Staff 3 any questions related to the allegation of Physical Abuse and the injuries the officer observed on Individual 2 and Child C. Instead, the investigator asked Staff 3 questions related to the allegations that Staff 4 locked Child C in the room with an adult also living at the home. The investigator was unable to locate Staff 4 for an interview and at the time he attempted to do so 16 months after the investigation began, according to C3, he was no longer employed there.

Finally, one day after Staff 4 locked Child C and Individual 2 in a bedroom, law enforcement returned to the group home to conduct a welfare check. According to the police report, "While on scene, medics assessed [Child C] as she complained of not feeling well. [Child C's] heart rate and blood pressure vitals were elevated to the point that medics determined she needed to go to the hospital." The investigator did not question any administrators nor staff members regarding Child

---

[67] See 26 Tex. Admin. Code §711.719(b)(3).
[68] See e.g., DFPS, *Preponderance of the Evidence*, 1, 5 (undated training manual) (on file with the Monitors).

C's admittance to a hospital for medical reasons nor did the investigator appear to consider whether Child C's medical issues were related to the serious allegations discussed above.

Notable Gaps in Investigation Timeframe:

The investigation took one year and five months to be completed. The intake was received on September 1, 2021. An extension was approved on November 1, 2021, with a documented reason of "Need more interviews." The investigation was delayed without activity from September 2021 to October 2022. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on February 7, 2023, approved on February 7, 2023, and closed on April 13, 2023.

**15. IMPACT Case ID:** 48846045

Summary of Key Allegations:

One month after it was alleged that Staff 4 locked Child C in a room at night with another adult living in the home and left the premises, on October 2, 2021, a law enforcement officer reported allegations of Physical Abuse and Neglect of Child C at her placement. The reporter stated that a staff member at the home contacted 911 to report Child C as a runaway. A law enforcement officer reportedly located Child C approximately a mile and a half from the home; she was walking down a busy street with her shirt off. According to the reporter, at the time Child C eloped, a staff member was spoon feeding another resident who used a wheelchair. When law enforcement located the child, she was reportedly happy to see the officer. The reporter observed that Child C had "speech issues" and was unable enunciate her name or address well. As the reporter and Child C neared the placement, the reporter allegedly observed that Child C's "mood changed" and she became "sad" and was "whimpering." Child C told the officer that Staff 3 hit her; the child demonstrated the hit by making a fist and putting it on her chin. The officer did not observe any injuries on Child C.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect and Physical Abuse investigation of Child C by a named staff member, Staff 3. This was the ninth pending investigation of alleged abuse and neglect of Child C in four months, the third time that the child expressed to a reporter that someone was hitting her at the home, and the second time Child C specified that it was Staff 3 who hit her. And yet, one month after receiving the intake report, HHSC's PI did nothing to investigate these serious allegations and the investigation sat with no activity for over a year. In its investigative findings entered 16 months later, PI entered a disposition of Unconfirmed for the allegation of Neglect and a disposition of Inconclusive for the allegation of Physical Abuse. Due to substantial investigative deficiencies, the dispositions of the Neglect and Physical Abuse allegations related to Child C cannot be determined.

Monitors' Review:

43

The investigator failed to appropriately investigate the allegations of Neglect and Physical Abuse of Child C by Staff 3. First, despite Child C's outcry to the police officer that Staff 3 hit her in the face, the investigator did not interview her until five days after the receipt of the intake report.[69] During her face-to-face interview, Child C confirmed that at the time she ran away, Staff 3 was caring for another resident, and Child C decided to leave the placement. Child C also reported that Staff 3 hit her with a closed fist on the right side of her face. The investigator documented that Child C did not know when or why Staff 3 hit her, that it was first time Staff 3 hit her and that no one was present at the time. The investigator documented that she observed discoloration on Child C's face; however, she documented that it appeared to be dark skin pigmentation and not a bruise. HHSC provided the Monitors with photos, from which it is difficult to discern whether Child C had a bruise on her right temple or whether it was a spot of dark skin pigmentation. The investigator did not document any efforts to accommodate Child C's limited speech and comprehension during the interview.

Following Child C's disclosure to the investigator that Staff 3 hit her in the face, inexplicably the investigator did not pursue any investigative activity for 16 months and the child remained in the placement. It is unclear from the investigative record whether Staff 3 had access to Child C during this extended timeframe prior to her removal from the placement in April 2022. After this substantial delay, the investigator attempted to contact Staff 3 for an interview. At that time, according to the administrator at C3 Academy, Staff 3 reportedly no longer worked at the home and did not return the investigator's call to schedule an interview.

In addition to failing to interview Staff 3, the investigator also appeared to fail to identify that this was Child C's second allegation of Physical Abuse against Staff 3 and that Individual 2 had also recently made the same allegation. During this investigation, and at a significantly delayed time (January 27, 2023), the investigator documented that the prior case history of the "principals" was reviewed (presumably Staff 3);[70] however, the investigator reported that she did not use the case history because "it was deemed not relevant." The investigator erred when stating that Staff 3's prior case history was not relevant to her consideration of the allegations of Physical Abuse. This conclusion is unreasonable and inappropriate and raises questions regarding whether the required case history review was performed.

Sixteen months after the alleged incident, the investigator interviewed a nurse who reported that she saw Child C daily and assessed her after any incidents, such as if the child ran away from the facility. The nurse reported that she no longer had access to her notes related to Child C, presumably due to the investigator's significant delay interviewing her. Based on her recollection 16 months later, she stated that she did not observe any injuries on Child C that were consistent with being hit or punched in the face during the time around October 2, 2021, when the child eloped from the placement. However, Child C did not provide a date or timeframe for when Staff 3 allegedly hit her and the delay and lack of access to her notes rendered the utility of the nurse's statement limited at best. The investigator also interviewed the law enforcement officer who was

---

[69] The investigator made a first attempt to interview Child C three days after the receipt of the intake report at the location she attended for treatment services; however, the child was no longer present at that location when the investigator arrived. The investigator did not attempt to interview her at the group home later that day.

[70] Due to its relevance, HHSC PI instructs its investigators to review the case history of the alleged victim and alleged perpetrator at the commencement of all investigations. HHSC, *Provider Investigations Handbook*, §3310 Prior Case History, available at https://www.hhs.texas.gov/handbooks/provider-investigations-handbook/3000-investigation-process.

the reporter; the officer's account was consistent with the initial report of the allegations to SWI, and he again repeated his concern that Child C's demeanor changed in the presence of Staff 3 and that this concerned him.

Notable Gaps in Investigation Timeframe:

The investigation took one year and four months to be completed. The intake was received on October 2, 2021. An extension was approved on November 2, 2021, with a documented reason of "Need to request documentation and police report, talk to Ap." The investigation was delayed without activity from October 2021 to January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 27, 2023, approved on January 27, 2023, and closed on January 30, 2023.

## 16. IMPACT Case ID: 48896408

Summary of Key Allegations:

Approximately one month after the above investigation was initiated, on November 7, 2021, a clinical therapist at a hospital reported an allegation of Sexual Abuse of Child C. According to the reporter, Child C locked herself in her room at the C3 Academy group home on the date of the intake report. After an unknown period of time in her room alone, Child C used her hand to break a window and ran away from the home. Once Child C was located (presumably by law enforcement, although the intake report does not specify), she was taken to the hospital for "aggression and running away." While at the hospital, Child C made an outcry that an unnamed staff member forced her to have sex with him and attempted to force Child C to have sex with his girlfriend. Child C reported that the staff member was no longer employed at the home. The child reported that she did not want to return to the home.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority One investigation, PI initiated a Sexual Abuse investigation of Child C by an unnamed staff member. This became the tenth pending investigation into allegations of abuse or neglect of Child C while placed at C3 Academy. This investigation evidenced one of the more egregious and confounding failures by PI to conduct its investigation in a manner consistent with the child's safety needs. Due to a dangerous delay and an utter disregard for child safety by the State, a disposition of the Sexual Abuse allegation related to Child C cannot be determined. The investigator assigned the allegation a disposition of Inconclusive.

Monitors' Review:

When the investigator attempted to conduct a timely, face-to-face interview of Child C at a hospital, a registered nurse requested that the investigator not speak with Child C due to difficult behaviors she had reportedly exhibited at the hospital; the investigator agreed to not speak with the child. It is unclear from the investigative record whether the investigator observed Child C at the hospital.

Ten days later, the investigator contacted a Children's Advocacy Center (CAC) to schedule a forensic interview of Child C in response to her allegation of Sexual Abuse. The CAC informed the investigator that only a law enforcement officer or detective who was assigned to Child C's case could request a forensic interview of a child. The investigator did not document any other efforts to secure a forensic interview. As a result, Child C did not participate in a forensic interview with a skilled interviewer who was competent in speaking with children who report allegations of Sexual Abuse.

Over the next 12 months, the investigator did not pursue any investigative activity into the Sexual Abuse allegations, despite the seriousness of Child C's allegation and the failure, up to this point, to interview the child. Notably, during that period of time, one staff member at the group home (Staff 2) was investigated by DFPS's CPI for Sexual Abuse of his stepdaughter and the allegation was substantiated on September 28, 2022. There is nothing in the record indicating that PI had any awareness of the DFPS investigation and substantiation. Nevertheless, finally on November 30, 2022, over a year after the initiation of the investigation while the investigation sat with no documented activity other than an extension, a different investigator attempted to interview Child C. When interviewed face-to-face, Child C allegedly responded to the investigator's questions by shrugging her shoulders or stating that she did not remember the incident. Approximately one month later, in late December 2022, a third investigator interviewed Child C; the interview was not conducted face-to-face, but through a Microsoft TEAMS video call. Child C confirmed over the computer that an unnamed individual sexually abused her. Child C additionally stated that the abuse occurred in a living room and she nodded affirmatively that the unnamed individual's girlfriend was present at the time, as she alleged in the original intake. Child C was reportedly unable or unwilling to provide the name of the alleged perpetrator to the investigator. At the conclusion of the interview, the investigator documented the following: "Investigator ended the interview due to [Child C's] limited speech and lack of response."

Not only did the investigators fail to interview the child for over one year, but when they finally did speak to her, the investigators did not facilitate Child C's participation in the interviews through appropriate accommodations for her limited speech and comprehension, which was fundamental to gathering information about the allegation to support Child C's safety and well-being even after she confirmed the abuse.

Over a year after the investigation began and for the first time, the investigator finally attempted to identify an alleged perpetrator through interviews with administrative staff members at C3 Academy. Both administrators reported to the investigator that Child C had a history of making false allegations of Sexual Abuse. The investigator documented that an administrator stated, "[Child C] would make the same allegations all of the time, against staff and other individuals." But the Monitors' review showed that Child C's investigative history at the placement does not include any prior investigations of Sexual Abuse; therefore, either that statement was untrue or staff members failed to report the prior allegations by the child. The lack of investigative history suggests that, if Child C did make those allegations in the past, staff members did not report Child C's prior allegations of Sexual Abuse to SWI. But the investigator did not question the administrator about this potential failure. (The monitoring team's review found that in many instances, law enforcement officers were the primary reporter of alleged abuse and neglect of Child C that led to the 12 investigations at C3 Academy).

46

During an interview, one of the administrators provided the investigator with the name of a male staff member (Staff 2) who worked in the HCS home at the time of Child C's allegation one year prior; the investigator added this individual as the alleged perpetrator.[71] Another administrator reported that Staff 2 no longer worked for the home and was presently in jail and "will not be released anytime soon." Five months prior, on June 22, 2022, while this investigation sat without activity, DFPS had received an intake report that Staff 2 sexually abused his stepdaughter and substantiated the allegations on September 28, 2022. When the investigator resumed in November 2022 and Staff 2 had already been substantiated by DFPS for the Sexual Abuse of his stepdaughter, the investigator appeared entirely unaware of these developments. Moreover, in part due to the failure of the investigator to timely identify an alleged perpetrator and conduct this investigation, it appears that Staff 2 had access to all of the residents at the HCS home, including Child C for some period of time.[72]

In addition to the substantiation of Sexual Abuse, Staff 2's investigative history includes one other investigation with allegations of Sexual Abuse from November 2018 while employed by C3 Academy. In that investigation, a young woman resident at the home alleged that Staff 2 masturbated while she was showering. PI assigned a finding of Unconfirmed to the allegation. But the investigator failed to review or discuss both the substantiation for Sexual Abuse by DFPS and the alleged Sexual Abuse allegation investigated by PI during Staff 2's employment at C3 Academy. When the investigator finally interviewed Staff 2 at a county jail 13 months after the investigation began, the alleged perpetrator denied the allegation that he sexually abused Child C. The investigator documented that Staff 2 was in jail due to alleged sexual abuse of his stepdaughter.

The investigator did not interview any other staff members or residents who may have had information related to Child C's allegation. When the investigator asked one of the administrators to provide the names of other residents who lived in the home at the same time as Child C one year prior, the administrator reported that she did not remember their names and when the investigator followed up for records of their names, there is no documentation indicating that she ever received it from the administrator. The administrator also did not appear to respond to the investigator's requests for documents one year after the investigation began, such as timesheets, Staff 2's employment application, names and numbers of other residents, and Child C's incident reports and hospital records.[73] The investigator did not appear to ask Child C the names of other staff members or residents. More critically, the investigator did not review any of Child C's nine prior investigations, all of which occurred in close proximity to these allegations and included names and contact information of other residents and staff members who lived or worked in the home during that time period.

---

[71] The investigator did not document whether she asked the administrator whether there were any other males who worked at the home at the time of the allegation. The monitoring team's reviews showed that multiple males worked in the HCS home while Child C was a resident; it is unknown why these individuals were not considered by the investigator. Lastly, while the investigator documented that Staff 2 was the alleged perpetrator in the investigative record, the investigator did not formally assign Staff 2 as the alleged perpetrator in IMPACT. As such, the alleged perpetrator for this case is documented as unknown in IMPACT.

[72] Child C was discharged from C3 Academy in May 2022.

[73] The monitoring team was unable to locate any documentation in NeuDocs for this investigation.

Due to these critical deficiencies and the neglectful manner with which this investigation was conducted, the monitoring team was unable to determine an appropriate disposition for the allegation of Sexual Abuse of Child C.

Notable Gaps in Investigation Timeframe:

The investigation took one year and one month to be completed. The intake was received on November 7, 2021. An extension was approved on December 10, 2021, with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from November 2021 to November 2022. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on December 21, 2022, approved on December 21, 2022, and closed on December 23, 2022.


**17. IMPACT Case ID:** 49096014

Summary of Key Allegations:

On April 6, 2022, five months after PI opened the above investigation involving allegations of Sexual Abuse of Child C, an OCOK caseworker reported an allegation of Physical Abuse of Child C at C3 Academy. The reporter alleged that a staff member (Staff 5) hit Child C on the leg with a cord because she was allegedly behaving "bad." The caseworker reported that Child C had a thin bruise on her left thigh that was about two inches long. Seven days later, on April 13, 2022, school personnel reported that Child C stated that she did not want to return to C3 Academy because she was being abused there. The reporter stated that a school nurse observed Child C with circular bruises on the front of her thigh, noting that one bruise was approximately two inches in length. The reporter stated that Child C said the injury occurred in the group home, but Child C did not provide the name of the individual who allegedly hit her.

Assigned Priority and Disposition:

Following receipt of the two intake reports, which SWI referred for a Priority Two investigation, PI initiated a Physical Abuse investigation of Child C by a named staff member (Staff 5). This became the eleventh pending investigation into allegations of abuse or neglect of Child C while placed with C3 Academy and the sixth allegation of Physical Abuse. In a failure to prioritize Child C's safety, the investigation had a nine-month delay in investigative activity, despite Child C's confirmation of her allegation of Physical Abuse. Due to substantial investigative deficiencies, a disposition of the allegation cannot be determined, despite the investigator's assignment of a disposition of Inconclusive.

Monitors' Review:

Due to significantly delayed and missing interviews, the investigator failed to gather sufficient information to determine whether Staff 5 physically abused Child C. Nine days after SWI received the first intake report, the investigator interviewed Child C, who maintained her original

allegation.[74] She stated to the investigator that on an unknown date, she went in the bathroom at C3 Academy and hit her head on the wall; after Staff 5 heard Child C hit her head, Child C stated that Staff 5 entered the bathroom and hit her with a white cord on her leg. Child C stated that no one observed the incident. According to the investigator, Child C did not allow her to observe whether she had any bruising nor photograph her.

Despite Child C's confirmation of her allegation of Physical Abuse by Staff 5, the investigator did not conduct any investigative activity for nine months, a clear disregard for the child's safety. Based on the investigative record, it is unclear whether Staff 5 continued to work and have access to residents at C3 Academy during this significant lapse in investigative activity. Nine months after Child C's interview and when Child C was no longer placed at the group home, the investigator first attempted to contact Staff 5. At that point, Staff 5 reportedly no longer worked at C3 Academy and did not respond to the investigator's late attempt for an interview. In the absence of this key interview with Staff 5, the investigator did not attempt to interview collateral staff members nor residents to gather information about the allegation. When the investigator interviewed the reporters (school personnel and caseworker), they consistently reported that Child C disclosed to them nine months prior that a staff member hit her with a cord and they observed a bruise on Child C's leg, though it was unclear to the reporters whether the bruise was new or old when they observed it. Despite Child C's consistent outcry to both reporters and the investigator that Staff 5 hit her with a cord, the investigator assigned a disposition of Inconclusive to the allegation of Physical Abuse by Staff 5.

Notable Gaps in Investigation Timeframe:

The investigation took nearly ten months to be completed. The intake was received on April 6, 2022. An extension was approved on May 11, 2022 with a documented reason of "Extraordinary Circumstances." A second extension was approved on August 16, 2022, again with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from April 2022 to January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 27, 2023, approved on January 27, 2023, and closed on January 30, 2023.

## 18. IMPACT Case ID: 49131249

Summary of Key Allegations:

On April 28, 2022, Child C's caseworker reported an allegation of Physical Abuse of Child C at C3 Academy. The caseworker reported that on the date of the intake report hospital staff notified her that an unnamed staff member dropped Child C off at the hospital. The unnamed staff member reported to the hospital that Child C had been restrained at the group home; the staff member reportedly did not provide any other information to the hospital before departing and no one stayed with the child at the hospital. While at the hospital, medical personnel determined that Child C had a fractured jaw, which required surgery. The reporter stated that it was unclear how or when Child

---

[74] The investigator attempted a timely face-to-face interview with Child C; however, the attempt was unsuccessful because no one at the group home allegedly opened the door to the investigator. The investigator did not attempt to interview Child C again until nine days after the date of the first intake report.

C was injured. One day later, on April 29, 2022, medical personnel from the hospital reported that Child C had a fractured mandible (lower jaw) in two places and Child C was unable to explain how she was injured.

Assigned Priority and Disposition:

Following receipt of the two intake reports, which SWI referred for a Priority One investigation, PI initiated a Physical Abuse investigation of Child C by a named staff member, Staff 6. This investigation became the twelfth pending concurrent investigation of abuse and neglect of Child C at C3 and the seventh allegation of Physical Abuse. The allegation of Physical Abuse should have been substantiated with a disposition of Confirmed. The disposition of Inconclusive assigned by PI nine months after the investigation was initiated is inappropriate, and the investigation was conducted with an utter disregard for child safety.

Monitors' Review:

Despite a delayed and deficient investigation, the Monitors found that the record contains a preponderance of evidence that Staff 6 hit Child C, causing substantial injury to the child by fracturing her jaw. The Monitors identified the following evidence in support of assigning the allegation of Physical Abuse with a disposition of Confirmed:

- Medical personnel reported that Child C was diagnosed with a fractured jaw in two places after a C3 staff member dropped the child off at the hospital;

- When the investigator asked Child C what Staff 6 "did to her," Child C "clearly stated" that Staff 6 hit her; and,

- An administrator of C3 Academy, who was interviewed six months after the intake, reported that another resident[75] informed her that she observed Staff 6 hit Child C in the face with his fist multiple times the day before the child was taken to the hospital. According to the administrator, after the child was physically abused by Staff 6, presumably the only staff member on-duty for that evening's shift, Child C reportedly went to bed with untreated and substantial injuries. The following day, a different staff member and the administrator observed blood and bruising on Child C's face. At this time, the administrator instructed a staff member to transport the child to a hospital and the administrator reportedly notified law enforcement. The Monitors were not able to locate any documentation confirming that anyone at C3 notified SWI of the critical incident of abuse and the investigator did not attempt to corroborate the administrator's claim that the group home notified law enforcement. The administrator reported that Staff 6 was immediately terminated.

Based upon the above evidence, the investigative record contains a preponderance of evidence that Staff 6 used inappropriate and excessive force when he hit Child C and fractured her jaw in two

---

[75] Because C3 Academy did not comply with the investigator's request for the witness's contact information, the investigator did not interview the witness. It is unclear whether the investigator could have obtained the witness's contact information independent of C3 Academy. C3 Academy also failed to comply with the investigator's request for other documentation related to Child C and the allegations.

places. At the time of this incident, PI's investigation of the Physical Abuse of Child C with a taser remained open for four more months until it was finally Confirmed in October 2022.

The monitoring team's review identified that on February 24, 2022, two months prior to Staff 6 hitting and significantly injuring Child C, PI initiated a separate investigation (IMPACT ID: 49038369) involving allegations that Staff 6 physically abused an adult resident at the group home.[76] Because PI did not conduct a timely or adequate investigation of the Physical Abuse allegation related to the adult resident, Staff 6 continued to work at the group home and two months later was able to physically assault Child C.

As noted above, the monitoring team found that the investigation of Staff 6's Physical Abuse of Child C was again significantly delayed and deficient, which is particularly egregious given the severity of the incident of Physical Abuse suffered by Child C. In addition to conducting delayed interviews with key individuals six months after the investigation began, the investigator did not investigate the following allegations of Neglect made by the child's caseworker during the investigation. These allegations raised significant concern for the safety and well-being of the residents placed at C3 Academy.

- The OCOK caseworker reported that when law enforcement arrived at the group home a few hours after Child C arrived at the hospital, "C3 Academy had completely cleaned out the house." The investigator did not appear to ask the caseworker to provide any clarifying detail to explain her statement that the group home had "completely cleaned house." The investigator also did not attempt to contact the responding police station for eight months after the investigation began to request information, such as a police report, which may have provided additional information regarding the caseworker's statement. The investigative record did not include a police report.

- The OCOK caseworker reported that when law enforcement arrived at the group home they observed that one on-duty staff member had an ankle monitor and was reportedly "out on bond for felony stalking" and another on-duty staff member was a registered sex offender.[77] The investigator made no attempts to identify the names of these staff members, to determine whether they continued to be employed at C3 Academy and had access to residents, nor to corroborate or explore the information about the staff members' alleged criminal charges. The investigator only documented in her findings that "It is a concern that the agency is employing registered sex offenders." The investigator did not appear to take any action regarding this serious safety concern, another egregious failure to conduct the investigation in a manner consistent with child safety at all times that

---

[76] The investigation (IMPACT ID: 49038369) of Staff 6 was initiated on February 24, 2022 in response to, among other allegations, a law enforcement officer's report to SWI that he observed that an adult resident of C3 Academy had a bruise under his left eye. During the adult resident's interview with a PI investigator on February 25, 2022, the individual reported that he thought Staff 6 tried to hit him, that Staff 6 was mean to him "over little stuff," and that Staff 6 told the individual to "Get your ass to bed." The investigator's photograph of the adult showed bruising under his eye. Following this interview and clear indication of risk related to Staff 6, the investigator did not pursue any investigative activity for 14 months. At this delayed time, the investigator attempted to interview, among other individuals, Staff 6. Staff 6 did not respond to the investigator's attempts for an interview. Shortly thereafter, the investigator closed the deficient investigation with a finding of Inconclusive for the allegation of Physical Abuse.

[77] Due to investigative failures, it is unclear whether the staff member that the OCOK caseworker stated was a registered sex offender was Staff 2, who was reportedly incarcerated for sexually assaulting a minor, as discussed in investigation IMPACT ID: 48896408.

reflected a shocking disregard of children's safety.

- The OCOK caseworker reported that C3 Academy terminates staff members after allegations of abuse or neglect are made against them; however, the group home will then hire these same staff back after an investigation has closed. The investigator did not investigate this allegation and did not appear to discover evidence that, in this instance, it was not accurate.

- The OCOK caseworker reported that C3 Academy did not provide her with any of Child C's paperwork, medications, or belongings after Child C left the placement. The caseworker reported that she threatened to call law enforcement in order for the group home to provide Child C's medications, which she ultimately received. The group home never provided Child C's belongings or paperwork.

- The OCOK caseworker reported in her intake report that according to hospital personnel, a staff member from C3 Academy dropped the child off at the hospital and departed without providing additional information on behalf of the child, leaving the child alone. She also indicated that she learned of the child's status through hospital personnel, as opposed to notification from anyone at the placement. The investigative record failed to clarify or confirm the duration of time C3 Academy left the child alone at the hospital with a fractured jaw nor whether anyone attempted to notify the caseworker or law guardian.

Due to serious and ongoing safety concerns that appeared to have gone unaddressed by HHSC and PI, a detective for the local police department reported to the investigator that the department was presently attempting to "shut down" C3 Academy. Following the detective's statement to the investigator, the investigator did not document that she took any additional action to safeguard the children and adults still placed at C3 Academy.

This egregious incident of Physical Abuse occurred nearly one year after a different staff member tasered Child C, seven months after another staff member locked Child C in a bedroom and left the group home location, and five months after her outcry of sexual abuse, among other serious allegations; and yet, once again, the investigator failed to consider or discuss whether administrators at C3 were neglectful, particularly for a failure to "provide a safe environment for [Child C], including the failure to maintain adequate numbers of appropriately trained staff, if such failure results in physical or emotional injury or death to [Child C] or which placed [Child C] at risk of physical or emotional injury or death."[78]

Child C did not return to C3 Academy after she was hospitalized for a fractured jaw.

Notable Gaps in Investigation Timeframe:

The investigation took nine months to be completed. The intake was received on April 28, 2022. An extension was approved on June 8, 2022, with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from May 2022 to November 2022. The record did not include any explanation for the lack of investigative activity and

---

[78] See 26 TEX. ADMIN. CODE §711.719(b)(3).

substantial delay in completing the investigation. The investigation was completed on February 7, 2023, approved on February 7, 2023, and closed on April 13, 2023.

## Child D, age 15, IQ of 47

The monitoring team reviewed three PI abuse or neglect investigations with a disposition of Unconfirmed that involved a child (Child D, age 15) while he was placed at Exceptional Employment Service, an HCS Group Home. Child D is diagnosed with the following: autism spectrum disorder; Moderate Intellectual Disabilities; Speech Impairment; Attention-Deficit/Hyperactivity Disorder; Urinary Incontinence; and Mitochondrial Metabolic disease, which causes gastrointestinal and respiratory problems. Due to Child D's low IQ of 47 and behavioral and mental health needs, he was eligible for and enrolled in the HCS waiver program and was placed at the HCS Group Home from April 23, 2018 until present. As discussed below, the monitoring team's review found that PI inadequately conducted the following three abuse or neglect investigations involving Child D while he was placed at Exceptional Employment Service.

## 19. IMPACT Case ID: 48870997

Summary of Key Allegations:

On October 20, 2021, a law enforcement officer reported an allegation of Neglect of a child (age 13 and not in DFPS care) at Exceptional Employment Service. The reporter stated that the child was located by a member of the community after running away from the facility. The reporter alleged that "[t]his [was] not the first or second time a special needs child ran away or escaped" from the group home.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to the child who was not in DFPS care. During the investigation and nearly four months after receiving the intake, the investigator added two PMC children (Child D, age 15 and Child E, age 15) to the investigative record as alleged victims due to the nature of the allegations; Child D and Child E lived in the home at the time of the incident. Due to substantial investigative deficiencies, most notably that it took 15 months to complete the investigation, a disposition regarding the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed for both Child D and Child E.

Monitors' Review:

This investigation is deficient due to significant investigative delays, including a four-month delay in speaking to the alleged victims, a failure to conduct face-to-face interviews with the alleged victims, and a missing interview with the alleged perpetrator. Approximately four months after the investigation was initiated, the investigator interviewed a collateral staff member who reported that Child D and Child E lived in the home at the time of the alleged incident. The investigator had not previously identified the other residents who lived in the home at the time the primary victim ran away. At this delayed time, the investigator attempted to conduct telephone interviews with both Child D and Child E, despite the HCS Group Home's house manager reporting to the

investigator earlier that Child D was "non-verbal" and Child E "had one or two words or [can] mimic a full sentence, but he wouldn't understand what you are saying."[79] Nevertheless, the investigator proceeded to contact both children by telephone. The investigator documented that Child D did not respond to any of the questions the investigator asked despite the fact that his record and the house manager indicated that he would not have the capacity to do so. The investigator's documentation of her interview with Child E also demonstrated the inappropriate nature of telephone interviews with children, especially those with intellectual disabilities. While Child E was able to answer some of the investigator's initial questions, the investigator documented that Child E became distracted and was not able to answer any of the investigator's further questions. As such, the investigator did not gather any relevant information from either Child D or Child E regarding the allegation or their safety at the placement.

Nearly four months after the investigation commenced, the investigator first attempted to interview the alleged perpetrator; however, the alleged perpetrator did not respond to the investigator's multiple attempts for an interview. According to an HCS case manager, the alleged perpetrator no longer worked at the home. The investigator did not investigate the reporter's allegation that multiple children eloped from the home due to repeated concerns for a lack of supervision. Moreover, again, PI investigative practice does not include a review of the referral history of the site unless it involves the same alleged perpetrator or victim and therefore, the investigator did not review other relevant information, such as whether there were similar allegations investigated at that group home consistent with the instant allegations. Due to these deficiencies, the investigator did not gather adequate information to render a disposition of Unconfirmed for the allegation of Neglect.

<u>Notable Gaps in Investigation Timeframe:</u>

The investigation took one year and three months to be completed. The intake was received on October 20, 2021. An extension was approved on November 20, 2021, with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from April 2022 to January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 27, 2023, approved on January 27, 2023, and closed on March 29, 2023.

**20. IMPACT Case ID:** 49061280

<u>Summary of Key Allegations:</u>

On March 12, 2022, a law enforcement officer reported an allegation of Neglect of Child D, the same child described in the above investigation and who continued to be placed at Exceptional Employment Service. According to the reporter, Child D eloped from the group home when a staff member was using the bathroom. Law enforcement officers located Child D approximately a mile and a half from the home on the median of a roadway during rush hour at 5:45 p.m. Child D was

---

[79] Child D's record documents that he is primarily non-verbal and is only able to use a few words and gestures. As noted above, he has an IQ of 47, which places him in the Moderate Intellectual Disability range with the mental age of a six- to nine-year-old in his adulthood. Child E's record documents that he is diagnosed with severe autism and exhibits echolalia, meaning that the child is prone to repeating words spoken by another person. The monitoring team was unable to locate Child E's IQ in his case record.

reportedly not injured. The reporter additionally stated that law enforcement had responded to multiple incidents of Child D running away from the home and that they were familiar with Child D. The reporter expressed concerns that the home may not be equipped to care for Child D.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to Child D. Due to substantial investigative deficiencies, most notably that it took ten months to complete the investigation, a disposition regarding the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

Due to the following deficiencies, the investigator failed to determine whether a staff member adequately supervised Child D to prevent his elopement from the home. First, when the investigator conducted a face-to-face interview with Child D, the investigator did not document any efforts to accommodate communication with Child D, who, as discussed in the above investigation (IMPACT ID: 48870997), is primarily non-verbal and uses only a few words and gestures to communicate his needs and wants. Instead, the investigator documented that she asked the largely non-verbal child a series of questions about the alleged incident to which the child was unable to respond. As a result, the investigator did not gather any information from the child about the allegations. Next, the investigator failed to reconcile conflicting descriptions of the incident between law enforcement and staff members. A law enforcement officer reported that the child ran away during the day and officers recovered him at 5:45 p.m. When interviewed ten months after the investigation commenced, the on-duty staff member and the child's case manager reported that the child ran away at night. This discrepancy impacts the investigator's assessment of supervision because during the day the child was subject to one-to-one supervision whereas during the night, while asleep, the child was not subject to one-to-one supervision. To address this discrepancy, the investigator could have requested a police report to confirm the time of day the incident occurred. During his interview, the responding law enforcement officer reiterated his concern expressed in the intake report that the group home did not appear to have adequate staffing; the officer stated that he believed Child D required placement in a more secure setting to ensure his safety. Lastly, the investigator also failed to identify and interview, if appropriate, any other individuals living at the home about the incident or supervision during the relevant time periods.

In addition, despite the report by law enforcement that staff members appeared unable to adequately supervise the residents in the home, the investigator failed to discuss or further explore whether administrators had failed to "provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff" that resulted in or created risk of physical or emotional injury or death for this child.[80] Finally, without reviewing the referral history at the site when conducting an investigation, the investigator did not consider highly relevant information about whether there were similar patterns of allegations involving the facility relevant to that analysis.

Notable Gaps in Investigation Timeframe:

---

[80] *See* 26 TEX. ADMIN. CODE §711.719(b)(3).

The investigation took ten months to be completed. The intake was received on March 12, 2022. An extension was approved on April 11, 2022, with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from March 2022 to January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 26, 2023, approved on January 26, 2023, and closed on February 3, 2023.

## 21. IMPACT Case ID: 49160126

Summary of Key Allegations:

On May 16, 2022, nearly two months after the above investigation began, school personnel reported that staff members at the school observed Child D with three marks on his right cheek, two bruises on the left hip, and a small bruise on the right hip. She stated that no one observed these injuries on the child previously (meaning they were new). The reporter also stated that approximately two weeks prior, the school nurse documented that the child had a bruised knuckle that appeared to suggest that someone had bent the child's finger back. On May 13, 2022, three days prior to the report, a staff member at the school separately observed bruising on the child's Adam's apple and on his left upper cheek. The reporter stated that she believed a staff member or another resident at the home caused the child's injuries.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Physical Abuse investigation related to Child D. Despite the investigator observing injuries on the child's face and body consistent with the intake, PI completed no additional investigative activity for nearly nine months after interviewing the child. Shortly after resuming and poorly conducting the rest of the investigation, the investigation was finally completed, approved and closed on the same day. Due to substantial investigative deficiencies, a disposition regarding the Physical Abuse allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

The investigator did not document any efforts to interview Child D in a manner that facilitated, to some degree, the child's ability to respond to interview questions. As in prior investigations involving this non-verbal child, the investigator documented that she asked Child D a series of questions related to his injuries and the allegations, and the child was unable to respond to any of the questions. During the initial face-to-face interview, the investigator observed and photographed the injuries on Child D's body; the Monitors viewed the photographs of the injuries and they were consistent with the injuries the reporter described in the intake report.

Following the investigator's attempted interview with Child D, when she observed and documented the unexplained bruising on the child's face and body, and her interview with the reporter, inexplicably the investigator did not pursue any investigative activity for nearly nine months. At this delayed time, the investigator conducted interviews with, among other individuals,

the child's caseworker, school and facility nurses, facility staff and administration, and interviewed the reporter again. Based upon the investigative record, the investigator's interviews with these individuals focused on Child D's history of reportedly difficult and "aggressive" behaviors which often resulted in injury to Child D and others. The investigator did not document any attempts during the interviews to gather information regarding the cause(s) of the specific injuries to Child D as of the report date.

The investigative record includes several incident reports from the home that involved Child D around the date of the intake report. The investigator did not explore these incidents with the individuals interviewed to determine whether any of these incidents resulted in injuries to Child D nor whether staff members supervised and cared for Child D appropriately during these incidents, including an incident that occurred one day prior to the intake report. The investigator did not interview all relevant staff members who were responsible for the supervision of Child D as cited in the incident reports, nor did she interview two other residents reportedly involved in one incident.

Notable Gaps in Investigation Timeframe:

The investigation took nearly eight months to be completed. The intake was received on May 16, 2022. An extension was approved on June 15, 2022, with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from May 2022 to February 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on February 10, 2023, approved on February 10, 2023, and closed on February 10, 2023.

**Child F, age 16-17, IQ of 71 and Child G, age 17, IQ of 57**

**22. IMPACT Case ID:** 48693853

Summary of Key Allegations:

On June 5, 2021, a staff member (Staff 1) reported allegations of Neglect of two children (Child F, age 16 and Child G, age 17) placed at Educare, the HCS Group Home[81] in which Child A was placed until May 10, 2021.[82] When Staff 1 reported to work, she allegedly relieved another staff member (Staff 2) who was responsible for the supervision of five residents, including Child F and Child G. According to Staff 1, she was thereby left alone to care for a total of six residents, including one additional individual who required one-to-one supervision. Staff 1 reported that it appeared the company was short-staffed and that she needed assistance. Staff 1 alleged that five of the residents had not received their medications that day. When she made her report to SWI, Staff 1 expressed that she could not properly supervise the six individuals in her care and that she needed help.

Assigned Priority and Disposition:

---

[81] In IMPACT, the child's living arrangement at this time was listed as HCS Group Home (1-4).

[82] The staff members involved in this investigation are different from those involved in investigations with Child A, who appeared in six investigations at Educare reviewed by the monitoring team.

Following receipt of the intake report, which SWI referred for a Priority One investigation, PI initiated a Neglect investigation related to Child F and Child G by Staff 2. Due to substantial investigative deficiencies, most notably the failure to investigate the allegations for 19 months, a disposition regarding the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

The investigator attempted to conduct a timely face-to-face interview with Child F and Child G; however, the investigator documented that when she knocked on the door of the Educare HCS Group Home, no one answered. The investigator did not attempt to re-interview the children for 19 months. There was little investigative activity during the extensive and unexplained delay of the investigation for 19 months, aside from requesting and receiving an extension for "extraordinary circumstances" for which there was no explanation in the record.[83] After 19 months, the investigator contacted both children by telephone and interviewed the alleged perpetrator. Not surprisingly, the investigator could not uncover any information pertinent to the allegations due to the passage of time. On the telephone, Child G reportedly refused to participate in the interview and Child F was unable to recall living at the home. The investigator documented that Child F stated that she "didn't remember anything." The investigator also interviewed the alleged perpetrator, who reported that he was also unable to recall the alleged incident 19 months later. Due to these deficiencies caused by the significant delay in any investigative activity, the investigator failed to gather any information regarding the allegations and a disposition cannot be rendered.

Notable Gaps in Investigation Timeframe:

The investigation took 19 months to be completed. The intake was received on June 5, 2021. An extension was approved on July 2, 2021, with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from August 2021 to December 2022. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 20, 2023, approved on January 24, 2023, and closed on January 31, 2023.

### 23. **IMPACT Case ID**: 48842983

Summary of Key Allegations:

On September 30, 2021, a law enforcement officer reported the following allegations of Neglect related to a child (Child F, age 16) placed at Educare, an HCS Group Home. The officer reported that at the beginning of September 2021 (a few weeks prior to the date of the intake report), the child ran away from the home and visited an adult male (Individual 1, age 37) who was the husband (or boyfriend) of an Educare staff member (Staff 2). According to the reporter, Staff 2 provided law enforcement with an audio recording that included the child's disclosure that she had a sexual

---

[83] Presumably, the extension was due to COVID-19 during that time period; however, the lack of any activity and length of delay are without explanation.

relationship with Individual 1. The officer reported that law enforcement was presently investigating Individual 1's alleged sexual assault of the child. One day after the initial report, on October 1, 2021, school personnel reported that the child believed she was pregnant. Child F reported that she was experiencing cramps and morning sickness and missed her period. Child F reported that she had sexual intercourse with Individual 1 multiple times over the past few months. Reportedly, Individual 1 brought the child lunch at school and the two were observed hugging in his car.

Assigned Priority and Disposition:

Following receipt of the two intake reports, one of which SWI referred as a Priority One intake, PI initiated a Sexual Abuse and Neglect investigation of the child by Individual 1 and an unnamed staff member respectively. Due to substantial investigative deficiencies, a disposition of the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed. Regarding the Sexual Abuse allegation, PI assigned the allegation a disposition of Other because Individual 1 "does not meet the definition of a direct provider as he was not providing any direct care to [the child] and was not working under the auspices of a volunteer or a care provider while in [the child's] home."[84] According to the investigative record, law enforcement conducted a separate criminal investigation of Individual 1 with allegations of sexual assault of the child. Individual 1 was reportedly charged and subsequently incarcerated.

Monitors' Review:

The investigative record shows that Individual 1 visited the group home to see Staff 2 (his wife/girlfriend) on multiple occasions and, during these times, he was able to meet and interact with Child F. According to a staff member (Staff 3), on one occasion, the child and Individual 1 visited together on the back porch of the group home and Staff 3 observed the child with her arms on Individual 1's shoulders. The investigator did not adequately explore whether staff members permitting Individual 1 to visit the group home and their subsequent failure to immediately remove Individual 1 from the group home constituted Neglect. Furthermore, given that it was the central factor that led to the sexual assault of Child F by Individual 1, the investigator did not adequately explore or probe Educare's training, policies and procedures associated with allowing third parties into the home. The investigator instead noted it only as a concern and suggested future training for staff members about related protocol.[85]

Despite the seriousness of the allegations, the investigator failed to adequately and timely investigate whether staff members appropriately supervised the child to prevent or address her elopements from the group home. During these elopements, Child F went to see Individual 1 and was the alleged victim of sexual assault. Child F was unable to consent to sexual activity with an

---

[84] During the investigation, the investigator confirmed that Individual 1 was employed by two different agencies to care for other residents at HCS Group Homes run by Daybreak and D&S Residential at the time of these allegations, not by Educare. PI determined that he did not qualify as a direct provider as to Child F. The Texas Administrative Code defines a direct provider as "[a] person, employee, agent, contractor, or subcontractor of a service provider responsible for providing services to an individual receiving services." 26 TEX. ADMIN. CODE §711.3(15).

[85] Staff 2 reported to the investigator that Individual 1 stopped by the home to see her and bring her food. She also reported that she let him come into the group home because he was reportedly suspicious of her cheating on him and she intimated that she was fearful of disallowing his visits because he was physically violent with her in her own home.

adult male. While the investigative record includes specific instances when the child ran away from the group home to meet with Individual 1, the investigator did not adequately question staff members or the child to determine whether staff members maintained appropriate supervision of the child at these or any other times the child ran away from the group home to meet with Individual 1. In the absence of gathering the above key information regarding supervision, the investigator cannot render a finding for the allegation of Neglect.

In addition, the Monitors observed the following investigative failures, which are similar in nature to those identified by the Monitors in their other reviews of PI investigations of abuse and neglect at Educare. The investigative record shows that at least one staff member responsible for the care of the child reported that she was not adequately trained to care for the child. Staff 3 reported that the child was difficult to manage and that she believed she was working each time the child ran away. She also stated that the group home was not adequately staffed for increased supervision of the child and that the group home "cannot keep staff" due to the long hours staff members are expected to work. Despite gathering this information, the investigator failed to consider whether Educare administrators failed to "provide a safe environment for [the child], including the failure maintain adequate numbers of appropriately trained staff" and whether this failure contributed to the alleged harm and risk of harm to Child F.

As in other PI investigations involving Educare, the investigator found that the child did not have a Behavior Support Plan in place at the group home. A case manager reported that personnel were currently attempting to implement a plan for the child and that the child's targeted behavior for the plan was elopement. Again, the investigator failed to consider whether administrators at Educare failed to "establish or carry out an appropriate individual program plan or treatment plan" for the child and whether this failure contributed to the alleged harm and risk of harm to the alleged victim.

Notable Gaps in Investigation Timeframe:

The investigation took one year and three months to be completed. The intake was received on September 30, 2021. An extension was approved on November 3, 2021, with a documented reason of "Law enforcement requests that an investigation be temporarily discontinued." There was no investigative activity from November 2021 to early March 2022 in compliance with law enforcement's request. Law enforcement permitted the investigation to resume in early March 2022. However, there was no PI investigative activity from April 2022 to January 2023. The record did not include any explanation for this second instance of inactivity and substantial delay in completing the investigation. The investigation was completed on January 24, 2023, approved on January 25, 2023, and closed on January 29, 2023.

## 24. **IMPACT Case ID:** 48856634

Summary of Key Allegations:

On October 10, 2021, Staff 3 reported an additional allegation of Neglect related to Child F and the allegations discussed in the above investigation (IMPACT ID: 48856634). Staff 3 reported that on the date of the intake report, between 11:00 a.m. and 12:00 p.m., the child ran away from the group home twice. The child allegedly ran to Individual 1 on both instances. After the first runaway

episode on that date, law enforcement located the child with Individual 1 in his vehicle. Due to these incidents, the group home placed the child on one-to-one supervision.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation of the child by an unnamed staff member. Due to substantial investigative deficiencies, a disposition of the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

PI investigators appear to have conducted this and the above investigation (IMPACT ID: 48842983) together; interviews with most key individuals were jointly used by both investigations. As a result, the investigative flaws detailed for the above investigation apply to this investigation. In addition to the investigative deficiencies described in the above summary, the current investigation contains the following additional deficiencies:

- During interviews with staff members and the child, the investigator did not adequately explore staff members' supervision of the child on October 10, 2021 when she ran away twice to meet Individual 1. In her interview, the child stated that she exited the group home from her bedroom window when staff members were attending to other residents. The question of supervision is highly relevant to this investigation because these runaway incidents occurred after the group home administrators and staff members were clearly aware of Individual 1's involvement with, and alleged sexual assault of, the child.

- Given the significant risk posed to the child by Individual 1, the investigator should have explored whether the group home administration's failure to immediately increase the child's supervision level after they were informed of the criminal investigation involving Individual 1 and the child had disclosed sexual contact by Individual 1 in September 2021 constituted Neglect. According to the investigative record, following these incidents reported on October 10, 2021, the group home increased the child's supervision from "routine" to one-to-one supervision.

Notable Gaps in Investigation Timeframe:

The investigation took one year and three months to be completed. The intake was received on October 10, 2021. An extension was approved on November 12, 2021, with a documented reason of "Extraordinary Circumstances." The investigation was delayed without activity from October 2021 to mid-March 2022 and again from April 2022 to January 23, 2023. Presumably, the initial delay through mid-March 2022 was related to law enforcement's request that the above, related investigation be temporarily discontinued. However, the investigation then sat dormant and was not completed until January 24, 2023, approved on January 24, 2023, and closed on January 29, 2023.

According to the child's record in IMPACT, DFPS removed the child from Educare on October 28, 2021 "due to concerns with the placement and services not received in the home."

## 25. IMPACT Case ID: 49512218

Summary of Key Allegations:

On February 7, 2023, a 2INgage case manager reported allegations of Neglect of Child F, who was included in the above investigations. At the time of this intake, Child F was no longer placed at Educare, the group home subject to the above investigations; Child F was now placed at Ability Options, LLC, an HCS Group Home. The reporter stated that staff members at Ability Options failed to secure medical care for the child when she had a urinary tract infection (UTI). Due to an absence of timely medical care, the child reported that she experienced pain when using the bathroom. According to the reporter, the child requested that a staff member at the placement take her to the doctor, as did the caseworker, but no one did so. As a result, a caseworker took the child to the doctor where she was prescribed medication to treat the UTI. Reportedly, no one at the placement provided the child with the prescribed medication needed to treat the UTI following the doctor appointment.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation of the child by a named and unnamed staff member. Due to substantial investigative deficiencies, the disposition of the Neglect allegation cannot be determined, and the assigned disposition of Unconfirmed is inappropriate.

Monitors' Review:

The investigator failed to adequately investigate a new allegation of Neglect that emerged during the investigation. The child's caseworker and the child reported that approximately three months prior to the start of this investigation, the child reported concerns related to her vaginal area to a staff member at the placement and to her caseworker, and no one at the HCS Group Home secured the child a medical appointment in response to her concern. The caseworker and the child further stated that, as a result, there was a delay in seeking medical treatment until the caseworker eventually resolved the issue. During interviews, staff members and a different caseworker reported to the investigator that, on the contrary, someone at the placement secured a medical appointment for the child in a timely manner three months prior and during the appointment, the child received a urinalysis and a birth control shot. Prior to entering a disposition of Unconfirmed, the investigator did not resolve the discrepancy of whether anyone at the home secured the child a medical appointment. While the investigator requested that the placement provide the child's medical records, it appears the placement did not comply with this request as the investigative record does not confirm it. There is no evidence that the child received medical care at the time she requested it.[86]

Notable Gaps in Investigation Timeframe:

None. The intake was received on February 7, 2023. The investigation was completed on February 23, 2023, approved on February 24, 2023, and closed on February 24, 2023.

---

[86] At the time of the monitoring team's review of the investigation, the child had exited DFPS care. As such, the monitoring team was unable to access the child's Star Health Passport to review the child's log of medical appointments while in DFPS's care.

**Child H, age 16, IQ of 40**

**26. IMPACT Case ID:** 49372520

Summary of Key Allegations:

On October 19, 2022, school personnel reported the following allegations of Neglect related to a child (age 16) placed at another Educare HCS Group Home.

- For the first two months of school, the Educare HCS Group Home did not pick up the child from school on time. Staff members from the home reportedly did not arrive at the school until approximately 5:30 p.m., despite the school allegedly conducting several face-to-face conversations with staff members regarding an appropriate pick-up time for the child.

- On Saturday, October 15, 2022, a school paraprofessional observed the child running alone along a roadside. After stopping the child, the school personnel observed that the child was wearing a diaper that was "saturated," had no shoes on and "seemed lost."

- For the month preceding the report, the child had been "extremely" tired at school. When school personnel asked the child about his fatigue, the child reported that his "mother has been giving him melatonin in the mornings."

- The child arrived at school appearing unbathed. School personnel also observed that the child was "constantly hungry and begging for food" from teachers and classmates.

One day after the initial report, on October 20, 2022, a DFPS staff member reported similar allegations of Neglect related to the child. The reporter stated that a named staff member at the Educare HCS Group Home provided the child with melatonin, a medication which was reportedly not on the child's list of prescribed medications. The reporter expressed concern that the melatonin caused the child to be "very groggy" at school. The reporter also stated that on October 15, 2022, the child ran away from the placement. The reporter stated that the child is "low functioning" and should not have been on a busy street alone. The reporter alleged that staff members at the home were not aware that the child had eloped for at least 35 minutes and that the child "could have been seriously injured while unsupervised."

Assigned Priority and Disposition:

Following receipt of the two intake reports, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation of the child by two named staff members. Due to substantial investigative deficiencies, a disposition of the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

The investigator did not attempt to reconcile conflicting descriptions of the child's elopement from the facility as provided by the child and one of the staff members who was named as an alleged

63

perpetrator. During his interview, the child stated that the staff member was asleep at the time of the elopement. In contrast, the staff member reported that she was in a separate room attending to the hygiene needs of two other individuals living in the home. The investigator did not attempt to interview the other two individuals who may have been able to resolve this discrepancy. Similar to other investigations reviewed by the monitoring team, this investigative record raises questions regarding the safety of a common modality of staffing in HCS Group Homes: a single staff member with limited training and support charged with caring for and supervising three or more individuals (of various ages) who have reduced intellectual functioning, among other needs and vulnerabilities. Moreover, again, the investigator did not discuss or further explore whether the lack of ability to supervise the child was Neglect due to a failure "provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff" that resulted in or created risk of physical or emotional injury or death for this child.[87]

Next, the investigator did not determine the duration of time between when the child eloped from the placement and when the staff member determined that the child was no longer present in the home. In the second intake report, the reporter alleged that the staff member was unaware the child ran away for at least 35 minutes; however, delayed interviews with the on-duty staff member and an assisting staff manager suggest that they responded timely to the elopement. The investigator did not attempt to corroborate the staff members' accounts during interviews with school personnel. The investigator also did not attempt to interview the responding law enforcement officer who may have been able to provide information on the timeframe and whether the child was observed in a "saturated" diaper. Due to these deficiencies, the disposition of Unconfirmed to the allegation of Neglect is inappropriate.

Regarding the allegation that a staff member provided the child with unprescribed melatonin which resulted in the child experiencing drowsiness at school, the investigation was deficient. During his interview, the child confirmed his allegation and stated that a named staff member provided him with melatonin. The staff member denied the allegation and reported to the investigator that she adhered to the child's prescribed medication list; she stated that melatonin was not on the list and that a nurse's approval was necessary to provide a child with melatonin, which she did not have. The investigator did not interview any other residents to obtain information regarding whether a staff member provided the child or other residents melatonin. The investigative record also included the child's Medication Administration Record (MAR); the MAR showed that the child was prescribed multiple medications that listed a side effect of "drowsiness." The investigator did not attempt to interview the child's nurse or prescribing physician to understand the child's medication history, including any changes in the child's medications over the past month and to assess whether the child's currently prescribed medications may have caused his drowsiness. Due to these lapses in investigative practice, the investigator did not gather sufficient information to assign a disposition for the allegation of Neglect.

Notable Gaps in Investigation Timeframe:

The investigation took three months to be completed. The intake was received on October 19, 2022. An extension was approved on November 18, 2022, with a documented reason of "Need to interview AP and potential collateral witnesses." The investigation was delayed without activity

---

[87] *See* 26 TEX. ADMIN. CODE §711.719(b)(3).

from October 2022 to January 2023. The record did not include any explanation for the lack of investigative activity and substantial delay in completing the investigation. The investigation was completed on January 27, 2023, approved on January 27, 2023, and closed on March 29, 2023.

### Child I, age 16, IQ of 60

**27. IMPACT Case ID:** 49420343

Summary of Key Allegations:

On November 25, 2022, a staff member at Brenham State-Supported Living Center reported that a staff member was "observed to be asleep" during two-to-one nighttime supervision of a child (age 16).

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation of the child by Staff 1. Due to substantial investigative deficiencies, a disposition of the Neglect allegation cannot be determined, despite the investigator's assignment of a disposition of Unconfirmed.

Monitors' Review:

According to the investigative record, the child required two-to-one supervision, which was to be provided by Staff 1 and Staff 2. Despite their principal roles in the investigation, the investigator did not attempt to interview Staff 1 or Staff 2 to gather information regarding the allegation that Staff 1 fell asleep while responsible for the care of the child. As a result of this failure, the investigator failed to confirm another staff member's observation that Staff 1 was asleep, Staff 2 was "awake and alert" in the child's bedroom, the duration of time Staff 1 was asleep and whether Staff 2 had concerns related to Staff 1's supervision of the child. Due to these deficiencies, a disposition on the allegation of Neglect cannot be rendered.

Notable Gaps in Investigation Timeframe:

None. The intake was received on November 25, 2022. The investigation was completed on December 14, 2022, approved on December 14, 2022, and closed on February 16, 2023.

### Child J, age 17, IQ of 57

**28. IMPACT Case ID:** 49588244

Summary of Key Allegations:

On April 3, 2023, a DFPS staff member reported that a child (age 17) placed at Meridian Living Center, Inc., an HCS Group Home, was located by law enforcement in a Target store. The officer believed the child was experiencing homelessness.

Assigned Priority and Disposition:

Following receipt of the intake report, which SWI referred for a Priority Two investigation, PI initiated a Neglect investigation related to the child by a staff member. Due to substantial investigative deficiencies, a disposition regarding the Neglect allegation cannot be determined, and the assigned disposition of Unconfirmed is inappropriate.

Monitors' Review:

Due to a deficient investigation, the investigator did not establish whether the staff member adequately supervised the child prior to his elopement. The investigator did not document efforts to accommodate the child's limited speech and comprehension during her face-to-face interview with the child. The investigator documented that the child "presented with limited verbal ability" and his language was "difficult to understand." Based upon the record, and in similarity with other PI investigations, the investigator did not appear to contact the HCS Group Home or the child's caseworker prior to the interview to identify whether the child had speech and/or intellectual limitations that may require accommodation. As a result of these failures, the investigator did not appear to gather any information from the child related to the allegation or to the child's safety at the placement. Next, the investigator's questioning of the staff member did not adequately probe whether the staff member adequately supervised the child prior to the child eloping; for example, the investigator did not determine the child's proximity to the staff member. According to the staff member, at the time the child eloped, the staff member was grooming and bathing another resident. When the staff member completed this task, he could not locate the child in the home; he then called 911 and gathered the other residents into a car to search for the child.

It does not appear that one staff member would have been able to prevent this or other similar instances under the current staffing capacity in use at Meridian. The child's records documented that he has a history of "high risk behaviors," including frequently running away from placements and that, as a result, the child must be monitored "at all times." The investigative record raises questions regarding the Meridian's capacity to meet the child's supervisory needs to ensure his safety. Despite those objective facts in the record, the investigator did not discuss or further explore whether the allegations were due to a failure by Meridian to "provide a safe environment for [the child], including the failure to maintain adequate numbers of appropriately trained staff" that resulted in or created risk of physical or emotional injury or death for this child.[88] At the close of the investigation, the investigator documented that "It is recommended that [the child's] level of supervision be re-evaluated."

Additionally, as in all investigations conducted by PI, an investigator's assessment of Neglect for failure to provide a safe environment, including "failure to maintain adequate numbers of appropriately trained staff" is hampered by the fact that the investigators do not review the referral history of the group homes.

Notable Gaps in Investigation Timeframe:

None. The intake was received on April 3, 2023. The investigation was completed on April 21, 2023, approved on April 21, 2023, and closed on April 24, 2023.

---

[88] *See* 26 TEX. ADMIN. CODE §711.719(b)(3).

# Exhibit 2

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 16-40023

_____

M. D., by next friend Sarah R. Stukenberg; D. I., by next friend Nancy G. Pofahl; Z. H., by next friend Carla B. Morrison; S. A., by next friend Javier Solis; A. M., by next friend Jennifer Talley; J. S., by next friend Anna J. Ricker; K. E., by next friend John W. Cliff, Jr.; D. P., by next friend Karen J. Langsley; T. C., by next friend Paul Swacina,

        Plaintiffs - Appellees

v.

GREG ABBOTT, in his official capacity as Governor of the State of Texas; CHRIS TRAYLOR, in his official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas; JOHN J. SPECIA, JR., in his official capacity as Commissioner of the Department of Family and Protective Services of the State of Texas,

        Defendants - Appellants

_____

Appeal from the United States District Court for the
Southern District of Texas, Corpus Christi

_____

Before CLEMENT, ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM:

The only matter before us at this time is whether to grant a stay of the district court's order. This case is a class action filed under 42 U.S.C. § 1983 on behalf of foster children in the Texas foster care system (the "class

members") against various Texas state officials (the "State").  The district court concluded the State violated the class members' constitutional rights, and ordered injunctive relief.  The State appealed.  The district court denied the State's motion to stay pending appeal.  The State then filed a motion with this court that also sought a stay.  We construe narrowly the immediate injunctive relief ordered and DENY a stay.

## FACTS AND PROCEDURAL BACKGROUND

Among the allegations in the class members'[1] complaint is that the State violated their substantive due process rights by failing to keep them "reasonably safe from harm while in government custody" and denying them "the right to receive the most appropriate care, treatment, and services." Following a bench trial, the district court concluded that the State had violated the class members' constitutional rights.  *M.D. v. Abbott*, No. 2:11-CV-84, 2015 WL 9244873 (S.D. Tex. Dec. 17, 2015).  The district court said an overhaul of the foster care system's policies and procedures was required, and it identified goals that needed to be met.  *Id.* at *106–12.  A special master, appointed by the district court with input from the parties, is to make recommendations as to how to reach those goals.  *Id.* at *107–08.  Additionally, the district court mandated an immediate end to the "unsafe placement[]" of children, including ceasing assigning children to "foster group homes that lack 24-hour awake-night supervision."  *Id.* at *107.

The State now seeks a stay from this court under Federal Rule of

---

[1] The district court initially certified a class that included all children who were or would in the future be in Texas's foster care system.  On appeal, we vacated the certification.  *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 841–49 (5th Cir. 2012).  On remand, the district court recertified a general class (all children within the system) and two subclasses (children in foster care and children in foster group homes).

Appellate Procedure 8(a)(2).    Additionally, the class members filed an unopposed motion to seal records in Volume II of the Appendix, which would be consistent with the documents' sealed status in district court proceedings.

## DISCUSSION

We consider four factors when ruling on a motion to stay an injunction pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013). "A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* (quotation marks omitted). The applicant "bears the burden of showing that the circumstances justify an exercise of" our discretionary power to stay a case. *See Nken v. Holder*, 556 U.S. 418, 433–34 (2009).

Here, the class members argue that the breadth of the district court's injunction has not yet, except in one particular, been determined. A special master will be appointed to develop recommendations for implementing the goals outlined in the district court opinion. The district court then must accept those recommendations before any substantive changes to the foster care system are implemented. Based on the need for these future rulings by the district court, class members argue that the only injunctive relief ordered by the district court that is immediately appealable under 28 U.S.C. § 1292(a)(1) is the mandate to end "unsafe placements." An injunction must provide "explicit notice of the precise conduct that is outlawed." *See Alabama Nursing Home Ass'n v. Harris*, 617 F.2d 385, 387–88 (5th Cir. 1980); Fed. R. Civ. P. 65(d)(1)(C). Otherwise, it may be deemed impermissibly vague. *Harris*, 617

F.2d at 387–88.  Thus, we construe the district court's mandate narrowly, as the class members argue it should be construed, as only precluding placements in foster group homes that lack 24-hour supervision.

Because the prohibition on unsafe placements is the only portion of the order currently appealable, it is the only portion of the district court's order that we could stay.  *See Sierra Club v. Clifford*, 257 F.3d 444, 446 (5th Cir. 2001) (reviewing an order of reference after the district court had accepted the special master's recommendations)[2]; *see also* 9C ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2615 (3d ed.) (orders of reference to a special master, and procedural direction given to a special master during the course of a reference, are not immediately appealable).[3]

Having construed the injunction, we now consider whether it should be stayed.  The record is vast, but we find evidence supporting the grave problems arising from the lack of 24-hour supervision in foster group homes.  As to that claim only, we find that the State has not made a showing of a likelihood of success in overturning the injunction.  *See Griffith v. Johnston*, 899 F.2d 1427, 1439–40 (5th Cir. 1990) (recognizing the "special relationship" between the state and children under its care can trigger substantive due process concerns);

---

[2] In *Sierra*, we provided "that an aggrieved party may seek [immediate] review of an order of reference" with the district court's permission under 28 U.S.C. § 1292(b) or by petitioning for writ of mandamus, "but the party is not required to do so because such order . . . may be reviewed on appeal." 257 F.3d at 448.  Here, the district court did not certify the reference as appealable under Section 1292(b) and the State did not petition this court for writ of mandamus.

[3] Several other circuits have held the same.  *See, e.g., Bogard v. Wright*, 159 F.3d 1060, 1063 (7th Cir. 1998) ("The appointment of a special master . . . is deemed a procedural order . . . [that has] the form of an injunction [but is] . . . not classified as [an] injunction[] for purposes of section 1292(a)(1)."); *Jackson by Jackson v. Fort Stanton Hosp. & Training Sch.*, 964 F.2d 980, 988 (10th Cir. 1992) (recognizing that the preparation and submission of remedial plans are not appealable under Section 1292(a)(1), but the portion of the order that clearly contains injunctive relief is appealable); *Apex Fountain Sales, Inc. v. Kleinfeld*, 818 F.2d 1089, 1096 n.6 (3d Cir. 1987) (noting that an appeal of a special master's appointment "may . . . ripen[] with the entry of the district court's final order, thereby providing [the court] with jurisdiction"); *Thompson v. Enomoto*, 815 F.2d 1323, 1326–27 (9th Cir. 1987) (appointment of a master pursuant to an original consent decree does not have the practical effect of granting or denying an injunction).

*Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880–81 (5th Cir. 2004) (discussing the government's obligation to provide its juvenile wards "personal security and reasonably safe living conditions"). We in no way bind a subsequent merits panel with respect to this conclusion.

As to the balance of harms, the State rests its argument primarily on supposed irreparable harm resulting from being ordered to pay for the special master's work. The State argues that if the district court's appointment of a master is later set aside, it will not be able to recoup those costs. Financial harm, though, is outweighed by the harm to the class members and public interest if we stay the case. A stay would allow the State to continue to make apparently dangerous placements in foster group homes that lack 24-hour supervision. We agree with other circuits that "where the value of the constitutional rights to be protected far outweigh[] administrative costs that might be incurred in formulating a remedy, the lower court proceedings . . . should continue." *See Reed v. Rhodes*, 549 F.2d 1050, 1052 (6th Cir. 1976) (considering a stay in school desegregation case).

The State also argues that the injunction impairs its ability to carry out its policies, including placing siblings in the same foster group home. The class members correctly note that the State can still place children in the same group home provided that home has 24-hour supervision.

The public interest also supports allowing the special master to proceed. Because the safety and rights of vulnerable children are at stake, and the immediate injunctive relief ordered is concentrated on a single, narrow mandate, the *Planned Parenthood* factors weigh in favor of denying a stay.

IT IS ORDERED that the State's motion to stay pending appeal is DENIED. IT IS FURTHER ORDERED that the class members' unopposed motion to place Volume II of the Appendix under seal is GRANTED.